## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALLAN ROBERTS,** | ) |
| | ) |
| **BETHAN JOHNSON,** | ) |
| | ) |
| **C.D.R., by his Father and Next Friend, ALLAN** | ) |
| **ROBERTS,** | ) |
| | ) |
| **JACO BOTES,** | ) |
| | ) |
| **NATASHA GROVE,** | ) |
| | ) |
| **STEVEN CROWLEY,** | ) |
| | ) |
| **O.J.C., by her Father and Next Friend, STEVEN** | ) |
| **CROWLEY,** | ) |
| | ) |
| **L.A.C., by her Father and Next Friend, STEVEN** | ) |
| **CROWLEY,** | ) **Case No. 1:20cv1227** |
| | ) |
| **SARAH CROWLEY,** | ) |
| | ) |
| **MICHAEL CROWLEY,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **PATRICIA CROWLEY,** | ) |
| | ) |
| **JOHN JAMESON,** | ) |
| | ) |
| **KRISTIN JAMESON,** | ) |
| | ) |
| **EDITH NICHOL,** | ) |
| | ) |
| **THOMAS JAMESON,** | ) |
| | ) |
| **ABDUL GHAFFAR MUGHAL,** | ) |
| | ) |
| **SITORAI KHASANZOD,** | ) |
| | ) |
| **KHALID MUGHAL,** | ) |
| | ) |
| **HAMID MUGHAL,** | ) |
| | ) |
| **ANGELA MUGHAL,** | ) |
| | ) |

**N.M., by her Father and Next Friend, ABDUL GHAFFAR MUGHAL,**                              )
                                                                                            )
                                                                                            )
**M.M., by his Father and Next Friend, ABDUL GHAFFAR MUGHAL,**                              )
                                                                                            )
                                                                                            )
**GEORGE RIEKERT,**                                                                         )
                                                                                            )
**SIMONÈ RIEKERT,**                                                                         )
                                                                                            )
**M.R., by her Father and Next Friend, GEORGE RIEKERT,**                                    )
                                                                                            )
                                                                                            )
**SIMON RIEKERT,**                                                                          )
                                                                                            )
**CHRISTIAAN OOSTHUIZEN,**                                                                  )
                                                                                            )
**WILHELMINA OOSTHUIZEN,**                                                                  )
                                                                                            )
**CHANTE OOSTHUIZEN,**                                                                      )
                                                                                            )
**SHIBONE DE BRUYN,**                                                                       )
                                                                                            )
**SHAUN OOSTHUIZEN,**                                                                       )
                                                                                            )
**MAGDALENA OOSTHUIZEN,**                                                                   )
                                                                                            )
**GEORGE KIESER,**                                                                          )
                                                                                            )
**MAGGIE KIESER,**                                                                          )
                                                                                            )
**EMOGENE BOJE,**                                                                           )
                                                                                            )
**SONE SMITH,**                                                                             )
                                                                                            )
**GAVIN SMITH,**                                                                            )
                                                                                            )
**JOHANNES KIESER,**                                                                        )
                                                                                            )
**HESTER HART,**                                                                            )
                                                                                            )
**ARNOLDUS KIESER,**                                                                        )
                                                                                            )
**JOHANN STEENBERG,**                                                                       )
                                                                                            )
**LORAINE STEENBERG,**                                                                      )

**RENÉ BOTHA,**                            )
                                           )
**JENÉ STEENBERG MARAIS,**                 )
                                           )
**DESERÉ STEENBERG,**                      )
                                           )
**ESTELLE BRINK,**                         )
                                           )
**LEON BOTHA,**                            )
                                           )
**BRENDON BOTHA,**                         )
                                           )
**LEANELLE BOTHA,**                        )
                                           )
**DEAN CAPAZORIO,**                        )
                                           )
**JANET CAPAZORIO,**                       )
                                           )
**BRANDON CAPAZORIO,**                     )
                                           )
**SHANNON FIGG,**                          )
                                           )
**GEORGE CAPAZORIO,**                      )
                                           )
**MAUD CAPAZORIO,**                        )
                                           )
**BETTINA CAPAZORIO,**                     )
                                           )
**CARIN CAPAZORIO,**                       )
                                           )
**PIERRE DU PLESSIS,**                     )
                                           )
**SAREL DU PLESSIS,**                      )
                                           )
**SUSAN DE CLERCQ,**                       )
                                           )
**SCHALK BRUWER,**                         )
                                           )
**ROZELLE ADAMS,**                         )
                                           )
**and**                                    )
                                           )
**MORNE BRUWER,**                          )
                                           )
**Plaintiffs,**                            )

|                                                    |     |
|----------------------------------------------------|-----|
|                                                    | )   |
| **v.**                                             | )   |
|                                                    | )   |
| **ISLAMIC REPUBLIC OF IRAN**                       | )   |
| **Serve:**   **Foreign Minister Mohammed Zarif**   | )   |
| **Ministry of Foreign Affairs**                    | )   |
| **Khomeini Avenue**                                | )   |
| **United Nations Street**                          | )   |
| **Tehran, Iran**                                   | )   |
|                                                    | )   |
| **Defendant.**                                     | )   |

## COMPLAINT

NOW COME the Plaintiffs, ALLAN ROBERTS, individually and as the natural guardian of C.D.R., BETHAN JOHNSON, JACO BOTES, NATASHA GROVE, STEVEN CROWLEY, individually and as the natural guardian of O.J.C. and L.A.C., SARAH CROWLEY, MICHAEL CROWLEY, PATRICIA CROWLEY, JOHN JAMESON, KRISTIN JAMESON, EDITH NICHOL, THOMAS JAMESON, ABDUL GHAFFAR MUGHAL, individually and as the natural guardian of N.M. and M.M., SITORAI KHASANZOD, KHALID MUGHAL, HAMID MUGHAL, ANGELA MUGHAL, GEORGE RIEKERT, individually and as the natural guardian of M.R., SIMONÈ RIEKERT, SIMON RIEKERT, CHRISTIAAN OOSTHUIZEN, WILHELMINA OOSTHUIZEN, CHANTE OOSTHUIZEN, SHIBONE DE BRUYN, SHAUN OOSTHUIZEN, MAGDALENA OOSTHUIZEN, GEORGE KIESER, MAGGIE KIESER, EMOGENE BOJE, SONE SMITH, GAVIN SMITH, JOHANNES KIESER, HESTER HART, ARNOLDUS KIESER, JOHANN STEENBERG, LORAINE STEENBERG, RENÉ BOTHA, JENÉ STEENBERG MARAIS, DESERÉ STEENBERG, ESTELLE BRINK, LEON BOTHA, BRENDON BOTHA, LEANELLE BOTHA, DEAN CAPAZORIO, JANET CAPAZORIO, BRANDON CAPAZORIO, SHANNON FIGG, GEORGE CAPAZORIO, MAUD CAPAZORIO, BETTINA CAPAZORIO, CARIN CAPAZORIO, PIERRE DU PLESSIS,

SAREL DU PLESSIS, SUSAN DE CLERCQ, SCHALK BRUWER, ROZELLE ADAMS, and MORNE BRUWER (collectively referred to herein as "Plaintiffs"), by counsel, and file this Complaint against Defendant, the Islamic Republic of Iran ("Iran"). This case arises out of terrorist attacks targeting American interests in the Republic of Iraq ("Iraq") between 2004 and 2011. Each attack was enabled by Iran's manufacture and widespread distribution of explosively formed penetrators ("EFPs") in Iraq. In support of their claim, Plaintiffs state as follows:

## I.      THE PARTIES

1.      Plaintiff Allan Roberts is a victim of a March 16, 2010 EFP attack.

2.      Bethan Johnson is the fiancée of Allan Roberts. On March 16, 2010, she was the functional equivalent of a spouse to Allan Roberts.

