**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALLAN ROBERTS et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. 1:20cv1227** |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Plaintiffs, Allan Roberts et al., come before this Court seeking a finding of liability,

appointment of a special master to determine damages, and the entry of default judgment against

the Islamic Republic of Iran ("Iran"), and in support thereof state as follows:

**I.     INTRODUCTION**

After the fall of Saddam Hussein in 2003, Iran perceived the continued presence of the

United States and its allies in Iraq as an existential threat to its own sovereignty. In response, as

summarized from the front lines in 2006 by Lieutenant General Peter W. Chiarelli of Multi-

National Corps–Iraq, Iran began "pursuing a multi-faceted, interventionist policy in Iraq" with

the intent to establish a pro-Iranian Iraqi government and "to either accelerate the withdrawal of

Coalition Forces, or perhaps, to keep us tied up here and 'bleed us white'." The U.S. Army in the

Iraq War, Vol. 1, United States Army War College Press, 573 (2019).

In pursuit of this goal, Iran and its proxies introduced a weapon onto the battlefield of

Iraq, the explosively formed penetrator ("EFP"). An EFP is specifically and specially engineered

to pierce the armored vehicles used by the Coalition soldiers and contractors that would

otherwise be relatively secure against the more crude improvised explosive devices commonly

utilized by Iraqi insurgents. Using the EFPs manufactured and distributed by Iran, Iraq's Shia militias achieved exponentially greater lethality from their roadside attacks.

In the midst of this lethal conflict, Allan Roberts, Jaco Botes, Steven Crowley, John Jameson, Abdul Mughal, George Riekert, Christiaan Oosthuizen, George Kieser, Johann Steenberg, Leon Botha, Dean Capazorio, Pierre du Plessis, and Schalk Bruwer ("the Victim Plaintiffs") signed up to serve as contractors in Iraq for companies employed by various agencies of the United States. The Victim Plaintiffs were subjected to physical and emotional trauma as the result of the detonation of an EFP during the 2004–2011 timeframe ("the EFP Attacks"). This trauma included amputations, shrapnel wounds, traumatic brain injuries, and PTSD. The Victim Plaintiffs now seek a civil judgment to compensate them for their pain, suffering, and emotional distress, as well as lost income and diminished earning capacity. The immediate family members of the Victim Plaintiffs ("the Family Plaintiffs"), whose exact relation to the Victim Plaintiffs are specified via the attached affidavits of the Victim Plaintiffs, seek compensation for solatium damages through related claims for intentional infliction of emotional distress.

Because of its longstanding support for international terrorists, including its specific and material support of violent militias in Iraq since at least 2004, Iran has forfeited its immunity to the claims brought in this matter under the Foreign Sovereign Immunities Act ("FISA"). *See* 28 U.S.C. § 1605A. As the manufacturer, state sponsor, supplier, trainer and instigator of the EFP Attacks, Iran is liable to Plaintiffs for the damages claimed in this case.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint in this matter on May 11, 2020. ECF No. 1. A summons was issued against Iran the following day. ECF No. 3. Plaintiffs initiated service by mail under 28 U.S.C. § 1608(a)(3) on June 8, 2020, ECF No. 6, which was processed by the Clerk's Office

on June 9, 2020, ECF No. 7. After waiting the requisite thirty days, Plaintiff initiated diplomatic

service pursuant to 28 U.S.C. § 1608(a)(4). ECF No. 8. Iran was formally served in this manner

on November 4, 2020. ECF No. 13. Plaintiffs requested entry of default on January 12, 2021,

ECF No. 14, and the Clerk entered it the next day. ECF No. 15.

## III. REQUEST FOR JUDICIAL NOTICE OF EVIDENCE PRESENTED IN A RELATED PROCEEDING

A trial court "may judicially notice a fact that is not subject to reasonable dispute because

it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Evid. 201(b). This inherent power includes the ability to take judicial notice of "court records in

related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C.

2010) (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n. 2 (D.C. Cir. 1938) ("A court may take

judicial notice of, and give effect to, its own records in another but interrelated proceeding.")).

Based on this principle, and in response to "the multiplicity of FSIA-related litigation in this

jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related

proceedings." *Id.*

Taking judicial notice of related proceedings, however, "does not conclusively establish

the facts" for purposes of the case at bar. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d

51, 59 (D.D.C. 2010). Instead, the trial court takes judicial notice of the earlier record for the

purpose of reviewing "evidence considered in the prior proceeding without necessitating the re-

presentment of such evidence." *Salzman v. Islamic Republic of Iran*, No. 1:17cv2475, 2019 WL

4673761, at *3 (D.D.C. Sept. 25, 2019) (quoting *Murphy*, 740 F. Supp. 2d at 59).

In a very similar case, this Court received evidence concerning Iran's liability for the

manufacture, distribution, and detonation of EFP devices in Iraq during the same time period at

issue here. *See generally*, *Karcher v. Islamic Republic of Iran*, Case No. 1:16cv232 ("*Karcher*").[1] That case revolved around the use of EFP devices to attack American military personnel in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 14 (D.D.C. 2019). The Court held a bench trial, from December 3–6, 2018, and the plaintiffs presented a wide variety of testimony and evidence for the Court's consideration.

In the process of ultimately proving their case, the *Karcher* plaintiffs established the key finding that "identification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible." *Id.* at 30 (emphasis in original). After considering plaintiff's evidence in *Karcher*, and "absent any indication that any of these EFPs was *not* backed by Iran," the Court granted their request for a default judgment. *Id.* (emphasis in original).

Plaintiffs here suggest that this Court should take judicial notice of the expert testimony presented in *Karcher*. Such an approach has already been used in this District in a post-*Karcher* case to help establish liability. In *Lee v. Islamic Republic of Iran*, the Court found that it "may rely on the evidence presented to the *Karcher* court, but must nonetheless 'reach [its] own, independent findings of fact.'" Case No. 1:19cv00830, 2021 WL 325958, at *2 (D.D.C. Feb. 1, 2021) (quoting *Rimkus*, 750 F. Supp. at 172). Relying heavily on facts submitted through judicial notice, the Court granted the EFP victims in *Lee* a default judgment as to liability. *Id.* at *15.

The present case closely resembles *Karcher* and *Lee*. All three matters center on Iraqi militias and their use of the same weapon, the EFP. The timeframe of the attacks—2004 to 2011—is identical. The same theory of liability is central to each case, namely that Iran manufactured, distributed, and trained (whether directly or through its agents and proxies) Iraqi militias in the use of EFP devices for the express purpose of attacking American interests. This

---

[1] References to docket entries or pleadings from *Karcher* will be cited herein as "*Karcher*, ECF No. X."

proximity in time and place, and the similar factual and legal theories of liability, weigh strongly in favor of this Court's ability to take judicial notice of evidence presented in *Karcher*, just as the Court did in *Lee*.

Because the cases are closely connected, and because the evidence in *Karcher* has already been found reliable in this Court twice-over, it serves the interests of justice and judicial economy for that evidence to be considered via judicial notice rather than requiring Plaintiffs to re-present the same material. *See Salzman*, 2019 WL 4673761, at *3.

That being said, and as will be shown in detail below, Plaintiffs' case here stands independent of the *Karcher* evidence, even though it can be corroborated and supported by it. Plaintiffs have retained Michael Pregent and D. Wade Barker, highly qualified experts whose opinions are sufficient to prove each element of Plaintiffs' liability claims.

