**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALLAN ROBERTS et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Case No. 1:20cv1227** |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| | ) |
| **Defendant.** | ) |

<u>**EXPERT AFFIDAVIT OF DONALD WADE BARKER**</u>

I, DONALD WADE BARKER, have personal knowledge of the facts and circumstances described herein and, if called, would testify in open court to the same. I swear or affirm:

**I.      QUALIFICATIONS & EXPERIENCE**

1.      I served as a member of the United States Army from 1995 until 2009 in a wide variety of roles, including seven separate combat tours (both in Iraq and Afghanistan) throughout my time in active duty.

2.      One such position was as the Officer in Charge of the 101st Air Assault Asymmetric Warfare unit. My role there was to oversee the development and implementation of counter-measures to combat the proliferation and effectiveness of improvised explosive devices ("IEDs") and explosively formed penetrators ("EFPs") throughout Iraq and Afghanistan. This unit was the first of its kind in the Army. As a result of my position, I received and taught the Army's most advanced trainings related to EFPs and their deployment in the Iraq combat theater.

3.      After my work with the Army, I served for five years as a research scientist at the George Tech Research Institute at the Georgia Institute of Technology. My role there was to study, assess, and design IED and counter-IED technologies, including EFPs. During this time, I also completed two additional tours of duty in Afghanistan as a civilian contractor. These dual

roles required that I stay up to date on all developments in my field and provided me access to the most current information.

4.      For my military service, I received a Bronze Star, a Meritorious Service Medal, three Army Commendation Medals, three Army Achievement Medals, three Iraqi Campaign Medals, three Afghanistan Campaign medals, two Global War on Terrorism Medals, a Good Conduct Medal, a Joint Humanitarian Medal, and a Presidential Unit Award.

5.      I presently serve as the Chief Executive Officer of the Tisdale Group, a company focused on producing defense technologies to reduce the risk to soldiers on the battlefield, including products to counter the impact and effectiveness of enemy EFP devices. I continue to hold a current Top Secret/Sensitive Compartmented Information security clearance.

6.      A copy of my current curriculum vitae is attached to this Affidavit.

## II.      PRIOR TESTIMONY

7.      I was named as an expert witness in the case of *Karcher v. Islamic Republic of Iran* and the Court qualified me on the subjects of "[improvised explosive devices ("IEDs")], EFPs and counter-IED technology." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 17 (D.D.C. 2019). I submitted a written expert report in that matter, dated August 29, 2018. *Karcher*, ECF No. 89. I also provided live testimony at a hearing on the same issues.

## III.      DOCUMENTS REVIEWED

8.      I reviewed the Complaint in this action as well as the specific evidence of each alleged EFP incident provided to me by Plaintiffs' counsel, which consist primarily of a combination of photographs, video records, and first-hand accounts from the victims. I consulted, when necessary, with the resource materials common to my field. I used photographs and data from confirmed EFP attacks that I have encountered before for comparison purposes

and relied upon open source and declassified reporting when, in my professional judgment, doing so was helpful, trustworthy, and warranted.

9.      I have reviewed my expert report and trial testimony from the *Karcher* case and, as I testify today, I stand by my written and verbal testimony in that matter and I have relied upon substantially the same methodologies for reaching my conclusions in this case.

10.      I have also reviewed the expert report of Kevin Lutz from *Karcher* and can affirm that I agree with his conclusions, observations, and opinions regarding the nature and function of EFP devices, as well as the direct and causal link of those devices' presence in Iraq with the actions of the Iranian government and its proxies.

## IV.    THE HISTORY, DESIGN, MANUFACTURE, AND USE OF EFP DEVICES

11.      The modern EFP was first developed and used by Lebanese Hezbollah ("Hezbollah") in the 1990s in an effort to damage Israeli armored vehicles. At that time, and still today, Hezbollah is the primary Iranian proxy group, heavily funded, trained, supplied, and directed by the Islamic Revolutionary Guard Corps ("IRGC") and its Quds Force ("IRGC-QF").

12.      The first recorded use of the Hezbollah EFP occurred on October 5, 1998 in Lebanon.[1]

13.      Iran, both directly, via the IRGC-QF, and indirectly, through Hezbollah, began distributing EFPs into Iraq in 2004, but the United States military did not begin to track their use in Iraq consistently until mid-2005. Concurrently with this distribution effort, Iran also began implementing and organizing specialized training programs to ensure the weapons could be used properly.

---

[1] Nicholas Blandford, "Warriors of God: Inside Hezbollah's Thirty-Year Struggle Against Israel," (Random House, 2011), p. 215.