3.      C.D.R. is the son of Allan Roberts and was born prior to March 16, 2010.

4.      Jaco Botes is a victim of a May 16, 2005 EFP attack.

5.      Natasha Grove is the daughter of Jaco Botes.

6.      Steven Crowley is a victim of a March 16, 2010 EFP attack.

7.      O.J.C. is the daughter of Steven Crowley.

8.      L.A.C. is the daughter of Steven Crowley.

9.      Sarah Crowley is the sister of Steven Crowley.

10.     Michael Crowley is the father of Steven Crowley.

11.     Patricia Crowley is the mother of Steven Crowley.

12.     John Jameson is a victim of a March 16, 2010 EFP attack.

13.     Kristin Jameson is the wife of John Jameson.

14.     Edith Nichol is the mother of John Jameson.

15.     Thomas Jameson is the father of John Jameson.

16.     Abdul Ghaffar Mughal is a victim of a June 23, 2011 EFP attack.

17.     Sitorai Khasanzod is the wife of Abdul Ghaffar Mughal.

18.     Khalid Mughal is the son of Abdul Ghaffar Mughal.

19.     Hamid Mughal is the son of Abdul Ghaffar Mughal.

20.     Angela Mughal is the daughter of Abdul Ghaffar Mughal.

21.     N.M. is the daughter of Abdul Ghaffar Mughal.

22.     M.M. is the son of Abdul Ghaffar Mughal.

23.     George Riekert is a victim of a June 23, 2011 EFP attack.

24.     Simonè Riekert is the daughter of George Riekert.

25.     M.R. is the daughter of George Riekert.

26.     Simon Riekert is the father of George Riekert.

27.     Christiaan Oosthuizen is a victim of a June 15, 2006 EFP attack.

28.     Wilhelmina Oosthuizen is the wife of Christiaan Oosthuizen.

29.     Chante Oosthuizen is the daughter of Christiaan Oosthuizen.

30.     Shibone de Bruyn is the daughter of Christiaan Oosthuizen.

31.     Shaun Oosthuizen is the son of Christiaan Oosthuizen.

32.     Magdalena Oosthuizen is the mother of Christiaan Oosthuizen.

33.     George Kieser is a victim of a January 4, 2006 EFP attack.

34.     Maggie Kieser is the wife of George Kieser.

35.     Emogene Boje is the daughter of George Kieser.

36.     Sone Smith is the step-daughter of George Kieser. On January 4, 2006, she was
the functional equivalent of a naturally born child to George Kieser.

37.     Gavin Smith is the step-son of George Kieser. On January 4, 2006, he was the functional equivalent of a naturally born child to George Kieser.

38.     Johannes Kieser is the brother of George Kieser.

39.     Hester Hart is the sister of George Kieser.

40.     Arnoldus Kieser is the brother of George Kieser.

41.     Johann Steenberg is a victim of a May 16, 2005 EFP attack.

42.     Loraine Steenberg is the wife of Johann Steenberg.

43.     René Botha is the daughter of Johann Steenberg and the wife of Leon Botha.

44.     Jené Steenberg Marais is the daughter of Johann Steenberg.

45.     Deseré Steenberg is the daughter of Johann Steenberg.

46.     Estelle Brink is the sister of Johann Steenberg.

47.     Leon Botha is a victim of a November 20, 2004 EFP attack.

48.     Brendon Botha is the son of Leon Botha.

49.     Leanelle Botha is the daughter of Leon Botha.

50.     Dean Capazorio is a victim of a January 2006 EFP attack.

51.     Janet Capazorio is the wife of Dean Capazorio.

52.     Brandon Capazorio is the son of Dean Capazorio.

53.     Shannon Figg is the step-son of Dean Capazorio. In January 2006, he was the functional equivalent of a naturally born child to Dean Capazorio.

54.     George Capazorio is the father of Dean Capazorio.

55.     Maud Capazorio is the mother of Dean Capazorio.

56.     Bettina Calder is the sister of Dean Capazorio.

57.     Carin Capazorio is the sister of Dean Capazorio.

58.    Pierre Du Plessis is a victim of a November 14, 2005 EFP attack.

59.    Sarel Du Plessis is the brother of Pierre Du Plessis.

60.    Susan De Clercq is the aunt of Pierre Du Plessis. On November 14, 2005, she was the functional equivalent of a parent to Pierre Du Plessis.

61.    Schalk Bruwer is a victim of a March 29, 2006 EFP attack.

62.    Rozelle Adams is the daughter of Schalk Bruwer.

63.    Morne Bruwer is the son of Schalk Bruwer.

64.    Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.    JURISDICTION AND VENUE

65.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

66.    Despite its status as a foreign state, Defendant is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due both to Iran's longstanding designation as a "State Sponsor of Terrorism" and to its specific provision of material support for the commission of the terrorist acts alleged within this Complaint.

67.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

68.    At the time of the attacks alleged herein, Allan Roberts, Steven Crowley, Jaco Botes, John Jameson, Abdul Ghaffar Mughal, George Riekert, Christiaan Oosthuizen, George Kieser, Johann Steenberg, Leon Botha, Dean Capazorio, Pierre Du Plessis, and Schalk Bruwer

(collectively, the "Victim Plaintiffs") were all either citizens of the United States of America or were performing a contract awarded by the United States Government and acting within the scope of that performance.

## III.    NATURE OF THE ACTION

69.    Following the overthrow of Saddam Hussein, Iran perceived the continued presence of United States personnel within Iraq as a threat. In response, Iran began a substantial covert effort to undermine American efforts in Iraq and increase the cost of those efforts, both financially and in terms of human lives, with the goal of ultimately forcing America's withdraw from the region. Iran primarily relied upon Iraq's various Shia militias to carry out the violent aspects of this plan. The most successful part of that strategy was Iran's manufacture and provision of EFPs to these militia groups. The detonation of Iranian-made EFPs in Iraq killed hundreds of American military personnel and civilian contractors, and wounded thousands more. Included among those many casualties were the Victim Plaintiffs.

70.    The provision of EFPs to Shia militias within Iraq was part of a broader conspiracy between Iran and its proxy forces, such as the Shia militias, to attack American interests throughout the Middle East with violent acts of terrorism.

71.    By knowingly and intentionally providing material support and resources, such as EFPs, for the express purpose of enabling and encouraging acts of terrorism, Iran is liable for the damages suffered by the Victim Plaintiffs and their family members, as a direct and proximate result of the various EFP attacks alleged herein.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Iran's Substantial & Pervasive Support for International Terrorism</u>

72.     Ever since the Iranian revolution in 1979, Iran has engaged in and provided material support towards acts of terrorism as an instrument of its foreign policy.

73.     Its primary means of providing this support is through long-term proxy relationships with militia groups, political parties, and terrorist organizations in various countries throughout the Middle East. Iran's widespread support for groups willing to commit acts of terrorism, such as Hezbollah, is well-documented, as is Iran's sponsorship of a wide variety of Shia militia groups in Iraq.

74.     On January 19, 1984, Iran was officially designated as a state sponsor of international terrorism under the Export Administration Act of 1979, 50 U.S.C. § 2405(j) and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b). That designation has persisted at all times relevant to this case.

75.     Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), a military force that operates in parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The IRGC also has a constitutional role as the defender of the Islamic Revolution.

76.     The Supreme Leader serves as commander in chief of the armed forces, appoints the head of each military branch, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time. The IRGC and its agencies are subsidiaries of Iran and act on behalf of Iran.

77.     The IRGC also owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

78.     On April 15, 2019, the IRGC was formally designated by the U.S. State Department as a Foreign Terrorist Organization.

79.     The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and deadly organizations in the world.

80.     The IRGC-QF provides funding and training for terrorism operations targeting American citizens, including support for groups like Hezbollah, and certain Shia militia groups in Iraq. These activities are known and sanctioned by Iran's Supreme Leader and are an official part of Iran's foreign policy.

81.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization." In October 2007, the IRGC-QF was designated as a Specially Designated Global Terrorist due to its provision of "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

82.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency with an annual budget of between $100 million and

$400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

      **B.**      **<u>Growing Conflict and Tension in Iraq</u>**

83.      The religion of Islam is primarily split between two sects, Shia and Sunni. Despite many similarities, key differences in doctrine, law, and theology between these sects have caused centuries of political and military conflict throughout the Middle East.

84.      Sunnis make up approximately eighty-seven to ninety-percent of Muslims worldwide.

85.      The nations of Egypt, Saudi Arabia, and Jordan, among others, are overwhelmingly populated by Sunni Muslims.

86.      Iran is overwhelmingly populated by Shia Muslims.

87.      Iraq, positioned between these two regions geographically, is comprised of a unique mix of approximately thirty-five percent Sunni and sixty-five percent Shia.