Mr. Pregent worked as a subject matter expert for the Defense Intelligence Agency in Iraq from 2006 to 2011, advising on substantially the same issues upon which he is testifying here. Ex. 1 at ¶ 2. Even after leaving Iraq, he continued to stay informed and involved with these subjects, academically contributing to the U.S. Army's History of the Iraq War publication as an expert on the subject of Iran's support for Iraqi militia groups. *Id.* at ¶ 4.

Mr. Barker, while in active-duty service in Iraq, oversaw the development of countermeasures to the proliferation and deployment of EFPs during the time period relevant to this case. Ex. 2 at ¶ 2. He continued his study of EFP devices after leaving active duty, serving an additional two tours in Afghanistan as a civilian contractor. *Id.* at ¶ 3. His current work involves the development of products and systems designed to counter EFP technology in the battlefield. *Id.* at ¶ 4.

Both retained experts have provided a detailed analysis and uncontroverted opinions regarding Iran's role in the EFP Attacks. But in addition to these reports, Plaintiffs respectfully suggest that this Court should take judicial notice of the following expert reports that were submitted in *Karcher*:

- Expert Report Michael Oates (*Karcher*, ECF No. 85);

- Expert Report of Michael Pregent (*Karcher*, ECF No. 86);

- Expert Report of Leo Bradley (*Karcher*, ECF No. 87);

- Expert Report of Russell McIntyre (*Karcher*, ECF No. 88);

- Expert Report of D. Wade Barker (*Karcher*, ECF No. 89);

- Expert Report of Kevin Lutz (*Karcher*, ECF No. 90).

As an added layer of connection to the instant matter and the present time, Plaintiffs' retained experts in this case have collectively reviewed each of these reports and affirmed that the relevant content is consistent with their current perspectives and opinions regarding the subject matter at issue in the instant case. Ex. 1 at ¶ 14; Ex. 2 at ¶ 10.

## IV.    LEGAL STANDARD FOR ENTRY OF DEFAULT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. 1608(e). This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003).

"When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044,

1047 (D.C. Cir. 2014); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211

(D.D.C. 2012) (via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105,

109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records"); *Bodoff v.*

*Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (with or without a live

evidentiary hearing). In sum, evidence "satisfactory to the Court," 28 U.S.C. 1608(e), may be

provided at an evidentiary hearing, but it can also consist of "sworn affidavits or declarations,

prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules

of Evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020).

In weighing the evidence, the trial court must consider Congress's stated purpose in

enacting § 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who

have committed or sponsored such acts and [to] deter them from doing so in the future," *Kim*,

774 F. 3d at 1408 (citation omitted)—while simultaneously recognizing the difficulty in

obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile

sovereign," *Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017). Although "[t]he

Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp.

3d 1, 17 (D.D.C. 2016), it should also "accept as true the plaintiffs' uncontroverted evidence,"

*see Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v.*

*Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007), "including proof by

affidavit," *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155

(D.D.C. 2009).[2]

---

[2] Based on the sworn affidavits attached hereto, *see* Exs. 1–15, and the materials from *Karcher* that can be considered via judicial notice, *see supra* Part III, Plaintiffs submit that it is reasonable and appropriate for the Court to rule on liability without the need for an evidentiary hearing. Proceeding in this manner would have the secondary benefit of avoiding the challenges inherent in travel during the ongoing pandemic, particularly for internationally located parties. If, however, the Court prefers to receive live testimony, Plaintiffs are prepared and willing to proceed immediately.

## V.      STATEMENT OF FACTS

### A.      Iran's Longstanding Support of International Terrorism

Since the Iranian revolution in 1979, Iran has supported terrorist organizations and

international acts of terrorism as an instrument of its stated foreign policy goals. Ex. 1 at ¶ 15;

*Karcher*, ECF No. 85 at 12. As a result of this widespread support for terrorist groups such as the

Lebanese Hezbollah ("Hezbollah"), the State Department formally designated Iran as a state

sponsor of terrorism in 1984. Ex. 1 at ¶¶ 16–17; *see also* 49 Fed. Reg. 2836 (Jan. 23, 1984); *Est.*

*of McCarty v. Islamic Republic of Iran*, Case No. 1:19cv853, 2020 WL 7696062, at *3 (D.D.C.

Dec. 28, 2020) ("Iran committed substantial support to fund Hezbollah's acts of 'terrorism as an

official means of forwarding foreign policy' in the early 1980s").

Iran's support for terrorism is largely carried out under the umbrella of the Islamic

Revolutionary Guard Corp ("IRGC"), a paramilitary organization that answers directly to the

Supreme Leader of Iran. Ex. 1 at ¶ 23; *Karcher*, ECF No. 88 at 5. The IRGC was designated as a

Foreign Terrorist Organization in April 2019, in large part due to its active role in providing EFP

devices to Iraqi militias. Ex. 1 at ¶ 24.

Within the IRGC is a specialized branch known as the Qods Force ("IRGC-QF"). The

IRGC-QF is primarily focused on foreign operations and has a long and well-documented history

of supporting terrorism on behalf of Iran. In recognition of this malign behavior, the U.S.

Department of Treasury designated the IRGC-QF as a Specially Designated Global Terrorist in

October 2007. *Id.* at ¶ 26; *Karcher*, ECF No. 88 at 4 n.1, 5 n.3. When explaining the purposes for

this designation, the Treasury Department explained that the IRGC-QF provides "lethal support

in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants

who target and kill Coalition and Iraqi forces and innocent Iraqi citizens." *Id.*

Iran, through the IRGC and the IRGC-QF, has groomed Hezbollah as its premier proxy militia in the region. *Id.* at ¶ 17; *see also Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 93 (D.D.C. 2019). Iran has historically provided Hezbollah with between $100 and $200 million annually, Ex. 1 at ¶ 17, growing in recent years to be estimated as high as $1 billion, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018) (citing expert opinion of Dr. Levitt). In exchange, Hezbollah often aides Iran in the execution of complex attacks and the creation and/or training of additional proxy militias. Ex. 1 at ¶ 18, 20–22; *Karcher*, ECF No. 88 at 8–9.

Leveraging its successful longstanding relationship with Hezbollah, Iran has repeatedly attempted to replicate this type of proxy relationship throughout the Middle East, including— most notably and successfully—in Iraq. Ex. 1 at ¶ 27.

### B.    Iran's History of Malign Influence in Iraq

Iran has a long and tense history with its Iraqi neighbors. During the reign of Saddam Hussein, the two countries engaged in a protracted war, resulting in the exile of many Shia Iraqis into Iran. *Id.* at ¶ 29. As part of its conflict with Iraq, Iran molded these Shia exiles into a fighting force known as the Badr Corps. *Id.*; *Karcher*, ECF No. 88 at 15. After the Coalition invasion and the fall of Saddam in 2003, Iran quickly dispatched the Badr Corps into Iraq, serving as a *de facto* arm of the IRGC that was integrated into the rebuilt Iraqi security forces. Ex. 1 at ¶¶ 29–30; *Karcher*, ECF No. 85 at 15; *Karcher*, ECF No. 88 at 16.

In addition to the Badr Corps, Iran supported an insurgency threat to the Coalition named Jaysh al-Mahdi ("JAM"), a nationalist militia established by Shia cleric Muqtada al-Sadr for the purpose of resisting what it perceived as the continued occupation of Iraq by foreign forces. Ex. 1 at ¶ 31; *Karcher*, ECF No. 85 at 17–18. Iran, in an effort to further its influence within Iraq and

increase its ability to strike Coalition forces, used its relationship with al-Sadr to become an early benefactor of JAM. *Id.*; *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 40 (D.D.C. 2019).