14.     As the use of EFPs increased sharply, Coalition forces in Iraq deployed numerous efforts to protect themselves by adding various levels and types of armor to their vehicles, but none of these efforts were consistently successful in stopping a properly fired EFP from achieving damaging penetration.

15.     EFP devices are highly effective against armored vehicles because of their ability to focus the energy of an explosive blast into a plate of metal, forming that metal into the shape of a slug. This process involves what is known as the Misznay-Schardin effect.

16.     The Misznay–Schardin effect, also known as the platter effect, is a characteristic of the detonation of a broad sheet of explosive. The explosive blast expands directly away from, or perpendicular to, its plane in both directions. But, when one side is backed by a heavy or fixed mass, most of the blast energy will be sent in the other direction.

17.     This scientific principle is perfectly demonstrated by the design of an EFP, where one end of a steel pipe is welded shut with a steel plate, creating what is essentially a fixed mass at that end. The open end of the pipe is packed with explosive material and then closed with a specially manufactured copper plate. Upon detonation, the blast is primarily directed into the copper plate, forming it into a large molten slug at extremely high rates of speed.

18.     Because of the nature of this design, the type of explosive used is also a key aspect of a successful EFP device. Many common explosive materials detonate at temperatures below the melting point of copper, which would then lead to a failure to form the copper plate into the slug-shape needed for maximum penetration and impact.

19.     By contrast, high-energy ("HE") explosive material, such as C-4, will detonate at much higher temperatures. Copper is used effectively in tandem with these types of explosives

because its melting point is just below the maximum detonation temperature of C-4 and other similar explosive materials.

20.     Even with the correct materials in hand, however, the components of an EFP still must be manufactured and prepared correctly in order for its projectile to be effective against modern armored vehicles. Most notably, this comes down to the milling of the copper plate, which must not be too thin so as to shatter or too thick so as to fail to take the desired shape. Obtaining the knowledge and ability to effectively complete this milling process requires specific training and equipment.

21.     Once a functional EFP device is assembled, it still must be detonated in a timely and effective fashion. Successful detonation requires that the device be both armed and triggered.

22.     Initially, EFP devices in Iraq were usually armed using remote frequency transmitters or via command wires. Once armed, the devices would most often be triggered by a passive infra-red device ("PIR") which would sense the heat signature of a vehicle's engine as it passed.

23.     The size and design of EFP devices also allowed for them to be strategically placed and disguised to avoid detection. A common method for this was removing a portion of curb from the side of the roadway and replacing it with an EFP array that was painted to match the adjacent curb. The directional nature and high speed of an EFP attack allows this to be an effective placement position while also prioritizing the concealment of the device. More common and simpler IED designs would not likely be effective against armored vehicles from such a placement.

## V.     IRAN IS RESPONSIBLE FOR THE PRESENCE OF EFP DEVICES IN IRAQ

24.     As noted above, the production of an effective EFP device requires access to very specific materials, a certain level of manufacturing capability, and detailed knowledge of the process. Aside from some basic manufacturing skills and equipment, none of these three factors were generally available to Iraq's Shia militias between 2004 and 2011.

25.     Iran's proliferation of EFPs into Iraq has been publicly recognized from its earliest stages. The United States Department of State, in its 2006 Country Reports on Terrorism document, blatantly stated that "Iranian government forces have been responsible for . . . providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah."

26.     In the following years, a wide variety of evidence unfolded confirming Iran's coordination and direction of the delivery of EFPs into Iraq and the training of Iraqi militia members in their effective use. Iran and Hezbollah worked hand in hand towards these goals.

27.     The United States military and intelligence services were able to confirm and track the training of Iraqis in Lebanon and Iran through the admissions of many detainees who described the nature and extent of their training.

28.     Many stockpiles of completed EFPs or ready-made EFP components were discovered in caches in Iraq and either confirmed to be of direct Iranian origin or produced on a scale and to a quality that was not feasible locally.

29.     Some evidence of locally manufactured EFPs was also found, but it was always based on the same Hezbollah-IRGC design. These locally made materials were also easily identifiable due to their poor quality, particularly when it came to the trigger mechanism (command wire versus dual trigger with PIR) and the milling of the copper plates.

30.     Moreover, even if an EFP was manufactured locally, it still required HE explosive material in order to function effectively. That type of explosive material was not readily available to Iraq's Shia militias without Iranian sponsorship.

31.     Iran's ongoing and intimate connection to the EFP deployments in Iraq was also observable in how the militias seamlessly adapted to complex countermeasure efforts. As Coalition forces worked to disrupt the arming and triggering of EFP devices, Iraqi Shia militias evolved along with them.