88.      On February 11, 1979, the Islamic Revolution in Iran succeeded in overthrowing the monarchy, providing Shia cleric Ayatollah Khomeini the opportunity to implement a Shia theocracy in Iran.

89.      Several months later, Saddam Hussein, a Sunni, became the leader of Iraq.

90.      Before long, tensions between these neighboring rulers boiled over and the Iran-Iraq War began in September 1980. This conflict endured until 1988.

91.      Under the rule of the Ayatollah, Iran sought to create a Shia revival throughout the Middle East region and implemented a foreign policy of supporting Shia militias, uprisings, and political organizations operating within its neighbors, including many inside Iraq.

92.     One example of these efforts was the Badr Brigade, which was formed in 1983 by Shia exiles from Iraq, with direct assistance and support from the IRGC. The Badr Brigade was supplied and trained by, and fought alongside, the IRGC throughout the Iran-Iraq War.

93.     After the Iran-Iraq War, the Badr Brigade continued to receive IRGC support for its ongoing efforts to oppose the rule of Saddam Hussein through various means, including the smuggling of people and weapons into Iraq from Iran. Until the Coalition invasion of Iraq in 2003, the Badr Brigade operated as Iran's surrogate in Iraq, a *de facto* arm of the IRGC-QF.

94.     Throughout this period, the IRGC, the IRGC-QF, and/or Hezbollah, an Iranian proxy acting on Iran's direction, trained the Badr Brigade and its leaders in insurgency and terrorist tactics, including the use of roadside explosives.

95.     On March 19, 2003, a coalition army, led primarily by the United States, invaded Iraq and ended the reign of Saddam Hussein. The invasion was largely complete within one month and attempts to rebuild and reconstruct the country began almost immediately.

96.     The Coalition Provisional Authority ("CPA"), a transitional government in Iraq, began operating in May 2003 with the goal of providing stable governance, promoting the development of a functional democracy, and reconstructing key infrastructure.

97.     The Iraqi Interim Government took over from the CPA on June 28, 2004, and was replaced by the Iraqi Transitional Government on May 3, 2005. The first permanent government began when Nouri al-Maliki took office as Prime Minister on May 20, 2006.

98.     During these transitional periods, various political parties and militia groups vied for power, influence, and control over the new government.

### C.      The Rise of Iranian-Sponsored Shia Militias in Iraq

99.     Iran, through the IRGC-QF and Hezbollah, has played a primary role in establishing, supporting, training, and supplying several violent Shia militia groups in Iraq for the express purposes of increasing its own political, cultural, and economic influence within Iraqi society and undermining American efforts in the region.

100.     In January 2007, Gen. Michael Hayden, director of the CIA, testified before Congress that "there's a clear line of evidence that points out the Iranians want to punish the United States, hurt the United States in Iraq, tied down the United States in Iraq, so that our other options in the region, against other activities the Iranians might have, would be limited."

101.     In 2010, the United States ambassador to Iraq, James Jeffrey, stated in an interview that Iranian-supported Shia militias and insurgent groups may have been responsible for up to one quarter of all United States combat casualties in Iraq.

102.     By supplying weaponry and training to proxy militia organizations such as the Badr Organization, Jaysh al-Mahdi, Promised Day Brigade, Asaib Al al-Haq, and Kata'ib Hezbollah (collectively, the "Proxy Militias"), Iran was able to consistently inflict lethal damage upon American forces without risking direct military confrontation.

103.     As summarized by the U.S. Army's own comprehensive report about the Iraq War, "the Iranian regime was content to fund, train and supply all parties willing to attack the U.S.-led coalition."

        i.      The Badr Organization

104.     The Badr Brigade, and its corresponding political wing, the Supreme Council for the Islamic Revolution in Iraq ("SCIRI"), publicly returned to Iraq after the fall of Saddam

Hussein. Because of their longstanding opposition to Saddam Hussein, both groups were welcomed as participants in a new and inclusive Iraqi government.

105.    In order to appear less militant in its approach, the SCIRI renamed the Badr Brigade as the Badr Organization of Reconstruction and Development ("Badr Organization") and later renamed itself as the Supreme Islamic Iraqi Council.

106.    During the early years of the CPA, Interim, and Transitional governments, the leaders of the SCIRI and the Badr Organization became increasingly involved in Iraq's developing political structure.

107.    As a result of this political involvement, the SCIRI was given control over Iraq's Ministry of Interior, the government agency responsible for policing activities and border enforcement. In April 2005, a former Badr Brigade commander was appointed to serve as the head of this agency.

108.    Despite its rise to public and political prominence in Iraq, the Badr Organization continued to receive guidance, training, weapons, and funding from Iran through the IRGC, the IRGC-QF, and/or Hezbollah.

109.    As early as July 2003, mere months after the invasion of Iraq, a Badr Corps commander received forty-million dollars from Iran for the express purpose of organizing the logistics network necessary to smuggle weapons to Shia militants. This commander, Abu Mustafa al-Sheibani, was instrumental in organizing the first EFP distribution networks.

> ii.    *Jaysh al-Mahdi*

110.    Muqtada al-Sadr is a prominent Iraqi Shia cleric. His father, Ayatollah Muhammad Sadiq al-Sadr, was an exalted Shia figure in Iraq who openly opposed Saddam Hussein's rule.

111.    Sadiq al-Sadr built a movement, the "Sadrist Movement," with the goal of restoring Shia Islam's relevance to the spiritual and sociopolitical needs of Iraqis.

112.    In 1991, after the United States expelled the Iraqi army from Kuwait, the Shia population revolted against Saddam Hussein, anticipating assistance from the United States which never materialized. Thereafter, Sadiq al-Sadr became overtly hostile to the United States.

113.    Sadiq al-Sadr and two of his sons were killed in 1999 and Muqtada al-Sadr assumed leadership over the Sadrist Movement. His popular appeal in the years that followed stemmed from his family name, Shia-based nationalism, and anti-American sentiment.

114.    Almost immediately after the Coalition's invasion of Iraq, in June 2003, Muqtada al-Sadr formed the Mahdi Army, also referred to as Jaysh al-Mahdi ("JAM"). JAM quickly became the largest Shia militia in Iraq. Iran, from the very beginning, recognized the opportunity to capitalize on this popular movement.

115.    Thousands of JAM fighters travelled to Lebanon for extensive training with Hezbollah operatives beginning in 2003. This relationship was encouraged and facilitated by Iran through the IRGC and IRGC-QF.

116.    On April 18, 2004, JAM initiated the first major armed confrontation against Coalition forces in Iraq by the Shia community.

117.    The U.S. State Department, in its April 27, 2005 Country Reports on Terrorism, stated that "Iran provided funding, safe transit, and arms to insurgent elements [within Iraq], including Muqtada al-Sadr's forces."

118.    The IRGC-QF also provided advisors in Iraq for JAM and its progeny in the construction, maintenance, and use of advanced weaponry.

119.    On November 10, 2005, two JAM members were taken into custody near the Iranian border and admitted to trafficking explosives from Iran.

120.    On November 28, 2006, a JAM commander met with Iranian officials at the Iraq/Iran border to pick up three shipments of rockets.

121.    In December of 2006, JAM planned to attack and kidnap United States soldiers who were travelling in Humvee convoys. The plan was to use improvised explosive devices and small arms fire to carry out the attacks. Any resulting captives were to be taken to Sadr City and held there to deter American raids. The person chosen to plan the operation, Shaykh Azhar al-Dulaimi ("Dulaimi"), was trained in Iran by Hezbollah, under the supervision of the IRGC-QF, about how to conduct precision military style kidnappings.

122.    In 2008, Iran provided JAM leaders and fighters with support and refuge in response to territorial gains by Coalition forces.

123.    On July 2, 2009, the Treasury Department issued a press release announcing that it had designated Abu Mahdi al-Muhandis under Executive Order 13438 as threatening the peace and stability of Iraq and its government.

124.    The Treasury Department press release further outlined JAM's terrorist activities and relationship with Iran through Abu Mahdi al-Muhandis, the release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces.
>
> . . .

In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad.

. . .

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

125.   Throughout the years, JAM also served as the parent organization for smaller and more radical groups with direct ties to Iran. These groups were identified by the American military as JAM "Special Groups."