In the first several years after the invasion, Iran consistently provided both the Badr Corps and JAM with money, weapons, training, and advice for the specific purpose of undermining the reconstruction efforts. Ex. 1 at ¶ 31. As the years passed, Iran refocused its efforts in Iraq by handpicking leaders and elite talent from the ranks of the Badr Corps and JAM to lead new, more directly controlled, elite militia groups. *Id.* at ¶¶ 32–34; *Karcher*, ECF No. 88 at 39–47. Those new groups included, among others, Kataib Hezbollah and Asa'ib Ahl al-Haq. *Id.*

Between 2004 and 2011, Iran provided advanced weapons, including EFP devices and components, financial support, and military training to all of its proxies in Iraq. Ex. 1 at ¶ 33. These efforts were supported and carried out by Hezbollah, with training camps hosted both within Iran and in Lebanon. *Id.*; *Karcher*, ECF No. 88 at 66–67. This support was so material and expansive that substantial percentages of United States military casualties could be tied to known IRGC-QF proxy organizations. Ex. 1 at ¶ 35; *Karcher*, ECF No. 85 at 29 (quoting Major General Lynch, explaining "that the technology and the financing and the training of the [EFPs] are coming from Iran"). In sum, "the Iranian regime was content to fund, train, and supply all parties willing to attack the U.S.-led coalition." *Id.* at ¶ 36 (quoting The U.S. Army in the Iraq War, Vol. 2, United States Army War College Press, 66 (2019)).

### C.     The Proliferation of EFPs into Iraq

The Iran-Hezbollah partnership is intimately connected to the history of the EFP. The first modern EFP was developed by Hezbollah in the 1990s, using support and resources from

Iran, for use against Israeli armored vehicles. Ex. 2 at ¶ 11. The first recorded EFP attack took place on October 5, 1998 in Lebanon. *Id.* at ¶ 12; *Karcher*, ECF No. 88 at 13.

Hezbollah and Iran, in partnership, began distributing EFP devices to Iran's proxies in Iraq in 2004. Ex. 1 at ¶ 40; Ex. 2 at ¶ 13; *Karcher*, ECF No. 85 at 25 n.51 (quoting State Department - Country Reports on Terrorism 2006); *Karcher*, ECF No. 88 at 27. The initial instances of EFP attacks in Iraq were immediately associated with the Hezbollah design and Iranian support. *Karcher*, ECF No. 88 at 55 (quoting "the Chilcot Report").

Concurrently with the supply of these weapons, Iran arranged for the training of large numbers of militia members in the appropriate assembly and use of EFP devices – a necessary component for the devices to be effective. Ex. 2 at ¶ 13; *Karcher*, ECF No. 90 at 19–21. Late in 2004, British intelligence reports concluded that rapid advancements in EFP technology focused in Shia-controlled areas of Iraq "could only have been achieved through focused external assistance." *Karcher*, ECF No. 88 at 67. Eventually, detainee interrogations showed how EFP-specific trainings were hosted by Hezbollah inside Iran for those militia members that showed the required aptitude. *Id.* at 70–71.

As early as October 2005, the American military began formally reporting on these malign activities. Ex. 1 at ¶ 40 (explaining how the IRGC-QF had "support[ed] two separate Iraqi EFP networks by sponsoring EFP [ ] training in Iran, Iraq, and Lebanon, and facilitating movement of EFP network personnel and equipment between Iran and Iraq"). Before long, "EFPs became 'the signature weapon of Iranian-supported Special Groups.'" *Karcher*, ECF No. 87 at 19 (quoting Gen. David Petraeus, MNF-I Commander's Weekly Assessment, April 14-20, 2008, at 37).

EFP devices are particularly effective against armored vehicles because of their special design and specific components, particularly (1) the concave copper disc; and (2) the high-energy explosives, such as C-4, that are used. Ex. 2 at ¶¶ 15–19. Mr. Barker summarizes by stating that "the production of an effective EFP device requires access to very specific materials, a certain level of manufacturing capability (for milling the copper plate to the exact thickness required), and detailed knowledge of the process" and that other than "some basic manufacturing skills and equipment, none of these three factors were generally available to Iraq's Shia militias between 2004 and 2011." *Id.* at ¶ 24. Without the supply and assistance of Iran and Hezbollah, EFPs would not have become a part of the arsenal used against Coalition forces during the time period that is at issue in this case. *Id.* at ¶ 96.

The Iranian supply of EFP devices and their components into Iraq was repeatedly confirmed by the discovery of various caches and stockpiles by Coalition forces. Ex. 1 at ¶ 43; Ex. 2 at ¶ 28; *Karcher*, ECF No. 87 at 19; *Karcher*, ECF No. 88 at 29–30, 59; *Karcher*, ECF No. 90 at 16–19. Military investigators often determined that particular EFP components originated and/or were manufactured in Iran. *Id.* By contrast, when Iraqi militias did attempt to manufacture their own EFP devices locally or using locally made components, they were easily identifiable because of their poor quality, especially with the milling of the copper plates, impacting the effectiveness of the weapons. Ex. 2 at ¶ 29; *Karcher*, ECF No. 90 at 21. Ultimately, however, even if an Iraqi militia did manage to produce an effective EFP device, it would a) be based on the same design introduced by Iran and Hezbollah, *id.* at ¶ 29, and b) require the use of high-

energy explosives,[3] which were only available to the militias thanks to Iran's provision and sponsorship, *id.* at ¶ 30; *Karcher*, ECF No. 90 at 23.

Finally, Iran's provision of equipment and its ongoing involvement in the execution of EFP attacks is also borne out by inspecting the triggering mechanisms. Although it is possible to do so via a direct command wire, many EFP devices in Iraq were armed using remote frequency transmitters and then triggered by a passive infra-red device which would detonate when it sensed the heat signature of a vehicle's engine. Ex. 2 at ¶ 22; *Karcher*, ECF No. 85 at 25–26. Coalition forces developed sophisticated countermeasures to these systems, including signal jamming and decoy devices. Ex. 2 at ¶ 33. And yet, with each new development, the Iraqi militias deploying the EFPs would quickly and effectively adapt to neutralize the Coalition countermeasure. *Id.* at ¶ 32. Such sophisticated adaptation would not have been possible "without the active involvement and oversight of the IRGC and Hezbollah." *Id.* at ¶ 33; *Karcher*, ECF No. 85 at 33 (adaptability "was a direct result of training and intelligence assessments provided by Hezbollah under the IRGC-QF's auspices").

In sum, the "militia groups in Iraq would not have developed the capabilities to manufacture or obtain EFPs" without the material support and resources of Iran. Ex. 2 at ¶ 96. The training provided "by Iran substantially increased the lethality and effectiveness of the" EFP devices it supplied. *Id.* at ¶ 98; *Karcher*, ECF No. 90 at 74 ("without the direct and active assistance and direction of the IRGC and Hezbollah, indigenous Shi'a terror cells would not have been nearly as effective and lethal in attacking U.S. military armor in Iraq during the relevant

---

[3] Mr. Barker explains in his sworn affidavit that common explosives, such as those generally available in Iraq between 2004-2011, detonate at temperatures below the melting point of copper which leads to a failure to melt the copper plate into its intended slug shape for a fully effective EFP. Ex. 2 at ¶¶ 17–19; *see also Karcher*, ECF No. 87 at 20. As explained below, the tell-tale damage marks identified by Mr. Barker in many of the photographs from the EFP Attacks could only have been made by a properly manufactured, assembled, and detonated EFP device.

period"). Ultimately, Iran's purpose in funneling EFP devices into Iraq and providing the accompanying training was to cause "violence to disrupt American interests in Iraq." Ex. 1 at ¶ 49; *see also Karcher*, ECF No. 87 at 17 (describing Iran's goal "to inflict pain on the United States").