32.     Each time the Coalition forces instituted a new method, there was an observable and immediate decrease in successful EFP attacks throughout the combat theater. Within a relatively short period of time, however, sometimes in mere weeks, the militias throughout Iraq would begin showing complex adaptations to the new procedures.

33.     I personally oversaw the development of electronic countermeasures, such as sophisticated radio jammers. Despite the technological complexity of these jamming systems, local militias started deploying effective countertactics very quickly. I do not believe it is possible for these militias to have deployed and implemented the technology necessary to overcome our efforts without the active involvement and oversight of the IRGC and Hezbollah.

## VI.    THE ALLEGED EFP ATTACKS

34.     Based on the information available to me in this matter, my education, training, and experience, I submit the following observations and conclusions regarding the explosive roadside attacks at issue in this matter. I submit and hold each of these opinions to a reasonable degree of professional certainty.

**A.     The November 20, 2004 Attack**

35.     I have reviewed the pictures related to this incident that are attached to the Affidavit of Leon Botha.

36.     The angle of impact displayed in these pictures was not ideal for the purposes of inflicting maximum damage on the intended targets. As a result, the damage patterns are not typical of a traditional EFP attack. Also, this incident occurred before the United States military began formally tracking and investigating EFP attacks in Iraq, which was not until mid-2005.

37.     Despite these irregularities, the photographs provided by Mr. Botha unveil multiple telltale signs that lead me to conclude, with a high degree of certainty, that an EFP device was involved.

38.     Below is a cropped portion of the photograph identified as BOTHA 008, showing the front of the vehicle.



39.     This photograph shows the primary impact point on the front driver's side windshield of the vehicle. The transparent armor of the windshield was penetrated, sending shrapnel throughout the vehicle. The photo identified as BOTHA 004 also shows that there were

penetrations through the steel door of the vehicle. These penetrations are consistent with the damage that would be expected to result from an effectively fired EFP.

40.     Two additional images conclusively confirm my opinion that this device was an EFP. Cropped portions of the photographs, identified as BOTHA 009 and BOTHA 010, respectively, are provided below.



41.     The image on the left, BOTHA 009, is taken from inside the vehicle and shows two copper slugs (seen in the bottom right quadrant of the picture) arrested in the driver's side transparent armor. The image on the right, BOTHA 010, shows a man holding shell fragments in his hand. Two of these fragments are undoubtedly copper material.

42.     The presence of copper slugs and fragments confirms, without any reasonable doubt, that this attack involved an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC.

**B.     The May 16, 2005 Attack**

43.     I have reviewed three photographs of the vehicle involved in this attack and an incident report provided by Mr. Steenberg.

44.     Although it is badly damaged by fire, certain telltale marks of EFP damage are still clearly visible in the pictures. Below is a cropped portion of the photograph attached to the Affidavit of Johann Steenberg and identified as STEENBERG 005.



45.     The yellow circle was on the picture when it was provided to me, but I have added the three small red circles to show what I believe to be the critical evidence.

46.     Each circled area represents a clean penetration through steel armor. The presence of these holes on both sides of the vehicle is significant because it shows the projectiles were capable of traveling cleanly through the steel armor, the entire vehicle, and cleanly through steel armor again on the other side.

47.     Based on my knowledge of the Iraq theater in 2005, the size, shape, location, and distribution of these penetrations could only reasonably be expected to have been made by an EFP device that was designed, manufactured, and distributed by Hezbollah and/or the IRGC.

**C.     The November 14, 2005 Attack**

48.     I have reviewed four photographs of the vehicle involved in this attack that took place outside the Iranian Embassy complex in Baghdad.

49.     Although it is badly damaged by fire, certain signs of EFP damage are still clearly

visible. Below is a cropped portion of the photograph attached to the Affidavit of Pierre du

Plessis and identified as DU PLESSIS 001.



50.     I added the two red circles to this image to highlight the areas of relevance

supporting that this attack was committed using at least one EFP device.

51.     The top circle shows a clean circular penetration through the vehicle's transparent

armor. That alone, given what I know of the Iraq theater and the defensive capabilities of that

material, is sufficient for me to conclude that this was likely an EFP attack.

52.     The lower red circle shows a circular penetration that carried cleanly through the

steel armor of the vehicle. This is also indicative of damage that would be expected from an EFP.

53.     Based on the statements of Mr. Du Plessis, it is my understanding that this was the last vehicle of a four-vehicle convoy. That fact makes it highly likely that this device was command triggered, as opposed to being set off by a PIR or some other passive trigger.