### iii.   Promised Day Brigade

126.   In August of 2008, Muqtada al-Sadr purported to disband JAM and transform it into a non-violent organization with a focus on educational and social projects.

127.   However, in November of 2008, Muqtada al-Sadr created the Promised Day Brigade ("PDB") to continue the violent fight against what he perceived as occupying troops.

128.   PDB was also a "Special Group" as defined by the United States military due to its receipt of Iranian support. PDB was predominantly comprised of former JAM members. These individuals received training and weapons directly from Iran, both as members of JAM and under the umbrella of PDB.

129.     PDB took responsibility for at least fifty-two attacks against Americans. For example, on June 28, 2011, PDB issued a statement claiming responsibility for ten mortar and rocket attacks against United States military convoys in which United States officials confirmed that three soldiers were killed.

130.     From 2008 until 2011, Iran harbored Muqtada al-Sadr in Qom, Iran, allowing him to safely run JAM and PDB from within Iran's territory.

        *iv.     Asaib Al al-Haq*

131.     Asaib Al al-Haq ("AAH") was founded by Qais Khazali at the suggestion of, and with the direct support, knowledge, and guidance from, Ayatollah Khomeini and IRGC-QF commander Qasem Soleimani.

132.     Iran provided AAH with millions of dollars monthly and trained its fighters in modern urban warfare tactics. By 2006, "AAH was clearly the most powerful of what was called the Special Groups." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 63 (D.D.C. 2018).

133.     At Iran's direction, "Hezbollah created a unit whose sole purpose was to train Iraqi Shia militants, including AAH, to carry out attacks in Iraq directed at U.S. troops and others." *Fritz*, 320 F. Supp. 3d at 63 (internal quotation marks omitted).

134.     One such attack occurred in 2007, when AAH kidnapped and executed five American soldiers from the Provincial Joint Coordination Center in Karbala, Iraq. Based on a wide variety of compelling evidence, this Court found that "Iran assisted AAH in planning and executing the Karbala attack." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d at 72.

135.     On January 3, 2020, AAH was designated as a Foreign Terrorist Organization by the U.S. State Department for its use of "violence and terror to further the Iranian regime's efforts to undermine Iraqi sovereignty."

v.      *Kata'ib Hezbollah*

136.    Jamal Jaafar Ibrahimi, more commonly known as Abu Mahdi al-Muhandis, was a leader of the Badr Corps during the Iran-Iraq War. He left that role sometime after the Coalition invasion of Iraq and founded Kata'ib Hezbollah in approximately 2007 with direct assistance and support from Iran.

137.    Qasem Soleimani, the IRGC-QF commander, was a known personal advisor of Kata'ib Hezbollah and al-Muhandis. At Iran's direction, instructors from Lebanese Hezbollah were employed in training members of Kata'ib Hezbollah.

138.    Special Groups led by al-Muhandis, including Kata'ib Hezbollah, transported EFPs from Iran to Iraq for widespread distribution.

139.    In April 2008, al-Muhandis facilitated the transport of trucks containing, among other weapons, EFPs, from Iran into Baghdad.

140.    In August 2008, four hard drives were seized from a storage facility associated with Kata'ib Hezbollah. These drives contained approximately 1,200 videos of planning and executing attacks against American-led forces, including the use of EFPs.

141.     On July 2, 2009, Kata'ib Hezbollah was designated as a Foreign Terrorist Organization by the U.S. State Department.

**D.      Iran's EFP Proxy Campaign in Iraq**

142.    After the fall of Saddam, Iran's intentions in Iraq came into focus quickly for those on the ground. By May 2006, Lieutenant General Peter W. Chiarelli had already observed that "[t]he Government of Iran is pursuing a multi-faceted, interventionist policy in Iraq" and "the primary purpose of their activities is to ensure that Iraqi policy is determined by a relatively weak, pro-Iranian, Shia-dominated, Islamist government [and t]he secondary purpose is to either

accelerate the withdrawal of Coalition Forces or, perhaps, to keep us tied up here and 'bleed us white'."

143.    The most lethal weapon in this Iranian campaign was the EFP.

144.    Before the introduction of the EFP into Iraq, roadside bombs, often referred to generally as improvised explosive devices or IEDs, were largely ineffective against American armored vehicles, personnel carriers, and tanks.

145.    By contrast to the rudimentary nature of an IED, an EFP is a complex shaped-charge explosive that requires the careful milling of a concave copper plate. When the device detonates, this concave plate transforms into a molten copper slug travelling at several times the speed of sound. Based on this design, the slug from an EFP can penetrate the armor of almost all vehicles, even the technologically advanced M1 tank.

146.    This same basic EFP design was first used against the Israeli military by Lebanese Hizballah as early as 1998. When the first EFP detonations occurred in Iraq in 2004, they were immediately recognized as essentially the same weapon.

147.    Iran delivered large numbers of EFPs to the Proxy Militias through multiple Iraqi EFP networks by sponsoring training in Iran, Iraq, and Lebanon, and facilitating the movement of personnel and equipment between Iran and Iraq.

148.    In 2006, American troops intercepted a shipment of crates containing the copper plates needed to construct EFPs. The plates were already milled, ready for assembly, and the U.S. military discovered that each plate had been turned on the same lathe in Iran. In this same shipment, cellular phones were seized that had previously been shipped to Iran.

149.    Once set-up and activated, the detonation of an EFP could be triggered manually, or by a passive infrared laser, like what is commonly used to prevent injuries with garage doors.

Activation was either accomplished manually or via cellular signals. Later iterations of EFPs became more advanced, some even using the electronic signal jammers deployed by Coalition forces as the ultimate triggering mechanism. Iran's assistance was instrumental in refining the design of EFPs, and updating the training for those deploying them, in order to maintain the weapon's lethality despite sophisticated American countermeasures.

150.    In 2007, the State Department's Country Reports on Terrorism stated that:

> Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program.

151.    In the first half of 2007, at least ten Iranian helicopter incursions into Iraq were detected along known EFP smuggling routes. This supports the speculation of General Petraeus that "those routes are being reconnoitered to allow smugglers to avoid detection by border patrols and also to assess deployed Coalition Forces."

152.    In October 2007, 280 at least partially assembled EFPs and more than 300 pounds of plastic explosives were discovered by American troops in Iraq. This finding was particularly significant because the items bore January 2007 Iranian manufacturing labels.

153.    According to data released by the Pentagon, there were 1,534 EFP detonations impacting U.S. troops in Iraq between July 2005 and December 2011. These events led to the

deaths of 196 soldiers and the wounding of another 861. Not included in these numbers are attacks against civilian contractors, such as the Victim Plaintiffs in this case.

154.    In a similar case, this Court has found Iran responsible for the "overwhelming majority" of EFP attacks in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 28–30 (D.D.C. 2019) ("[a]t a minimum, the metal, the HE explosive, and some degree of EFP manufacturing have each been attributed to Iran").

E.    **The EFP Attacks**

155.    The Victim Plaintiffs were each targeted by at least one EFP attack while working in Iraq on contracts for the United States Government between 2004 and 2011. Moreover, many of the Victim Plaintiffs experienced trauma and emotional distress from other EFP attacks in which they had friends who were killed or severely wounded and/or were responsible for securing the scene of the blast and personally observed the casualties.

*i.    The November 20, 2004 EFP Attack*

156.    On November 20, 2004, a four-vehicle convoy and personal security detail was returning to the Baghdad Hotel after successfully completing its task.

157.    Plaintiff Leon Botha ("Botha") was the driver of the second vehicle, a level six armored vehicle designed to carry and protect high-value passengers.

158.    Shortly after crossing the Olympic Bridge, as the convoy was making a left turn in the direction of the hotel, an EFP detonated on the left side of the second vehicle, penetrating it with shrapnel (the "November 20, 2004 EFP Attack").

159.    Botha was hit in the face and neck with shrapnel. The right rear passenger of the second vehicle sustained a broken arm and the well gunner of the lead vehicle was severely injured and bleeding profusely. The second vehicle, which Botha was driving, was disabled by

the blast and had to be pushed out of immediate danger by one of the trail vehicles. The entire convoy was targeted with small arms fire until it exited the blast area.

160.    In the days following the attack, members of the convoy were briefed by American military personnel that the explosive used in the November 20, 2004 EFP Attack was an EFP.