### D.      The EFP Attacks

The Victim Plaintiffs have provided first-hand information, photographs, and other admissible evidence to establish certain foundational facts about each of the attacks at issue here. Later in this Memorandum, those facts and the accompanying photographic evidence will be discussed in light of the conclusions drawn by Plaintiffs' retained experts concerning Iran's support for these attacks.

### i.      *The November 20, 2004 EFP Attack.*

On November 20, 2004, Leon Botha was driving the second vehicle in a four-vehicle escort convoy. Ex. 12 at ¶ 4. As they crossed the Olympic Bridge in Baghdad, an explosion occurred on the left side of his vehicle. *Id.* at ¶ 5. Mr. Botha was struck by shrapnel in the face and neck. *Id.* at ¶ 6. Some of the shrapnel pieces, which appeared to be made of copper, were collected and photographed. *Id.* at ¶ 8. United States military personnel later informed both Mr. Botha and George Kieser that the explosive device was an EFP. *Id.* at ¶ 9; Ex. 10 at ¶ 10.

### ii.      *The May 16, 2005 EFP Attack.*

On May 16, 2005, Jaco Botes was the commander of the lead vehicle in a four-vehicle convoy. Ex. 4 at ¶ 4. Johann Steenberg was the driver of the third vehicle. Ex. 11 at ¶ 4. A device detonated about four feet to the left of the lead vehicle, from approximately window-height, and the vehicle burst into flames. *Id.* at ¶ 5. Three men died instantly, and Mr. Botes sustained shrapnel wounds to his leg, arm, and neck. Ex. 4 at ¶ 8.

### iii. The November 14, 2005 EFP Attack.

On November 14, 2005, Pierre Du Plessis was the driver of the lead vehicle of a four-vehicle escort convoy. Ex. 14 at ¶ 5. As the convoy passed by the Iranian Embassy complex, a blast occurred next to the fourth vehicle. *Id.* at ¶ 6. Mr. Du Plessis quickly ran to the scene of the explosion, observing the mortal wounds to his friends and teammates and participating in the extraction of casualties from the burning vehicle. *Id.* at ¶¶ 7–8.

### iv. The January 4, 2006 EFP Attack.

On January 4, 2006, George Kieser was serving as the left rear shooter of the lead vehicle in a four-vehicle escort convoy. Ex. 10 at ¶ 4. As they approached the Olympic Bridge, an explosion occurred, disabling the third vehicle in the convoy. *Id.* at ¶ 5. Mr. Kieser returned to the scene of the explosion on foot, assisting with creating a secured perimeter. *Id.* at ¶ 6. Shortly thereafter, a secondary explosion occurred nearby, knocking him unconscious and throwing him to the ground. *Id.* at ¶ 7.

### v. The January 2006 EFP Attack.

In January 2006, Dean Capazorio was serving as the rear gunner of the last vehicle in a four-vehicle convoy. Ex. 13 at ¶ 5. The third vehicle in that convoy was hit by an explosive device that had been embedded in the curb. *Id.* at ¶¶ 6–7. Individuals inside the third vehicle received shrapnel injuries and Mr. Capazorio sustained permanent hearing damage. *Id.* at ¶¶ 6. 8. United States military personnel inspected the damaged vehicle and later informed Mr. Capazorio's team that the device was an EFP and that copper residue had been found. *Id.* at ¶ 7.

### vi. The March 29, 2006 EFP Attack.

On March 29, 2006, Schalk Bruwer was the driver of a four-vehicle convoy escorting personnel to the Baghdad Police Academy. Ex. 15 at ¶ 4. As the convoy travelled through a

15

tunnel, an explosion occurred close to Mr. Bruwer's vehicle. *Id.* at ¶ 6. The occupants, including Mr. Bruwer, were struck with shrapnel and the vehicle was disabled. *Id.* Mr. Bruwer and Mr. Steenberg were informed later by investigators that the explosion had been caused by an EFP hidden in a curb inside the tunnel. *Id.* at ¶ 10; Ex. 11 at ¶ 11.

### vii.  *The June 15, 2006 EFP Attack.*

On June 15, 2006, Christiaan Oosthuizen was the left shooter in the lead vehicle of an escort convoy. Ex. 9 at ¶ 4. As the convoy was approaching the Olympic Bridge, an explosion occurred close to the right side of the lead vehicle. *Id.* at ¶¶ 5–6. Mr. Oosthuizen sustained shrapnel wounds, hearing loss, and a concussion from the force of the blast. *Id.* at ¶ 7.

### viii.  *The March 16, 2010 EFP Attack*

On March 16, 2010, Allan Roberts, Steven Crowley, and John Jameson were riding in the last vehicle in a four-vehicle convoy. Ex. 3 at ¶ 5; Ex. 5 at ¶ 4; Ex. 6 at ¶ 4. At an Iraqi police checkpoint, an explosion occurred near the driver's side door of the vehicle. Ex. 3 at ¶ 6. Mr. Roberts lost both legs in the explosion. *Id.* at ¶ 7. Mr. Crowley's left leg had to be surgically amputated. Ex. 5 at ¶ 7. Mr. Jameson sustained various injuries to his knees, hips, back, neck, shoulders, head, and eardrums. Ex. 6 at ¶ 6. The team was later informed by investigators that the explosion had been caused by an EFP device. Ex. 3 at ¶¶ 8–9.

### ix.  *The June 23, 2011 EFP Attack.*

On June 23, 2011, George Riekert was riding in the second vehicle of a three-vehicle escort convoy. Ex. 8 at ¶¶ 4–5. Mr. Riekert's team was transporting two civilians, one of whom was Abdul Mughal, who was seated in the rear passenger side. Ex. 7 at ¶¶ 4–5. At approximately 12:43 p.m., a large explosion occurred to the left of their vehicle. Ex. 8 at ¶ 7. Mr. Mughal sustained a broken hand and shrapnel injuries, while the other civilian was killed instantly. *Id.* at

¶ 8; Ex. 7 at ¶ 7. Mr. Riekert was hit with shrapnel and suffered injuries to his head, neck, and back. Ex. 8 at ¶ 8.

## VI.   JURISDICTION

### A.   Subject Matter Jurisdiction

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity apply. *See* 28 USC § 1330(a). In this case, Iran is subject to suit under the FSIA's terrorism exception to sovereign immunity, *see* 28 U.S.C. § 1605A, which confers jurisdiction against a foreign government if: (1) the claim is against a designated "State Sponsor of Terrorism"; (2) the victims are nationals or employees of the United States; and (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of such acts. 28 USC §1605A(a)(1)–(2).[4]

The first two elements are straight-forward.

The Court may take judicial notice of Iran's status as a designated State Sponsor of Terrorism, both at the present time, and when the cause of action arose. *See, e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 100 (D.D.C. 2019) (citing 49 Fed. Reg. 2836–02 (Jan. 23, 1984), and U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm).

Plaintiff Abdul Mughal is a United States citizen. *See* Ex. 7 at ¶ 1. The other Victim Plaintiffs, although not American citizens, were indisputably acting within the scope of their employment under a contract with the United States at the time of the EFP Attacks because they

---

[4] Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran.

were on-duty and riding in their employers' vehicles. *See* Ex. 3 at ¶ 2; Ex. 4 at ¶ 2; Ex. 5 at ¶ 2; Ex. 6 at ¶ 2; Ex. 8 at ¶ 2; Ex. 9 at ¶ 2; Ex. 10 at ¶ 2; Ex. 11 at ¶ 2; Ex. 12 at ¶ 2; Ex. 13 at ¶ 2; Ex. 14 at ¶ 2; Ex. 15 at ¶ 2.