54.     It is important to note that this vehicle was struck directly in the transparent armor and in the gap between the front and rear doors. American intelligence operations confirmed that Iranian directed training to Iraqi militias identified those specific areas as the weakest spot in an armored vehicle. It is doubtful that this damage landed in this spot by accident or that an Iraqi insurgent fighter would have learned to identify this structural weakness without sophisticated training.

55.     Given the totality of this evidence, including the location of the attack, I believe that it is highly likely that this damage was caused by an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC, with the assistance of specific training from those organizations intended to increase the lethality of the weapons.

**D.     The January 4, 2006 Attack**

56.     I have reviewed five photographs of the vehicle involved in this attack.

57.     Below is a cropped portion of the photograph attached to the Affidavit of George Kieser and identified as KIESER 001.

12



58.     I added the red circle to this image to highlight key information that I believe necessitates the conclusion that this attack was committed with an EFP device.

59.     First, this image shows full penetration of the door armor, with little to no material deformation in the process. This perfectly matches the manner of how an EFP slug pierces steel armor and is unlikely to be caused by the other types of explosive devices at play in the Iraq combat theater at this time.

60.     Even more importantly, however, copper residue is clearly visible on the inside of the hole circled above. This is classic evidence of an EFP attack. I am not aware of any other explanation for the coloration seen in this picture. Small copper fragments are also visible in the photographs identified as KIESER 002–003.

61.     Based on my review of these images, particularly the evidence of copper residue and fragmentations, I have a high degree of certainty in stating that this attack was carried out using an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC.

### E.     The January 2006 Attack

62.     I have reviewed the three photographs attached to the Affidavit of Dean

Capazorio, as well as various written statements made by Mr. Capazorio.

63.     Below is a cropped portion of the photograph identified as CAPAZORIO 003:



64.     The illustrations on this image were present when I received it. Based on

representations from Mr. Capazorio, this picture is the confirmed blast site for the explosive

device that hit his convoy in January 2006. It is consistent with the design and tactical

deployment of EFP devices for them to be hidden in this manner. Importantly, the curb is

relatively undamaged – despite its proximity to the blast – an outcome that confirms the use of a

directional weapon, such as an EFP.

65.     The vehicle damage is seen in the below photograph, which is identified as

CAPAZORIO 002.



66.      The damage shown here is consistent with an upward angled impact from an EFP device hidden in a roadside curb. Moreover, inside the red circle that I added to this image is what appears to be copper residue left on the steel frame of the vehicle.

67.      In his sworn Affidavit, Mr. Capazorio stated that he was informed by United States military personnel that copper residue was found on the vehicle. The presence of copper residue after a roadside bombing in Iraq during this timeframe amounts to compelling evidence of the involvement of at least one EFP device in the attack.

68.      Given the totality of the evidence available to me, I believe that it is far more likely than not that this incident involved an EFP device that was designed, manufactured, and distributed by Hezbollah and/or the IRGC.

**F.      The March 29, 2006 Attack**

69.      I have reviewed eleven photographs of the vehicle involved in this attack as well as written statements by Mr. Bruwer.

70.     Although it is badly damaged by fire, certain marks indicative of EFP damage remain clearly visible. Below is a cropped portion of the photograph attached to the Affidavit of Schalk Bruwer and identified as BRUWER 006.



71.     The tightly distributed penetrations into this vehicle show that the blast was very directed. It is my opinion that the explosion was likely triggered by a PIR sensor, causing the explosion to hit the engine compartment and the main cabin of the vehicle as it passed.

72.     The vehicle is devoid of any large tearing marks that would normally be associated with either a mortar or artillery round or a more common IED.

73.     In sum, the damage observable in these pictures is similar to many confirmed EFP attacks that I investigated and documented during my time in the military and as a civilian contractor for the Department of Defense.

74.     Moreover, according to the sworn written testimony of Mr. Bruwer, it is my understanding that the explosive device was disguised in polystyrene and hidden inside a part of the curb along the side of the roadway. That method of camouflage was commonly used with

EFP devices and unlikely to be used with the other types of explosive weapons available to Iraqi militias in 2006.

75.     Given the totality of the evidence available to me, I believe that it is far more likely than not that the March 29, 2006 attack involved an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC.

**G.     The June 15, 2006 Attack**

76.     I have reviewed three photographs of the vehicle involved in this attack as well as written statements from Mr. Oosthuizen.

77.     Below is a cropped portion of the photograph attached to the Affidavit of Christiaan Oosthuizen and identified as OOSTHUIZEN 002.



78.     I added the two red circles to this image to highlight the entry and exit points of the penetrating slug that struck this armored vehicle.