161.    Among other medical concerns, Botha received multiple shrapnel wounds in his face and neck as a result of this incident.

ii.    *The May 16, 2005 EFP Attack*

162.    On May 16, 2005, a four-vehicle convoy was en-route from Al Kut to Rustimaniya, Iraq. The convoy was serving as a personal security detail.

163.    Plaintiff Jaco Botes ("Botes") was the commander of the lead vehicle, an up-armored Chevrolet Suburban. Plaintiff Johann Steenberg ("Steenberg") was the commander of the third vehicle.

164.    At approximately 6:35pm local time, an EFP detonated four feet from the left side of the lead vehicle causing it to immediately burst into flames (the "May 16, 2005 EFP Attack").

165.    Botes temporarily lost consciousness after the blast but recovered consciousness in time to jump from the burning vehicle, only to be shot three times in the back. Although protected by his body armor, he was spun into the path of the two trailing vehicles and nearly run over.

166.    The driver and right rear passenger of the lead vehicle were killed instantly. The well gunner was badly injured and placed in one of the other vehicles for safety. The left rear passenger was decapitated by the initial blast and his body was trapped within the vehicle. Steenberg oversaw the efforts to extract the casualties and secure the scene until backup arrived.

167.     Botes participated in securing the area surrounding the convoy and remained on the scene until an emergency response team arrived.

168.     Steenberg and Botes personally witnessed the extensive injuries suffered by their teammates, including the decapitation of the left rear passenger.

169.     Among other medical concerns, Botes received multiple shrapnel wounds in his left leg, left arm, and neck, as well as bruising to the left side of his face. He also sustained a burst eardrum.

*iii.     The November 14, 2005 EFP Attack*

170.     On November 14, 2005, a four-vehicle personal security convoy was en-route to the Ministry of Judges on Haifa Street in Baghdad.

171.     Plaintiff Pierre Du Plessis ("Du Plessis") was the driver of the lead vehicle.

172.     As the convoy was passing the Iranian Embassy, an EFP detonated directly into the follow vehicle, causing it to immediately burst into flames (the "November 14, 2005 EFP Attack").

173.     Du Plessis immediately stopped his vehicle in order to render assistance to the occupants of the disabled vehicle.

174.     Four people died as result of injuries from the November 14, 2005 EFP Attack. The driver was killed instantly from a shrapnel wound to his head. The front passenger, a close friend of Du Plessis, died quickly. The third, also a close friend of Du Plessis, exited the vehicle with his body in flames. Du Plessis attempted to extinguish the fire, but his efforts were ineffectual. This man died three days later after suffering extensive third-degree burns. A fourth man, an Iraqi national, also died several days later.

175.    Steenberg and Botha were members of the security and response team that arrived on the scene approximately three minutes after the November 14, 2005 EFP Attack. Steenberg took primary responsibility for extracting casualties from the damaged vehicle. Botha participated in establishing security for the surrounding area, while also assisting with cleaning up the remains of the deceased victims.

176.    Du Plessis, Steenberg, and Botha personally witnessed the extensive injuries suffered by their teammates during their efforts to provide rescue and support.

177.    Later, Botha was informed by American military personnel that the attack was confirmed as an EFP incident due to the presence of copper residue at the scene. It was also reported that it was suspected this attack was orchestrated by Iranian embassy staff.

    iv.    *The January 4, 2006 EFP Attack*

178.    On January 4, 2006, a personal security detail convoy was returning from Rusafa Correctional Facility to the Al Sadeer Hotel after having safely delivered its clients.

179.    Plaintiff George Kieser ("Kieser") was the left rear shooter of the lead vehicle.

180.    As the four-vehicle convoy approached the Olympic Bridge, an EFP detonated and disabled the third vehicle (the "January 4, 2006 EFP Attack").

181.    Kieser and the rest of his team quickly returned to the scene of the explosion and were instructed to form a 360-degree perimeter protecting the disabled vehicle and injured personnel. Kieser was directed to take up a position at the rear of the convoy.

182.    On route to his position, Kieser stopped to investigate a suspicious vehicle. As he reached it, a secondary explosion occurred nearby, in the exact position where he had been instructed to go. This explosion threw Kieser approximately forty feet away and knocked him unconscious. He woke up shortly thereafter with a loud ringing in his ears.

183.    Among other medical concerns, Kieser suffered hearing loss and a knee injury from this incident.

    v.    *The January 2006 EFP Attack*

184.    In January 2006, a four-vehicle convoy was en-route to the Baghdad Hotel. The convoy was serving as a personal security detail.

185.    Plaintiff Dean Capazorio ("Capazorio") was the well gunner of the fourth vehicle.

186.    As the convoy turned onto River Road in Baghdad, an EFP detonated and disabled the first limo, causing extensive damage (the "January 2006 EFP Attack").

187.    Slowed by the explosion, the convoy immediately came under small arms fire. As the well gunner, Capazorio returned fire as the convoy attempted to exit the area.

188.    The individual being escorted by the convoy sustained a serious leg injury and had to be transported for immediate medical treatment.

189.    After the incident, it was confirmed to Capazorio by his superiors, based on information from the American military, that the explosive device involved was an EFP.

190.    Among other medical concerns, Capazorio suffered hearing loss from this incident.

    vi.    *The March 29, 2006 EFP Attack*

191.    On March 29, 2006, a personal security detail convoy was traveling from the International Zone to the Baghdad Police Academy.

192.    Schalk Bruwer ("Bruwer") was the driver of the lead vehicle. Steenberg was the driver of the second limo. Botha was the shooter of the follow vehicle, the last in the convoy.

193.    The convoy had to drive through a tunnel on its route and sent two scout vehicles ahead to confirm the tunnel was clear. After confirmation was received, the remaining four

vehicles proceeded through the tunnel. Approximately halfway through the tunnel, an EFP detonated, disabling the lead vehicle (the "March 29, 2006 EFP Attack").

194.    Immediately after the explosion, Bruwer realized his left arm was bleeding and that his front passenger was slumped forward unconscious. Bruwer used his right arm to hold his passenger back against the seat, while attempting to steer with his left. He quickly discovered that the vehicle controls were completely unresponsive.

195.    Steenberg proceeded to use his vehicle to execute a "push out" maneuver, propelling the disabled lead vehicle out of the tunnel.

196.    After exiting the tunnel, flames started to engulf the lead vehicle. Bruwer exited the vehicle while Steenberg began futile attempts to douse the flames. Steenberg successfully extracted the front passenger through the driver's side door and carried him to the medic for emergency treatment of severe shrapnel wounds.

197.    Shortly after the explosion, Capazorio arrived as part of the emergency response and security team. Botha and Capazorio participated in securing the 360-degree perimeter and ensuring the safe evacuation of injured personnel.

198.    Bruwer, Steenberg, Botha, and Capazorio personally witnessed the extensive injuries suffered by their teammates.

199.    It was later determined that this attack was caused by an EFP that was disguised to look like a portion of the curb so that it would go undetected by the scout vehicles to ensure maximum damage to "high priority" targets such as American military contractors.

200.    Among other medical concerns arising from this incident, Bruwer suffered shrapnel wounds to his left arm and Steenberg suffered a knee injury.

### vii.   The June 15, 2006 EFP Attack

201.    On June 15, 2006, a personal security detail convoy was returning from the Baghdad Police Academy after having completed its mission.

202.    Plaintiff Christiaan Oosthuzien ("Oosthuzien") was the left shooter of the lead vehicle.

203.    As the convoy approached the Olympic Bridge, Oosthuzien noticed that Iraqi police had stopped all nearby traffic. Moments later, an EFP detonated approximately four to six feet from the right side of the lead vehicle (the "June 15, 2006 EFP Attack").

204.    The armored vehicle was penetrated by the EFP shell and shrapnel filled the vehicle causing injuries to each occupant.

205.    Among other medical concerns, Oosthuzien received multiple shrapnel wounds to the face and neck, hearing loss, and a concussion. Once the scene was secured, he was airlifted for immediate medical treatment.

### viii.   The March 16, 2010 EFP Attack

206.    On March 16, 2010, a four-vehicle convoy was traveling from Camp Taji to Camp Victory in Baghdad, Iraq.

207.    Plaintiffs Steven Crowley ("Crowley"), John Jameson ("Jameson"), and Allan Roberts ("Roberts") were in the fourth vehicle, an armored Land Cruiser.