Plaintiffs can satisfy the third element by showing evidence of: a) an act of attempted extrajudicial killing against each victim; (b) committed with the aid of material support from Iran; and (c) that resulted in personal injuries to the Victim Plaintiffs.

> i.   *The Victim Plaintiffs were subjected to attempted acts of extrajudicial killing.*

The FSIA's terrorism exception defines an extra-judicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). Accordingly, the TVPA provides that an "extra-judicial killing" is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73.

Although the text of this statutory provision does not directly address attempted acts, given the FSIA's stated purpose, any "ambiguities [should be interpreted] flexibly and capaciously." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 n.4 (D.C. Cir. 2013). Consistent with the statute's purpose, the definition of "extra-judicial killing" within the TVPA has been interpreted to "allow[] plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Id.* (citing *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014); *Doe v. Constant*, No. 04cv10108, 2006 WL 3490503 at 9 n.3 (S.D.N.Y. Oct. 24, 2006)). Therefore, in this statutory context, "deliberated" attempts to kill, regardless of whether they

actually result in deaths, "fall within the scope of Section 1605A(a)(1)." *Karcher*, 396 F. Supp. 3d at 58.

Here, as in *Karcher*, each of the Victim Plaintiffs were subjected to an attempted extrajudicial killing by means of specially designed roadside explosives known as EFPs. As discussed in detail throughout this memorandum, an EFP is specially engineered for the purpose of piercing armored vehicles. Any individual using an EFP, or any entity distributing such weapons, necessarily possesses the intent to kill the intended targets.

> ii.    *These attempted acts of extrajudicial killing were committed with the aid of material support and resources from Iran.*

The relevant definition of "material support or resources" is "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials." *Hamen*, 401 F. Supp. 3d at 103 (quoting 18 U.S.C. § 2339A(b)(1)).

The act of supplying a weapon that is later used in a terrorist attack is a classic example of material support, so long as that act was completed "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." *Karcher*, 396 F. Supp. at 55 (quoting 28 U.S.C. § 1605A(a)(1)). Here, the IRGC and the IRGC-QF serve as agents of Iran while arranging for the manufacture and distribution of EFPs into Iraq. *Id.* Moreover, the design and nature of EFP devices themselves supports the proposition that Iran intended for these weapons to be used to kill. *Id.* at 56 (because of "this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate").

Relying on the same type of evidence as what is presented here, the Court in *Karcher* found that "identification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible." *Id.* at 30. (emphasis in original). By the same vein, "absent any indication that any of these EFPs was *not* backed by Iran," this Court should hold Iran responsible for the provision of material support and resources towards each of the EFP Attacks. *Id.* (emphasis in original).

While this would be sufficient, Plaintiffs here offer evidence that goes beyond Iran's pervasive and unique supply of EFPs and training of Iraqi Shia militias in their use against Americans. In addition, for each of the incidents described herein, Mr. Barker, an explosives expert with a distinguished military career overseeing the U.S. response to EFPs in Iraq, has examined the evidence for each attack and concluded that the explosive devices were EFPs of a type manufactured and proliferated by Hezbollah and the IRGC/IRGC-QF at the direction of Iran. Such a finding is sufficient to prove that Iran provided material support and resources towards the EFP Attacks.

> a.      *The November 20, 2004 EFP Attack.*

On November 20, 2004, Leon Botha was driving a vehicle struck by an explosive device. Ex. 12 at ¶¶ 4–5. He provided photographs of the damage caused by the attack. *Id.* at ¶ 8. Based on those photographs, Mr. Barker determined that the transparent armor of the vehicle's windshield was penetrated in a manner "that would be expected to result from an effectively fired EFP." Ex. 2 at ¶ 38–39 (citing Ex. 12 at 7, 11). Mr. Barker further identified positive evidence of an EFP in two photographs showing what he refers to as "undoubtedly copper material." *Id.* at ¶¶ 40–41 (citing Ex. 12 at 12–13). Based on his extensive experience, these photographs led Mr. Barker to conclude "without any reasonable doubt, that this attack involved an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC." *Id.* at

¶ 42. In addition to this assessment, Mr. Botha has stated that he was told "by members of the United States military that the device used in this incident was determined to be an [EFP]." Ex. 12 at ¶ 9.

b.     *The May 16, 2005 EFP Attack.*

On May 16, 2005, Johann Steenberg and Jaco Botes were part of a convoy that was struck by an explosive device. Ex. 11 at ¶¶ 4–5. Mr. Steenberg and Mr. Botes provided photographs of the damage caused by this attack. *Id.* at 7–8; *see also* Ex. 4 at ¶ 9. Based on these photographs and his experience, Mr. Barker determined that the clean penetrations through both sides of the vehicle's steel armor "could only reasonably be expected to have been made by an EFP device that was designed, manufactured, and distributed by Hezbollah and/or the IRGC." Ex. 2 at ¶¶ 44–47 (citing Ex. 11 at 8). Given his personal and professional "knowledge of the Iraq theater in 2005," Mr. Barker does not believe that any other weapon available to insurgents at that time would have resulted in this type of penetration damage, *i.e.* clean penetration through the steel armor on one side of the vehicle, travelling through the vehicle, and cleanly piercing the steel armor on the other side of the vehicle. *Id.* at ¶ 47.

c.     *The November 14, 2005 EFP Attack.*

On November 14, 2005, Pierre Du Plessis was part of a convoy that was struck by an explosive device. Ex. 14 at ¶¶ 5–6. Mr. Du Plessis provided photographs of the damage caused by this attack. *Id.* at ¶ 9. Leon Botha, who subsequently responded to this scene, has testified that he was told by "American military personnel that copper residue was found on the targeted vehicle" and "that it was suspected that Iranian diplomatic personnel participated in preparing and executing this incident." Ex. 12 at ¶ 11. The attack took place outside the Iranian Embassy complex. Ex. 14 at ¶ 6.

Based on the available photographs, Mr. Barker has opined that the size, shape, and location of the penetrations in the damaged vehicle make it "highly likely that this damage was caused by an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC." Ex. 2 at ¶¶ 49–52, 55 (citing Ex. 14 at 3). Mr. Barker also notes that, based on Mr. Du Plessis's affidavit, he believes the EFP in this incident was triggered by command wire, *id.* at ¶ 53, and that the location of the damage was in the transparent armor and in the gap between the front and rear doors, *id.* ¶ 54. American intelligence operations confirmed that the Iranian-directed training identified those same two areas as the weakest spots in an armored vehicle. *Id.* The command wire method of detonation, in combination with the precision of the attack, led Mr. Barker to conclude that the November 14, 2005 attack was committed "with the assistance of specific training" that was provided "to increase the lethality." *Id.*

> d.   *The January 4, 2006 EFP Attack.*

On January 4, 2006, George Kieser was part of a convoy that was subjected to an explosive attack. Ex. 10 at ¶¶ 4–5. Mr. Kieser provided photographs of the aftermath of that incident. *Id.* at ¶ 10. After reviewing those photographs, Mr. Barker highlighted one image where the penetration of the steel armor "perfectly matches" the damage that would be expected from an EFP and with copper residue "clearly visible." Ex. 2 at ¶¶ 57–60 (citing Ex. 10 at 4). Mr. Barker also identifies two other images containing copper fragmentations, giving him "a high degree of certainty in stating that this attack was carried out using an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC." *Id.* at ¶¶ 60–61 (citing Ex. 10 at 5–6). He is not aware of any other types of explosives in the Iraqi theatre at the time that would penetrate the steel armor with "no material deformation" and leave small copper fragments in the hole. *Id.* at ¶¶ 59–61.