79.     Mr. Oosthuizen indicates that his vehicle was struck from the right side, the passenger side. This testimony is consistent with the above image. The red circle on the right shows the total penetration of the steel frame as the slug entered the vehicle.

80.     The red circle on the left shows a clean exit hole. As is quite obvious from this picture, the slug was still traveling at a speed significant enough to cleanly penetrate the driver's side transparent armor on its way out of the vehicle. Aside from an expertly manufactured, assembled, and detonated EFP device, no weapon available to militias in Iraq in 2006 could have accomplished that feat.

81.     Based on my knowledge of the Iraq theater circa 2006, the size, shape, and location of these penetrations could only have been made by an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC.

**H.     The March 16, 2010 Attack**

82.     I have reviewed the JTF Troy Team Report attached to the Affidavit of Allan Roberts.

83.     The overall damage to this vehicle is not what I would consider to be textbook or generally expected for an EFP incident. However, it is my belief that this unusual damage pattern was because the individual perpetrator of this attack was relatively inexperienced and assembled the device imperfectly.

84.     The JTF Troy Team Report referenced evidence that an individual had been on site to detonate and witness the attack. That would have been somewhat unusual for an EFP attack in 2010, as, by that time, advanced passive triggering mechanisms were more common because they reduced the risk of capture or death for the perpetrator. However, it was well documented that new recruits would often stay at the site of their first attacks in order to video the explosion as proof of their capabilities. Such an immature bombmaker would have required detailed instructions for the assembly and detonation of an EFP device.

85.     Despite the unusual overall damage I observed, I can positively confirm the assessment of the JTF Troy Team Report that the explosive device responsible for this attack was an EFP.

86.     Below is a cropped portion of an image embedded in the Report, found on the page identified as ROBERTS 006.



87.     The pinpointed nature of the entry-point that is clearly visible in this picture, the hole at the end of the red and yellow lines, is strongly indicative of an EFP design. In my experience, any other type of device would have likely distributed far more widespread damage to the impact area.

88.     Moreover, the positioning and placement of this device, two feet off the ground and directionally focused, is much more consistent with an EFP device than any other plausible option given the time and place.

89.     These key observations, considered along with the overall description of this event, lead me to the conclusion that although an EFP device was used, it did not detonate to its

full potential. However, I am confident that the entry hole seen above could only have been made

by an EFP device designed and distributed by Hezbollah and/or the IRGC.

     **I.**      **The June 23, 2011 Attack**

    90.     I have reviewed six photographs of the vehicle involved in this attack and the

witness statement attached to the Affidavit of George Riekert. I also reviewed a video of the

attack that was recorded from the dash cam of one of the convoy vehicles.

    91.     Below is a cropped portion of the photograph identified as RIEKERT 002.



    92.     I added the red circle to this image to highlight the area of damage confirming to

me that this attack was committed using an EFP device. This clean penetration of a large slug

through transparent armor can only reasonably be explained by the involvement of an EFP.

    93.     The video recording further cemented my opinion. It shows that the blast seat was

at least thirty feet away from the vehicle at the time of detonation. Despite that distance, the

transparent armor was impacted by a compact slug at an extremely high rate of speed, causing

localized damage.

94.     I am confident that the June 23, 2011 attack was committed using an EFP device designed, manufactured, and distributed by Hezbollah and/or the IRGC.

## VI.    OPINIONS & CONCLUSIONS

95.     Iran, both directly via the IRGC-QF, and indirectly through its influence over its proxy Hezbollah, introduced and supplied EFPs into Iraq following the 2003 invasion for the purpose of giving Iraqi militia groups a viable weapon against the armored vehicles used by the Coalition forces.

96.     Without Iranian directed support, militia groups in Iraq would not have developed the capabilities to manufacture or obtain EFPs.

97.     Iran, both directly and indirectly, provided training to Iraqi militias in the use and deployment of EFPs, including ongoing training in methods for overcoming the evolving counter-measures deployed by Coalition forces.

98.     The EFP training provided and directed by Iran substantially increased the lethality and effectiveness of the devices in operation.

99.     As described and explained in detail above, each of the explosive attacks at issue in this case was carried out using at least one EFP device of the type designed, manufactured, and distributed into Iraq by Hezbollah and/or the IRGC.

100.    Therefore, based on my knowledge, expertise, and conclusions described herein, each of which I hold within a reasonable degree of professional certainty, the attacks described above were completed as the direct and proximate result of material support and resources provided by Iran.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Signed this __01__ day of __April__, 2021.


*Wade Barker*
Donald Wade Barker