208.    At that time, Crowley, Jameson, and Roberts were working for Aegis as members of a personal security detail for personnel working with the U.S. Army Corps of Engineers.

209.    Crowley, the vehicle commander, was seated in the front passenger seat. Roberts was driving, and Jameson was standing in a gun turret at the rear of the vehicle.

210.     The convoy slowed slightly as it approached an unmanned Iraqi Police checkpoint and an EFP detonated two feet from the driver's side door (the "March 16, 2010 EFP Attack"). The weapon's main projectile pierced the vehicle's armor, through the driver's door.

211.     Among other medical concerns, Roberts experienced an immediate traumatic amputation of his left leg. His right leg was severely wounded and eventually required a below-the-knee amputation.

212.     Among other medical concerns, Crowley's left leg was partially amputated by the explosion, resulting in a below-the-knee amputation.

213.     Among other medical concerns, Jameson suffered injuries to his knees, hips, back, neck, and shoulders. Jameson was hit in the head by shrapnel, endured a burst eardrum, and a traumatic brain injury.

### ix.     The June 23, 2011 EFP Attack

214.     On June 23, 2011, a three-vehicle convoy was returning from the campus of Mustansiriya University in Baghdad, Iraq to the Mansour Compound.

215.     Plaintiffs Abdul Ghaffar Mughal ("Mughal") and George Riekert ("Riekert") were in the second vehicle, an armored limousine.

216.     Riekert was an employee of Sallyport Global Services, working as the team leader of a personal security detail. Mughal was working as a civilian contractor with the Iraq Financial Development Project of USAID and had travelled to Mustansiriya University in order to advise the academic leadership on obtaining accreditation for its business school.

217.     At approximately 12:43pm local time, an EFP detonated just outside the left rear window of the limousine, breaching the vehicle's armor, and causing extensive damage (the "June 23, 2011 EFP Attack"). The passenger seated behind the driver was killed instantly.

218.    Among other medical concerns, Mughal sustained a broken left hand, ruptured eardrums, and various shrapnel wounds.

219.    Among other medical concerns, Riekert injured his neck and back in the explosion and sustained multiple shrapnel injuries.

## V.    CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ALLAN ROBERTS
### (28 U.S.C. § 1605A(c))

220.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

221.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

222.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

223.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Allan Roberts, is an expected and welcomed result of those actions.

224.    Such conduct violates 28 U.S.C. § 1605A.

225.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

31

226.     The March 16, 2010 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

227.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Allan Roberts was injured in the March 16, 2010 EFP Attack.

228.     At the time of the March 16, 2010 EFP Attack, Allan Roberts was acting within the scope of his employment under a contract awarded by the United States Government.

229.     In addition to the March 16, 2010 EFP Attack, Allan Roberts was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Allan Roberts suffers from emotional and psychological trauma, including Post-Traumatic Stress Disorder ("PTSD").

230.     As a direct and proximate result of Iran's actions, Bethan Johnson and C.D.R. have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Allan Roberts' society and comfort.

231.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT II – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF JACO BOTES
#### (28 U.S.C. § 1605A(c))

232.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

233.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

234.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

235.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Jaco Botes, is an expected and welcomed result of those actions.

236.    Such conduct violates 28 U.S.C. § 1605A.

237.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

238.    The May 16, 2005 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

239.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Jaco Botes was injured in the May 16, 2005 EFP Attack.

240.    At the time of the May 16, 2005 EFP Attack, Jaco Botes was acting within the scope of his employment under a contract awarded by the United States Government.

241.    In addition to the May 16, 2005 EFP Attack, Jaco Botes was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Jaco Botes suffers from emotional and psychological trauma, including PTSD.

242.     As a direct and proximate result of Iran's actions, Natasha Grove has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Jaco Botes' society and comfort.

243.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT III – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF STEVEN CROWLEY
#### (28 U.S.C. § 1605A(c))

244.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

245.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

246.     Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

247.     As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Steven Crowley, is an expected and welcomed result of those actions.

248.     Such conduct violates 28 U.S.C. § 1605A.

249.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

250.    The March 16, 2010 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

251.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Steven Crowley was injured in the March 16, 2010 EFP Attack.

252.    At the time of the March 16, 2010 EFP Attack, Steven Crowley was acting within the scope of his employment under a contract awarded by the United States Government.

253.    In addition to the March 16, 2010 EFP Attack, Steven Crowley was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Steven Crowley suffers from emotional and psychological trauma, including PTSD.

254.    As a direct and proximate result of Iran's actions, O.J.C., L.A.C., Michael Crowley, Patricia Crowley, and Sarah Crowley have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Steven Crowley's society and comfort.

255.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

**COUNT IV – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF JOHN JAMESON**
**(28 U.S.C. § 1605A(c))**

256.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

257.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

258.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

259.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as John Jameson, is an expected and welcomed result of those actions.

260.    Such conduct violates 28 U.S.C. § 1605A.

261.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

262.    The March 16, 2010 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

263.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Jameson was injured in the March 16, 2010 EFP.

264.    At the time of the March 16, 2010 EFP Attack, John Jameson was acting within the scope of his employment under a contract awarded by the United States Government.

265.    In addition to the March 16, 2010 EFP Attack, John Jameson was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a

direct and proximate result of these traumatic experiences, John Jameson suffers from emotional and psychological trauma, including PTSD.

266.     As a direct and proximate result of Iran's actions, Kristin Jameson, Edith Nichol, and Thomas Jameson have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of John Jameson's society and comfort.

267.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT V – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ABDUL GHAFFAR MUGHAL
### (28 U.S.C. § 1605A(c))

268.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

269.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

270.     Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

271.     As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Abdul Ghaffar Mughal, is an expected and welcomed result of those actions.

272.     Such conduct violates 28 U.S.C. § 1605A.

273.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

274.    The June 23, 2011 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

275.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Abdul Ghaffar Mughal was injured in the June 23, 2011 EFP Attack.

276.    At the time of the June 23, 2011 EFP Attack, Abdul Ghaffar Mughal was acting within the scope of his employment under a contract awarded by the United States Government.

277.    In addition to the June 23, 2011 EFP Attack, Abdul Ghaffar Mughal was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Abdul Ghaffar Mughal suffers from emotional and psychological trauma, including PTSD.

278.    As a direct and proximate result of Iran's actions, Sitorai Khasanzod, Khalid Mughal, Hamid Mughal, Angela Mughal, N.M., and M.M. have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Abdul Ghaffar Mughal's society and comfort.

279.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VI – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF GEORGE RIEKERT
### (28 U.S.C. § 1605A(c))

280.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

281.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

282.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

283.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as George Riekert, is an expected and welcomed result of those actions.

284.    Such conduct violates 28 U.S.C. § 1605A.

285.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

286.    The June 23, 2011 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

287.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, George Riekert was injured in the June 23, 2011 EFP Attack.

288.     At the time of the June 23, 2011 EFP Attack, George Riekert was acting within the scope of his employment under a contract awarded by the United States Government.

289.     In addition to the June 23, 2011 EFP Attack, George Riekert was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, George Riekert suffers from emotional and psychological trauma, including PTSD.

290.     As a direct and proximate result of Iran's actions, Simonè Riekert, M.R., and Simon Riekert have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of George Riekert's society and comfort.

291.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VII – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF CHRISTIAAN OOSTHUIZEN
### (28 U.S.C. § 1605A(c))

292.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

293.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

294.     Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

295.     As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against

American contractors, such as Christiaan Oosthuizen, is an expected and welcomed result of those actions.

296.    Such conduct violates 28 U.S.C. § 1605A.

297.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

298.    The June 15, 2006 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

299.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Christiaan Oosthuizen was injured in the June 15, 2006 EFP Attack.

300.    At the time of the June 15, 2006 EFP Attack, Christiaan Oosthuizen was acting within the scope of his employment under a contract awarded by the United States Government.

301.    In addition to the June 15, 2006 EFP Attack, Christiaan Oosthuizen was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Christiaan Oosthuizen suffers from emotional and psychological trauma, including PTSD.

302.    As a direct and proximate result of Iran's actions, Wilhelmina Oosthuizen, Chante Oosthuizen, Shibone de Bruyn, Shaun Oosthuizen, and Magdalena Oosthuizen have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Christiaan Oosthuizen's society and comfort.