22

e.      *The January 2006 EFP Attack.*

In January 2006, Dean Capazorio was a member of a convoy that was struck by an explosive device. Ex. 13 at ¶¶ 5–6. Photographs of the location where this incident took place were provided by Mr. Capazorio. *Id.* at ¶ 11. One of those pictures shows the location of the explosive device and Mr. Barker opines that this represents a blast seat "consistent with the design and tactical deployment of EFP devices," Ex. 2 at ¶¶ 63–64 (citing Ex. 13 at 6). The lack of damage to the surrounding area is also unique to an EFP-type design. *Id.* The image of the damage to the convoy vehicle shows the presence of copper residue. Ex. 2 at ¶¶ 65–66 (citing Ex. 13 at 5). Mr. Capazorio also testified that American military personnel informed him that "they had found copper residue both in and on the damaged vehicle." Ex. 13 at ¶ 7. Based on all of this information, Mr. Barker stated "that it is far more likely than not that this incident involved an EFP device that was designed, manufactured, and distributed by Hezbollah and/or the IRGC." Ex. 2 at ¶ 68.

f.      *The March 29, 2006 EFP Attack.*

On March 29, 2006, Schalk Bruwer was driving an escort vehicle that was struck by an explosive device. Ex. 15 at ¶¶ 4, 6. Mr. Bruwer provided photographs of the damage done to his vehicle. *Id.* at ¶ 9. Based on these photographs, Mr. Barker summarized that observable damage patterns were "similar to many confirmed EFP attacks that [he] investigated and documented" in his career. Ex. 2 at ¶¶ 70–73. The tightly distributed penetrations indicate the blast was likely triggered by a PIR sensor that would be most likely used with an EFP. *Id.* at ¶ 71. And the vehicle was devoid of any tearing marks typically associated with a mortar, an artillery round, or an IED. *Id.* at ¶ 72.

Mr. Bruwer was informed after the incident that the explosive device was an EFP and that it "had been disguised in polystyrene to make it appear as part of the curb." Ex. 15 at ¶ 10. Johann Steenberg was also informed "by military investigators that an EFP device had been hidden into the curb." Ex. 11 at ¶ 11. According to Mr. Barker, that type "of camouflage was commonly used with EFP devices and unlikely to be used with the other types of explosive weapons available to Iraqi militias in 2006." Ex. 2 at ¶ 74. Based on all of this, Mr. Barker opines that "it is far more likely than not" that this incident "involved an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC." *Id.* at ¶ 75.

g.      *The June 15, 2006 EFP Attack.*

On June 15, 2006, Christiaan Oosthuizen was riding in a vehicle that was hit with by an explosive device. Ex. 9 at ¶¶ 4, 6. Mr. Oosthuizen provided pictures of the resulting damage. *Id.* at ¶ 8. In one of those pictures, Mr. Barker identified evidence of clean penetration holes through both sides of the armored vehicle. Ex. 2 at ¶¶ 77–79 (citing Ex. 9 at 4). The clean exit hole on the other side of the vehicle demonstrates that "the slug was still travelling at a speed significant enough to cleanly penetrate the driver's side transparent armor on its way out of the vehicle. Aside from an expertly manufactured, assembled, and detonated EFP device, no weapon available to militias in Iraq in 2006 could have accomplished that feat." *Id.* at ¶ 80. This damage, in Mr. Barker's opinion, "could only have been made by an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC." *Id.* at ¶¶ 80–81.

h.      *The March 16, 2010 EFP Attack.*

On March 16, 2010, Allan Roberts, Steven Crowley, and John Jameson were travelling in a vehicle that was struck by an explosive device. Ex. 3 at ¶¶ 5–6. Mr. Roberts has provided a

copy of the report from the military team that investigated the scene of the attack. *Id.* at ¶ 9.[5]

That report repeatedly identifies the device as an EFP. *See id.* at 3–10. After reviewing the

report, including the images contained therein, Mr. Barker highlights the the narrow point of

entry into the vehicle from the blast. Ex. 2 at ¶¶ 86–87 (citing Ex. 3 at 8). He views the damage

shown as "strongly indicative of an EFP design" and that "any other type of device would have

likely distributed far more widespread damage to the impact area." *Id.* at ¶ 87. Moreover, the

placement of the explosive device described by the report "is much more consistent with an EFP

device than any other plausible option given the time and place." *Id.* at ¶ 88. Mr. Barker

confidently supports the conclusion of the EOD Report by stating that the damage "could only

have been made by an EFP device designed and distributed by Hezbollah and/or the IRGC." *Id.*

at ¶ 89.

i.      *The June 23, 2011 EFP Attack.*

On June 23, 2011, George Riekert and Abdul Mughal were riding in a vehicle that was

struck by an explosive device. Ex. 8 at ¶¶ 4–8. Mr. Riekert has provided photographs of the

damage to the vehicle. *Id.* at ¶ 10. A video of the incident was made available to and reviewed by

Mr. Barker. Ex. 2 at ¶ 90. Based on the photographs and video recording, Mr. Barker observed

that a large slug cleanly penetrated the vehicle's transparent armor from a blast seat that was at

least thirty feet away at the time of the explosion. *Id.* at ¶¶ 91–93. The image he highlights in his

report shows a "clean penetration of a large slug though transparent armor." *Id.* at ¶ 92 (citing

---

[5] The plaintiffs in *Karcher* relied upon many similar military investigative reports. There, the victims were active-duty members of the military, making the completion of such a report after those incidents far more likely. To support the evidentiary value of those reports, the *Karcher* plaintiffs offered the expert testimony of Leo Bradley to establish "that the United States' findings—repeated in many reports from top U.S. government and military officials—that the type of EFPs used to injure Plaintiffs were of Iranian provenance and provided to Special Groups by Iran to attack Coalition Forces, are supported with a robust system for developing evidence and analysis." *Karcher*, ECF No. 87 at 48. Here, Plaintiffs rely on that same "robust system" for evidentiary support of the March 16, 2010 attack.

Ex. 8 at 4). He believes that this type of damage "can only reasonably be explained by the involvement of an EFP." *Id.*

In sum, Mr. Barker opines that "each of the explosive attacks at issue in this case was carried out using at least one EFP device of the type designed, manufactured, and distributed into Iraq by Hezbollah and/or the IRGC." *Id.* at ¶ 98. Given Iran's responsibility for introducing EFP devices into Iraq, intentionally raising the lethality of Iraq's Shia militias in the process, such a finding is more than sufficient to amount to the provision of material support towards the attacks at issue in this case.

       *iii.*       *The Victim Plaintiffs all suffered personal injuries as a result of the EFP Attacks.*

Each of the Victim Plaintiffs have provided a sworn statement that briefly identifies the physical, mental, and emotional toll of their exposure to one of the EFP Attacks.