303.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VIII – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF GEORGE KIESER
### (28 U.S.C. § 1605A(c))

304.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

305.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

306.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

307.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as George Kieser, is an expected and welcomed result of those actions.

308.    Such conduct violates 28 U.S.C. § 1605A.

309.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

310.    The January 4, 2006 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

311.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, George Kieser was injured in the January 4, 2006 EFP Attack.

312.     At the time of the January 4, 2006 EFP Attack, George Kieser was acting within the scope of his employment under a contract awarded by the United States Government.

313.     In addition to the January 4, 2006 EFP Attack, George Kieser was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, George Kieser suffers from emotional and psychological trauma, including PTSD.

314.     As a direct and proximate result of Iran's actions, Maggie Kieser, Emogene Boje, Sone Smith, Gavin Smith, Johannes Kieser, Hester Hart, and Arnoldus Kieser have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of George Kieser's society and comfort.

315.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT IX – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF JOHANN STEENBERG
### (28 U.S.C. § 1605A(c))

316.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

317.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

318.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

319.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Johann Steenberg, is an expected and welcomed result of those actions.

320.    Such conduct violates 28 U.S.C. § 1605A.

321.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

322.    The May 16, 2005 EFP Attack, the November 14, 2005 EFP Attack, and the March 29, 2006 EFP Attack were unauthorized, illegal, and deliberate uses of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

323.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Johann Steenberg was injured in the May 16, 2005 EFP Attack, the November 14, 2005 EFP Attack, and the March 29, 2006 EFP Attack.

324.    At the time of the May 16, 2005 EFP Attack, the November 14, 2005 EFP Attack, and the March 29, 2006 EFP Attack, Johann Steenberg was acting within the scope of his employment under a contract awarded by the United States Government.

325.    In addition to the May 16, 2005 EFP Attack, the November 14, 2005 EFP Attack, and the March 29, 2006 EFP Attack, Johann Steenberg was also exposed to trauma and

emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Johann Steenberg suffers from emotional and psychological trauma, including PTSD.

326.    As a direct and proximate result of Iran's actions, Loraine Steenberg, René Botha, Jené Steenberg Marais, Deseré Steenberg, and Estelle Brink have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Johann Steenberg's society and comfort.

327.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT X – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF LEON BOTHA
### (28 U.S.C. § 1605A(c))

328.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

329.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

330.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

331.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Leon Botha, is an expected and welcomed result of those actions.

332.    Such conduct violates 28 U.S.C. § 1605A.

333.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

334.    The November 20, 2004 EFP Attack and the November 14, 2005 EFP Attack were unauthorized, illegal, and deliberate uses of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

335.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Leon Botha was injured in the November 20, 2004 EFP Attack and the November 14, 2005 EFP Attack.

336.    At the time of the November 20, 2004 EFP Attack and the November 14, 2005 EFP Attack, Leon Botha was acting within the scope of his employment under a contract awarded by the United States Government.

337.    In addition to the November 20, 2004 EFP Attack and the November 14, 2005 EFP Attack, Leon Botha was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Leon Botha suffers from emotional and psychological trauma, including PTSD.

338.    As a direct and proximate result of Iran's actions, René Botha, Brendon Botha, and Leanelle Botha have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Leon Botha's society and comfort.

339.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XI – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF DEAN CAPAZORIO
### (28 U.S.C. § 1605A(c))

340.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

341.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

342.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

343.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Dean Capazorio, is an expected and welcomed result of those actions.

344.    Such conduct violates 28 U.S.C. § 1605A.

345.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

346.    The January 2006 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

347.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Dean Capazorio was injured in the January 2006 EFP Attack.

348.    At the time of the January 2006 EFP Attack, Dean Capazorio was acting within the scope of his employment under a contract awarded by the United States Government.

349.    In addition to the January 2006 EFP Attack, Dean Capazorio was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Dean Capazorio suffers from emotional and psychological trauma, including PTSD.

350.    As a direct and proximate result of Iran's actions, Janet Capazorio, Brandon Capazorio, Shannon Figg, George Capazorio, Maud Capazorio, Bettina Calder, and Carin Capazorio have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Dean Capazorio's society and comfort.

351.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XII – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF PIERRE DU PLESSIS
### (28 U.S.C. § 1605A(c))

352.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

353.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

354.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

355.     As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Pierre Du Plessis, is an expected and welcomed result of those actions.

356.     Such conduct violates 28 U.S.C. § 1605A.

357.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

358.     The November 14, 2005 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

359.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Pierre Du Plessis was injured in the November 14, 2005 EFP Attack.

360.     At the time of the November 14, 2005 EFP Attack, Pierre Du Plessis was acting within the scope of his employment under a contract awarded by the United States Government.

361.     In addition to the November 14, 2005 EFP Attack, Pierre Du Plessis was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Pierre Du Plessis suffers from emotional and psychological trauma, including PTSD.

362.     As a direct and proximate result of Iran's actions, Sarel Du Plessis and Susan De Clercq have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Pierre Du Plessis' society and comfort.

363.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XIII – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF SCHALK BRUWER
### (28 U.S.C. § 1605A(c))

364.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

365.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

366.     Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

367.     As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Schalk Bruwer, is an expected and welcomed result of those actions.

368.     Such conduct violates 28 U.S.C. § 1605A.

369.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

370.     The March 29, 2006 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

371.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Schalk Bruwer was injured in the March 29, 2006 EFP Attack.

372.     At the time of the March 29, 2006 EFP Attack, Schalk Bruwer was acting within the scope of his employment under a contract awarded by the United States Government.

373.     In addition to the March 29, 2006 EFP Attack, Schalk Bruwer was also exposed to trauma and emotional distress from other EFP incidents during his time of service in Iraq. As a direct and proximate result of these traumatic experiences, Schalk Bruwer suffers from emotional and psychological trauma, including PTSD.

374.     As a direct and proximate result of Iran's actions, Rozelle Adams and Morne Bruwer have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Schalk Bruwer's society and comfort.

375.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XIV – INTENTIONAL INFLICTION OF
## EMOTIONAL DISTRESS AGAINST ALL FAMILY MEMBER PLAINTIFFS

376.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

377.     The Family Member Plaintiffs consist of Bethan Johnson, C.D.R., Natasha Grove, O.J.C., L.A.C., Sarah Crowley, Michael Crowley, Patricia Crowley, Kristin Jameson, Edith Nichol, Thomas Jameson, Sitorai Khasanzod, Khalid Mughal, Hamid Mughal, Angela Mughal, N.M., M.M., Simonè Riekert, M.R., Simon Riekert, Wilhelmina Oosthuizen, Chante Oosthuizen, Shibone de Bruyn, Shaun Oosthuizen, Magdalena Oosthuizen, Maggie Kieser, Emogene Kieser, Sone Smith, Gavin Smith, Johannes Kieser, Hester Hart, Arnoldus Kieser, Loraine Steenberg,

René Botha, Jené Steenberg Marais, Deseré Steenberg, Estelle Brink, Brendon Botha, Leanelle Botha, Janet Capazorio, Brandon Capazorio, Shannon Figg, George Capazorio, Maud Capazorio, Bettina Calder, Carin Capazorio, Sarel Du Plessis, Susan De Clercq, Rozelle Adams, and Morne Bruwer.

378.    The Proxy Militias' use of EFPs to commit acts of terrorism against the Victim Plaintiffs was intentional and reckless, extreme and outrageous, and caused the Family Member Plaintiffs to experience severe emotional distress.

379.    The detonation of EFPs by the Proxy Militias violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

380.    These acts of terrorism were extreme and outrageous, perpetrated with the intent to intimidate and coerce.

381.    Iran, through its influence with the Proxy Militias, knowingly and willfully provided material support, training, and direction to these acts of terrorism, with the express purpose of causing severe injury or death to the victims of the attacks and intimidating others.

382.    Iran knew, or reasonably should have known, that these terrorist acts would cause severe emotional distress to the family members of those who were attacked.

383.    Therefore, Iran is responsible for the damages suffered by the Family Member Plaintiffs as a direct and proximate result of the EFP attacks on the Victim Plaintiffs.