Allan Roberts suffered the loss of both legs. Ex. 3 at ¶ 7. Jaco Botes received shrapnel wounds to his leg, arm, and neck, a large bruise on his face, and a burst eardrum. Ex. 4 at ¶ 8. Steven Crowley lost his left leg. Ex. 5 at ¶ 7. John Jameson incurred injuries to his knees, hips, back, neck, shoulders, eardrums, and suffered a traumatic brain injury. Ex. 6 at ¶ 6. Abdul Mughal broke his hand. Ex. 7 at ¶ 7. George Riekert sustained shrapnel wounds and injuries to his head, neck, and back. Ex. 8 at ¶ 8. Christiaan Oosthuizen suffered a traumatic loss of hearing, a concussion, and shrapnel wounds. Ex. 9 at ¶ 7. George Kieser injured his knee and incurred a traumatic brain injury. Ex. 10 at ¶ 7. Johann Steenberg injured his knee and developed severe post-traumatic stress disorder. Ex. 11 at ¶¶ 11–12. Leon Botha sustained shrapnel wounds and a traumatic brain injury. Ex. 12 at ¶ 7. Dean Capazorio suffered permanent hearing loss and severe post-traumatic stress disorder. Ex. 13 at ¶¶ 8, 12. Pierre du Plessis incurred severe post-traumatic

stress disorder. Ex. 14 at ¶ 10. Schalk Bruwer sustained a significant shrapnel injury to his left arm. Ex. 15 at ¶ 6.

Such uncontroverted testimony is sufficient to establish the existence of personal injuries necessary to satisfy this final element. *See* Ewan, 2020 WL 3081939, at *2 (explaining that "sworn affidavits or declarations" may be sufficient to satisfy the evidentiary burden on default). If the Court grants this Motion as to liability, or requires a full evidentiary hearing, Plaintiffs are prepared to fully detail the extent of these injuries, and to support these claims with medical documentation and expert medical testimony to prove the extent of each Victim Plaintiffs' injuries.

In sum, the Victim Plaintiffs have shown all the necessary elements to establish a waiver of Iran's sovereign immunity for a suit arising out of the EFP Attacks. Namely, that (1) Iran is a designated state sponsor of terrorism, *see supra* p. 17; (2) the Victim Plaintiffs were serving as employees of the United States at the time of the EFP Attacks, *see supra* p. 17; and (3) Iran's material support to Iraqi Shia militias was a proximate cause of the injuries sustained in the EFP Attacks, *see supra* Part IV.A.ii. Accordingly, this Court should find that Iran has forfeited any claim to sovereign immunity and that this Court may exercise subject matter jurisdiction over the claims asserted herein.

### B.    Personal Jurisdiction

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for satisfying the first element, this Court's subject matter jurisdiction, and proper service was obtained as is described below, thereby satisfying the second element for personal jurisdiction.

Title 28, Section 1608 prescribes the four methods of obtaining proper service in FSIA cases. *See* 28 U.S.C. § 1608(a)(1)–(4). These methods must be attempted in ascending order, but only to the extent that each is feasible in a specific case or applicable to a specific defendant. *Id*. The first two methods of service under Section 1608—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention," respectively—do not apply here, as Plaintiffs have no "special arrangement" for service with Iran, and Iran is not a party to "any applicable international convention on service of judicial documents." *See Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 70 (D.D.C. 2010); *Schwartz v. Islamic Republic of Iran*, Case No. 1:18cv1349, 2020 WL 7042842, at *15 (D.D.C. Nov. 30, 2020).

Plaintiffs initiated the third method of service, via foreign mailing pursuant to 28 U.S.C. § 1608(a)(3), on June 8, 2020. ECF No. 6. The Clerk's office was unable to effect service in this manner. *See* ECF No. 7. After waiting the requisite thirty days, Plaintiffs initiated the final method of service, in accordance with 28 USC § 1608(a)(4), on July 16, 2020. ECF No. 8. On July 30, 2020, the Clerk transmitted those documents to the State Department for service through diplomatic channels. *See* ECF No. 11.

The State Department confirmed on December 4, 2020 that the Iranian Ministry of Foreign Affairs was served with the pleadings on November 4, 2020. ECF No. 13.

Iran is outside the protection of sovereign immunity, *see supra* Section VI.A, and, as explained in this section, Plaintiffs have fully complied with the service requirements of Section 1608(a). Therefore, this Court may properly exercise personal jurisdiction over Iran in this matter. *See* 28 USC § 1330(b).

## VII.   LIABILITY

Liability in FSIA cases is traditionally determined in one of two ways: the most straight-forward of which is by proving the elements necessary to satisfy the federal cause of action established by Congress in Subsection (c) of Section 1605A; however, if a plaintiff does not advance this statutory cause of action, he or she may always pursue common law remedies.

Historically, the FSIA was not interpreted to create a federal cause of action but rather to operate as a "pass-through" for state law claims. *See Owens,* 864 F.3d at 809; *Cicippio-Puelo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033 (D.C. Cir. 2004); *Fritz,* 320 F.Supp.3d at 89. The law was amended as part of the National Defense Authorization Act in 2008 to explicitly authorize a federal cause of action, but this amendment "did not upset the prior law permitting plaintiffs to assert state law claims after clearing the hurdle of foreign sovereign immunity." *Fritz,* 320 F.Supp.3d at 89, *citing Owens,* 864 F.3d at 807–09.

Liability for the instant case will be analyzed for the Victim Plaintiffs under the federal cause of action found in the FSIA and for the Family Plaintiffs under applicable common law claims.

### A.   Iran is liable to the Victim Plaintiffs under 28 U.S.C. § 1605A.

"There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz,* 320 F.Supp.3d at 86–87, *quoting Foley v. Syrian Arab Republic,* 249 F.Supp.3d 186, 205 (D.D.C. 2017). A plaintiff who proves the waiver requirements of 28 U.S.C. §1605A(a) and is a U.S. national, military member or government contractor at the time of the terrorist act, "has also established entitlement to relief as a matter of federal law." *Fritz,* 320 F.Supp.3d at 87. Put differently, for the Victim Plaintiffs, "the elements of immunity and liability . . . are essentially the same." *Warmbier v. Democratic*

*People's Republic of Korea*, 356 F. Supp. 3d 30, 54 (D.D.C. 2018) (quoting *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 155 (D.D.C. 2010)).

Those 1605A elements—that Iran was designated as a state sponsor of terrorism; that the Victim Plaintiffs were performing a contract for the United States and acting within the scope of their employment; that money damages are being sought for personal injuries caused by attempted acts of extrajudicial killing, or the material support of such acts—are the same under both the sovereign immunity waiver and the liability aspects of the statute. *See id.*; *see also* 28 U.S.C. § 1605A(c). Accordingly, the Victim Plaintiffs are entitled to federal statutory liability as a matter of law for the reasons detailed above. See *supra* at Section IV.A.

**B.      Iran is liable to the Family Plaintiffs under D.C. law.**

*i.      D.C. law should apply to the Family Plaintiffs' claims.*

In *Owens,* 864 F.3d 751, (D.C. Cir. 2017), the Republic of Sudan argued that the 2008 amendments to the FSIA statute creating a federal cause of action also served to implicitly revoke a claimant's ability to rely on state law claims once jurisdiction was established. *Id.* at 808 ("Sudan suggests the Congress struck a deal when it recodified the new terrorism exception in §1605A: A plaintiff could sue under the new federal cause of action but could no longer press a state-law claim against a foreign sovereign via the pass-through process"). The D.C. Circuit flatly rejected that argument:

> Of course, in most cases brought under the new terrorism exception, the plaintiff need not rely upon state tort law. This does not, however, imply that the Congress intended to foreclose access to state law by those who need it, as do foreign family members. U.S. nationals will continue to sue under § 1605A(c) and benefit from its consistent application. But the pass-through approach remains viable to effectuate the intent of the Congress to secure recoveries for other plaintiffs harmed by a terrorist attack.

*Id.* at 809.