384.    Because Iran acted in a willful and wanton manner, showing a conscious disregard for the rights of others, the Family Member Plaintiffs request an additional award of punitive damages.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

For the Roberts Family, on Counts I and XIV, the following:

    a.  Compensatory damages for personal injuries to Allan Roberts, including pain and suffering and economic damages in the amount of $25,000,000, or a sum certain to be determined at trial;

    b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $13,000,000, comprised of the following sums:

       -  $8,000,000 on behalf of Bethan Johnson, fiancée of Allan Roberts;
       -  $5,000,000 on behalf of C.D.R., son of Allan Roberts;

    c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Roberts Family;

    d.  Interest, from March 16, 2010 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Botes Family, on Counts II and XIV, the following:

    a.  Compensatory damages for personal injuries to Jaco Botes, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

    b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $5,000,000, comprised of the following sums:

       -  $5,000,000 on behalf of Natasha Grove, daughter of Jaco Botes;

    c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Botes Family;

    d.  Interest, from May 16, 2005 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Crowley Family, on Counts III and XIV, the following:

a. Compensatory damages for personal injuries to Steven Crowley, including pain and suffering and economic damages in the amount of $25,000,000, or a sum certain to be determined at trial;

b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $22,500,000, comprised of the following sums:

- $5,000,000 on behalf of O.J.C., daughter of Steven Crowley;

- $5,000,000 on behalf of L.A.C., daughter of Steven Crowley;

- $5,000,000 on behalf of Michael Crowley, father of Steven Crowley;

- $5,000,000 on behalf of Patricia Crowley, mother of Steven Crowley;

- $2,500,000 on behalf of Sarah Crowley, sister of Steven Crowley;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Crowley Family;

d. Interest, from March 16, 2010 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Jameson Family, on Counts IV and XIV, the following:

a. Compensatory damages for personal injuries to John Jameson, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $18,000,000, comprised of the following sums:

- $8,000,000 on behalf of Kristin Jameson, wife of John Jameson;

- $5,000,000 on behalf of Edith Nichol, mother of John Jameson;

- $5,000,000 on behalf of Thomas Jameson, father of John Jameson;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Jameson Family;

d. Interest, from March 16, 2010 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Mughal Family, on Counts V and XIV, the following:

    a.  Compensatory damages for personal injuries to Abdul Ghaffar Mughal, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

    b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $33,000,000, comprised of the following sums:

- $8,000,000 on behalf of Sitorai Khasanzod, wife of Abdul Ghaffar Mughal;

- $5,000,000 on behalf of Khalid Mughal, son of Abdul Ghaffar Mughal;

- $5,000,000 on behalf of Hamid Mughal, son of Abdul Ghaffar Mughal;

- $5,000,000 on behalf of Angela Mughal, daughter of Abdul Ghaffar Mughal;

- $5,000,000 on behalf of N.M., daughter of Abdul Ghaffar Mughal;

- $5,000,000 on behalf of M.M., son of Abdul Ghaffar Mughal;

    c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Mughal Family;

    d.  Interest, from June 23, 2011 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Riekert Family, on Counts VI and XIV, the following:

    a.  Compensatory damages for personal injuries to George Riekert, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

    b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $15,000,000, comprised of the following sums:

- $5,000,000 on behalf of Simonè Riekert, daughter of George Riekert;

- $5,000,000 on behalf of M.R., daughter of George Riekert;

- $5,000,000 on behalf of Simon Riekert, father of George Riekert;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Riekert Family;

d. Interest, from June 23, 2011 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Oosthuizen Family, on Counts VII and XIV, the following:

a. Compensatory damages for personal injuries to Christiaan Oosthuizen, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $28,000,000, comprised of the following sums:

- $8,000,000 on behalf of Wilhelmina Oosthuizen, wife of Christiaan Oosthuizen;

- $5,000,000 on behalf of Chante Oosthuizen, daughter of Christiaan Oosthuizen;

- $5,000,000 on behalf of Shibone de Bruyn, daughter of Christiaan Oosthuizen;

- $5,000,000 on behalf of Shaun Oosthuizen, son of Christiaan Oosthuizen;

- $5,000,000 on behalf of Magdalena Oosthuizen, mother of Christiaan Oosthuizen;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Oosthuizen Family;

d. Interest, from June 15, 2006 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Kieser Family, on Counts VIII and XIV, the following:

    a. Compensatory damages for personal injuries to George Kieser, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $30,500,000, comprised of the following sums:

        - $8,000,000 on behalf of Maggie Kieser, wife of George Kieser;

        - $5,000,000 on behalf of Emogene Kieser, daughter of George Kieser;

        - $5,000,000 on behalf of Sone Smith, step-daughter of George Kieser;

        - $5,000,000 on behalf of Gavin Smith, step-son of George Kieser;

        - $2,500,000 on behalf of Johannes Kieser, bother of George Kieser;

        - $2,500,000 on behalf of Hester Hart, sister of George Kieser;

        - $2,500,000 on behalf of Arnoldus Kieser, bother of George Kieser;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Kieser Family;

    d. Interest, from January 4, 2006 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Steenberg Family, on Counts IX and XIV, the following:

    a. Compensatory damages for personal injuries to Johann Steenberg, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $25,500,000, comprised of the following sums:

        - $8,000,000 on behalf of Loraine Steenberg, wife of Johann Steenberg;

        - $5,000,000 on behalf of René Botha, daughter of Johann Steenberg;

- $5,000,000 on behalf of Jené Steenberg Marais, daughter of Johann Steenberg;

- $5,000,000 on behalf of Deseré Steenberg, daughter of Johann Steenberg;

- $2,500,000 on behalf of Estelle Brink, sister of Johann Steenberg;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Steenberg Family;

d. Interest, from May 16, 2005 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Botha Family, on Counts X and XIV, the following:

a. Compensatory damages for personal injuries to Leon Botha, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $18,000,000, comprised of the following sums:

- $8,000,000 on behalf of René Botha, wife of Leon Botha;

- $5,000,000 on behalf of Brendon Botha, son of Leon Botha;

- $5,000,000 on behalf of Leanelle Botha, daughter of Leon Botha;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Botha Family;

d. Interest, from November 20, 2004 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Capazorio Family, on Counts XI and XIV, the following:

a. Compensatory damages for personal injuries to Dean Capazorio, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $33,000,000, comprised of the following sums:

-     $8,000,000 on behalf of Janet Capazorio, wife of Dean Capazorio;

-     $5,000,000 on behalf of Brandon Capazorio, son of Dean Capazorio;

-     $5,000,000 on behalf of Shannon Figg, step-son of Dean Capazorio;

-     $5,000,000 on behalf of George Capazorio, father of Dean Capazorio;

-     $5,000,000 on behalf of Maud Capazorio, mother of Dean Capazorio;

-     $2,500,000 on behalf of Bettina Calder, sister of Dean Capazorio;

-     $2,500,000 on behalf of Carin Capazorio, sister of Dean Capazorio;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Capazorio Family;

    d. Interest, from January 31, 2006 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Du Plessis Family, on Counts XII and XIV, the following:

    a. Compensatory damages for personal injuries to Pierre Du Plessis, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $7,500,000, comprised of the following sums:

-     $2,500,000 on behalf of Sarel Du Plessis, brother of Pierre Du Plessis;

-     $5,000,000 on behalf of Susan De Clercq, aunt of Pierre Du Plessis;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Du Plessis Family;

    d. Interest, from November 14, 2005 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Bruwer Family, on Counts XIII and XIV, the following:

    a. Compensatory damages for personal injuries to Schalk Bruwer, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $10,000,000, comprised of the following sums:

        - $5,000,000 on behalf of Rozelle Adams, daughter of Schalk Bruwer;

        - $5,000,000 on behalf of Morne Bruwer, son of Schalk Bruwer;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Bruwer Family;

    d. Interest, from March 29, 2006 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: May 11, 2020               Respectfully submitted,

                                      /s/ Kevin A. Hoffman
                            Randy D. Singer (DCD Bar No. VA057)
                            Kevin A. Hoffman (DC Bar No. 1044559)
                            SINGER DAVIS, LLC
                            1209A Laskin Road
                            Virginia Beach, VA 23451
                            Phone: (757) 301-9995
                            Fax: (757) 233-1084
                            Email: randy.singer@singerdavis.law
                            Email: kevin.hoffman@singerdavis.law
                            *Counsel for Plaintiffs*