In circumstances where the federal cause of action is either not available to or not advanced by a particular plaintiff, this Court must first determine what substantive law applies. This determination is accomplished by applying the choice of law rules of the forum state. *Oveissi v. Islamic Republic of Iran,* 573 F.3d 835, 840 (D.C. Cir. 2009); *Owens v. Republic of Sudan,* 826 F.Supp.2d 128 (D.D.C. 2011), *aff'd in part and vacated in part on other grounds,* 864 F3d 751 (D.C. Cir. 2017)

The District of Columbia blends a "governmental interest analysis" with a "most significant relationship test." *Fritz,* 320 F.Supp.3d at 89 (quoting *Oveissi,* 573 F.3d at 842). Under the governmental interest analysis, this Court should evaluate "the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Ercules & Co., Ltd. V. Shama Rest. Corp.,* 566 A.2d 31, 40–41 (D.C. 1989).

The "most significant relationship test" requires this Court to consider four factors set forth in the Restatement (Second) of Conflict of Laws: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship, if any, between the parties is centered." *Id.* (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)). Consideration should also be given to the needs of international systems, the relevant policies of the forum, predictability, certainty and uniformity of result, and ease in the determination and application of the law to be applied. *Dammarell v. Islamic Republic of Iran,* 2005 WL 756090 at *18 (D.D.C. Mar. 29, 2005); *Fritz,* 320 F.Supp.3d at 90. Moreover, as a general rule, the law of the forum governs, "unless the foreign state has a greater interest in the controversy." *Owens,* F.Supp.2d at 154.

In similar FSIA cases addressing this issue, this Court has applied the substantive laws of the District of Columbia instead of the law where the injury occurred (Iraq) or the law where the plaintiffs happen to reside. For example, in *Owens,* this Court applied D.C. law rather than the law of the countries where the U.S. embassy bombings at issue occurred, finding that the United States had a "unique interest" in having its domestic law apply in terrorism cases, especially those directed against American interests. *Id.* "Furthermore, in light of the 2008 amendments to FSIA that seek to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism, the law of the forum state, the District of Columbia, should provide the rule of decision." *Id.* at 154–55.

Similarly, in *Dammarell*, this Court applied D.C. law in a case involving an attack on the U.S. embassy in Beirut, stressing the fact that the United States has a unique interest in having its domestic law apply to an attack on its embassy and diplomatic personnel overseas. 573 F.3d at 843. And in *Fritz,* a case involving United States soldiers abducted and killed by an Iraqi militia aided by Iran, this Court emphasized the "unique interest" of the United States in applying domestic law in terrorism cases and concluded that "the seat of the federal government" should provide the substantive law in such a case. 320 F.Supp.3d at 91.

Here, the Victim Plaintiffs were targeted with the EFP Attacks because they were advancing American efforts in Iraq. Like the circumstances in *Owens, Dammarell*, and *Fritz,* the EFP Attacks were terrorist attacks directed against American interests and the United States therefore has a unique and compelling reason for its domestic law to apply. In the interests of uniformity and certainty, the law of "the seat of the federal government" should govern, and this Court should apply D.C. law to the claims raised herein. *See id.*

ii.     *D.C.'s Substantive Law Provides a Remedy for the Family Plaintiffs.*

District of Columbia law provides a cause of action for the Family Plaintiffs that is the functional equivalent of the solatium damages available under 28 U.S.C. § 1605A.

To establish a prima facia case of intentional infliction of emotional distress under D.C. law, a plaintiff must establish: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) caused the plaintiff to suffer severe emotional distress. *Larijani v. Georgetown Univ.,* 791 A.2d 41, 44 (D.C. 2002). Acts of terrorism, "by their very definition," amount to extreme and outrageous conduct. *Valore*, 700 F.Supp.2d at 77; *Mwila v. Islamic Republic of Iran,* 33 F.Supp.3d 36, 40 (D.D.C. 2014). As set forth in detail above, Iran's conduct was intentional and reckless, necessarily causing the Family Plaintiffs severe emotional distress. This anguish, as noted in *Owens*, is an intentional part of the hostage taker's strategy. Accordingly, Iran is liable to the Family Plaintiffs for intentional infliction of emotional distress.

In *Owens,* the D.C. Circuit directly assessed whether terrorism plaintiffs who were not present at the scene of a terrorist attack could have a cause of action under the District of Columbia's framework of intentional infliction of emotional distress. Because D.C. had adopted the standard for intentional infliction of emotional distress set forth in the Restatement (Second) of Torts, Sudan argued on appeal that D.C. law therefore incorporated the Restatement's "presence requirement." *Owens,* 864 F.3d at 810. But the D.C. Circuit noted that the Restatement left "open the possibility of situations in which presence at the time may not be required." *Id.*

The D.C. Circuit certified the issue to the D.C. Court of Appeals. *Id.* at 812. The D.C. Court of Appeals held that the family member of a person injured by a terrorist attack did not have to be present in order to have a claim for intentional infliction of emotional distress. *Republic of Sudan v. Owens,* 194 A.3d 38, 42 (D.C. 2018). The Court of Appeals reasoned that

the policy considerations underlying the presence requirement were more than satisfied by the

strict jurisdictional requirements of 28 U.S.C. § 1605A:

> The presence requirement serves many purposes. It shields defendants from unwarranted liability, tries to ensure that compensation is awarded only to victims with genuine claims of severe emotional distress, and provides a judicially manageable standard that protects courts from a flood of IIED claims. *See* Restatement Second § 46 cmt. l. In FSIA terrorism cases, however, the presence requirement is not needed to achieve these goals: the very facts that justify stripping foreign sovereigns of their immunity allay the concerns that the presence requirement was designed to address.
>
> . . .
>
> Defendants in FSIA terrorism cases do not need this additional protection. Acts of terrorism are, by their very nature, designed "'to create maximum emotional impact,' particularly on third parties." . . . Therefore, when foreign states provide material support for terrorist attacks, it should come as no surprise that the acts they facilitated have caused severe emotional distress to persons who were not present at the time.
>
> Another purpose of the presence requirement is to increase the likelihood that only plaintiffs with "genuine" complaints of severe emotional distress can recover. *See* Restatement Second § 46 cmt. l. Yet, the risk of trivial or feigned claims is exceedingly low when the anguish derives from a terrorist attack that *killed or injured* a member of the plaintiff's *immediate family* . . . Consequently, in such circumstances, courts need not rigidly enforce the presence requirement to ward off disingenuous claims.

*Id.* at 43–44 (emphasis in original). Accordingly, the Family Plaintiffs can maintain their claim for

intentional infliction of emotional distress under D.C. law, despite the fact that they were not

present with the Victim Plaintiffs at the time of the EFP Attacks.

## VIII.   CONCLUSION

Iran purposefully manufactured EFPs, distributed them into Iraq, and trained Iraqi

militias in their use, all for the express purpose of maximizing American casualties in Iraq. The

case before the Court is squarely in line with the policy and purpose behind the FSIA's terrorism exception. Accordingly, Plaintiffs seek justice from this Court through a finding of liability against Iran for the attempted extrajudicial killing of the Victim Plaintiffs and the intentional infliction of emotional distress against the Family Plaintiffs.

WHEREFORE, Plaintiffs request that the Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs submit a Status Report within fourteen (14) days containing at least one recommendation for a qualified individual to serve as a special master for the hearing of evidence as to damages.

Dated: April 2, 2021                     Respectfully submitted,

            /s/ Kevin A. Hoffman
           Kevin A. Hoffman (DC Bar No. 1044559)
           Randy D. Singer (DCD Bar No. VA0157)
           SINGER DAVIS, LLC
           1209A Laskin Road
           Virginia Beach, VA 23451
           Phone: (757) 301-9995
           Fax: (757) 233-1084
           Email: kevin.hoffman@singerdavis.law
           Email: randy.singer@singerdavis.law
           *Counsel for Plaintiffs*