## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALLAN ROBERTS,** *et al.,* | |
| *Plaintiffs,* | |
| v. | **Case No. 1:20-cv-1227-RCL** |
| **THE ISLAMIC REPUBLIC OF IRAN** | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

During the United States military's occupation of Iraq, insurgents attacked American troops and their allies with explosively formed penetrators ("EFPs")—a type of improvised explosive device ("IED") capable of exceptional destruction and lethality. Plaintiffs here are thirteen contractors injured in EFP attacks (the "Contractor Plaintiffs")[1] and their immediate family members (the "Family Member Plaintiffs" and the "Mughal Plaintiffs").[2] These individuals ask the Court to hold the Islamic Republic of Iran ("Iran") liable for materially supporting the EFP attacks that injured them. Iran has not responded to this lawsuit, so plaintiffs have moved for default judgment. *See* Entry of Default, ECF No. 15; Mot. for Default J., ECF No. 16.

---

[1] The Contractor Plaintiffs are Allan Roberts, Jaco Botes, Steven Crowley, John Jameson, Abdul Ghaffar Mughal, George Riekert, the Estate of Christiaan Oosthuizen, George Kieser, Johann Steenberg, Leon Botha, Dean Capazorio, Pierre Du Plessis, and Schalk Bruwer.

[2] The Family Member Plaintiffs are Bethan Johnson, C.D.R., Natasha Grove, O.J.C., L.A.C., Sarah Crowley, Michael Crowley, Patricia Crowley, Kristin Jameson, Edith Nichol, Thomas Jameson, Simonè Riekert, M.R., Simon Riekert, Wilhelmina Oosthuizen, Chante Oosthuizen, Shibone de Bruyn, Shaun Oosthuizen, Magdalena Oosthuizen, Maggie Kieser, Emogene Boje, Sone Smith, Gavin Smith, Johannes Kieser, Hester Hart, Arnoldus Kieser, Loraine Steenberg, René Botha, Jené Steenberg Marais, Deseré Steenberg, the Estate of Estelle Brink, Brendon Botha, Leanelle Botha, Janet Capazorio, Brandon Capazorio, Shannon Figg, George Capazorio, Maud Capazorio, Bettina Calder, Carin Capazorio, Sarel Du Plessis, Susan De Clercq, Rozelle Adams, and Morne Bruwer. The Mughal Plaintiffs consist of Sitorai Khasanzod, Khalid Mughal, Hamid Mughal, Angela Mughal, N.M., and M.M.

In this memorandum opinion, the Court will set forth its findings of fact and conclusions of law on plaintiffs' claims.  Plaintiffs raise claims against Iran under the Foreign Sovereign Immunities Act ("FSIA"), which guarantees a private cause of action for victims of state-sponsored terrorism.  *See* 28 U.S.C. § 1605A(c).  Plaintiffs also allege claims for intentional infliction of emotional distress ("IIED") arising under District of Columbia ("D.C.") law.  The Court possesses subject matter jurisdiction over plaintiffs' § 1605A(c) claims.  But under D.C. choice-of-law principles, D.C. tort law cannot provide the substantive law governing plaintiffs' IIED claims.  Without evidence of British, South African, and Iraqi law, the Court cannot grant default judgment on plaintiffs' IIED claims on this record.

After considering plaintiffs' motion, applying relevant case law, and taking judicial notice of expert reports in related cases, the Court will **GRANT IN PART** and **DENY IN PART** plaintiffs' motion for default judgment against Iran.

## I.    LEGAL STANDARD

Plaintiffs moved for default judgment against Iran because Iran has not appeared or defended this lawsuit.  *See* Mot. for Default J.  But even when a defendant fails to appear, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The FSIA expressly provides that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish her claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). "[I]ndeed, 'the quantum and quality of evidence that might satisfy a court can be less than that normally required.'" *Owens v.*

*Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Additionally, a plaintiff moving for default judgment "must persuade the trial court" that it may exercise subject matter jurisdiction and personal jurisdiction over the defendant. *Karcher v. Islamic Republic of Iran*, 496 F. Supp. 3d 12, 21 (D.D.C. 2019) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)). After all, a default judgment "rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422. And a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

## II.     FINDINGS OF FACT

Before this Court can enter default judgment against Iran, it must "reach its own, independent findings of fact" notwithstanding prior cases implicating the same issues. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). "[N]umerous evidentiary sources" can support a default judgment. *Id.* at 171. Plaintiffs have submitted affidavits supporting their uncontroverted factual allegations and expert reports analyzing the alleged EFP attacks. The Court also takes judicial notice of *Lee v. Islamic Republic of Iran* and *Karcher v. Islamic Republic of Iran*, both of which involved similar EFP attacks. *See Lee v. Islamic Republic of Iran*, 515 F. Supp. 3d 475 (D.D.C. 2021); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019); *see also* Fed. R. Evid. 201(b). With these principles in mind, the Court enters the following findings of fact.

### A.  Plaintiffs' Claims

Plaintiffs are sixty-three individuals claiming injuries arising from alleged EFP attacks between 2004 and 2011. *See* Compl. ¶¶ 1–64, ECF No. 1. Abdul Ghaffar Mughal and the Mughal

Plaintiffs are U.S. citizens. Mughal Aff. ¶¶ 1, 3, ECF No. 17-7. All of the remaining plaintiffs are citizens of Great Britain and South Africa. *See generally* Mem. in Supp. of Pls.' Mot. for Default J., ECF No. 17 [hereinafter Mem. in Supp.]. They sued the Islamic Republic of Iran under the FSIA, alleging that Iran materially supported Iraqi insurgents between 2004 and 2011 by supporting the "manufacture and widespread distribution" of EFPs in Iraq. *Id.* at 5.

Though all plaintiffs filed claims under the FSIA, different sets of plaintiffs filed federal and state-law claims. The Contractor Plaintiffs filed claims under 28 U.S.C. § 1605A(c). These plaintiffs worked for U.S. contractors operating in Iraq and, at the time of the attacks, were acting within the scope of their employment. *See* Roberts Aff., ECF No. 17-3; Botes Aff., ECF No. 17-4; Crowley Aff, ECF No. 17-5; Jameson Aff., ECF No. 17-6; Mughal Aff., ECF No. 17-7; Riekert Aff., ECF No. 17-8; Oosthuizen Aff., ECF No. 17-9; Kieser Aff., ECF No. 17-10; Steenberg Aff., ECF No. 17-11; Botha Aff., ECF No. 17-12; Capazorio Aff., ECF No. 17-13; Du Plessis Aff, ECF No. 17-14; Bruwer Aff., ECF No. 17-15. The Family Member Plaintiffs asserted a separate IIED claim against Iran under D.C. tort law. Compl. ¶¶ 381–83; *see* Mem. in Supp. 30–34.

### B. Service of Process

Plaintiffs first attempted to serve Iran by requesting that the Clerk of the Court—pursuant to 28 U.S.C. § 1608(a)(3)—mail Iran a summons, complaint, and notice of suit. Aff. Requesting Foreign Mailing, ECF No. 6. This service failed because no company would ship packages to Iran. *See* 06/09/2020 Min. Entry; Notice, ECF No. 7. Plaintiffs then attempted service via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). Aff. Requesting Foreign Mailing, ECF No. 8. On November 4, 2020, plaintiffs successfully served Iran with a summons, a complaint, a notice of suit, and translations of each under cover of diplomatic note. Return of Service, ECF No. 13. Iran failed to answer this complaint or appear in this litigation within sixty days of service.

4

Accordingly, on January 13, 2021, the Clerk of the Court entered default against Iran. Entry of Default, ECF No. 15.

### C.  Iran's Connection to the EFP Attacks

The Court will detail Iran's longstanding support of proxy militias in Iraq through a condensed history. The Court relies on the expert reports and transcripts of the bench trial in *Karcher*. *See generally Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK) (D.D.C. Aug. 26, 2019). In addition to these materials and the *Karcher* and *Lee* decisions themselves, the Court refers to the expert reports and affidavits submitted by plaintiffs in this case.

#### i.  *Expert Testimony*

To begin, the Court qualifies six individuals as experts. Plaintiffs provided the Court with supporting affidavits from two of these experts—Michael Pregent and Donald Wade Barker—and requested that the Court take judicial notice of the remaining experts and their reports submitted in *Karcher*. After reviewing these materials, the Court will grant this request and take judicial notice of (1) the transcripts of the *Karcher* bench trial and (2) the *Karcher* expert reports. *See* Fed. R. Evid. 201(b); *Rimkus*, 750 F. Supp. 2d at 171. The Court therefore qualifies the following experts in this case.

- <u>Michael P. Pregent</u>. The court qualifies Pregent as an expert in "intelligence matters, including attribution of terror attacks and . . . evidence collection and analysis in the intelligence field." 12/06/2018 (AM) Tr. 173:3–7; *see* Expert Aff. of Michael Pregent, ECF No. 17-1 [hereinafter Pregent Aff.]; Expert Report of Michael P. Pregent, PX-155 [hereinafter Pregent Report, PX-155]; *see also Lee*, 518 F. Supp. 3d at 782; *Karcher*, 396 F. Supp. 3d at 18–19.[3]

---

[3] In accordance with *Lee* and *Karcher*, the Court uses a modified citation convention for evidence before the *Karcher* court. Any references to transcripts refer to those for the bench trial in *Karcher*. *Lee*, 518 F. Supp. 3d at 481 n.2. Exhibits submitted in *Karcher* are indicated by their title, "PX," and the exhibit number assigned during the *Karcher* trial. *Id.*

- Captain (Ret.) Donald Wade Barker. The Court qualifies Captain Barker[4] as an expert on "IEDs, EFPs, and counter-IED technology." 12/04/2018 (AM) Tr. 10:8–12; *see* Expert Aff. of Donald Wade Barker, ECF No. 17-2 [hereinafter Barker Aff.]; Expert Report of Capt. (Ret.) Donald Wade Barker, PX-158 [hereinafter Barker Report, PX-158]; *see also Lee*, 518 F. Supp. 3d at 482; *Karcher*, 396 F. Supp. 3d at 17.

- Lieutenant General (Ret.) Michael L. Oates. The Court qualifies Lieutenant General Oates as an expert "on the tactical and strategic threats faced by the [U.S.] and Coalition Forces in Iraq [from] 2003 to 2008[,] . . . including the specific threat to US military forces from IEDs and other ordnance, including EFPs." 12/03/2018 (AM) Tr. 86:15–22; *see* Expert Report of Lieutenant Gen. (Ret.) Michael L. Oates, PX-153 [hereinafter Oates Report, PX-153]; *see also Lee*, 518 F. Supp. 3d at 481; *Karcher*, 396 F. Supp. 3d at 18.

- Colonel (Ret.) Leo E. Bradley III. The Court qualifies Colonel Bradley as an expert on the U.S. military's practices for explosive ordnance disposal—including "locat[ing], identify[ing], render[ing] safe . . . unexploded ordnance, [and] exploit[ing] and evaluat[ing] that ordnance." 12/03/2018 (PM) Tr. 7:23–25, 8:1–2, 12:9–13; *see* Expert Report of Colonel (Ret.) Leo E. Bradley III, PX-156 [hereinafter Bradley Report, PX-156]; *see also Lee*, 518 F. Supp. 3d at 481–82; *Karcher*, 396 F. Supp. 3d at 17–18.

- Russell L. McIntyre. The Court qualifies McIntyre as an expert "on IED threats to [U.S.] forces, specifically in Iraq between 2003 and 2011, . . . with an additional focus on [EFPs]." 12/06/2018 (AM) Tr. 64:16–22; *see* Expert Report of Russell L. McIntyre, PX-157 [hereinafter McIntyre Report, PX-157]; *see also Lee*, 518 F. Supp. 3d at 482; *Karcher*, 396 F. Supp. 3d at 18.

- Colonel (Ret.) Kevin Lutz. The Court qualifies Colonel Lutz as an expert "in the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations" and "the tactics, techniques[,] and procedures used by terrorist groups in Iraq between 2003 and 2011." 12/06/18 (AM) Tr. 15:4–11; *see* Expert Report of Colonel (Ret.) Kevin Lutz, PX-159 [hereinafter Lutz Report, PX-159]; *see also Lee*, 518 F. Supp. 3d at 482; *Karcher*, 396 F. Supp. 3d at 18.

---

[4] For simplicity's sake, the Court omits the titles of plaintiffs' expert witnesses after the first reference.

### ii.   *Iran's Support for Proxy Forces in Iraq*

Mere months after Shi'a cleric Ayatollah Ruhollah Khomeini came to power in the Iranian Revolution of 1979, he established the Islamic Revolutionary Guard Corps ("IRGC") to "ensure there would be no backsliding in implementing [his] vision for an Islamic theocratic government in Iran." McIntyre Report, PX-157, at 4–5. To carry out its charge to "export[] revolution abroad," the IRGC created an "external operations directorate" known as the Qods Force. Oates Report, PX-156, at 11. The Qods Force "trains, advises[,] and logistically supports terrorist and insurgent movements," including covert special operations activities. McIntyre Report, PX-157, at 6. The IRGC and Qods Force report directly to the Supreme Leader of Iran. *Id.* at 4; Pregent Aff. ¶ 23.

Shortly after its founding, the Iranian government sent IRGC members "to assist the Lebanese Shi'a community to build a political movement and military" capable of resisting Israeli forces. McIntyre Report, PX-157, at 7. The IRGC settled on "newly-emerging Hezbollah" as its target. *Id.* Hezbollah's leaders "swore an oath of fealty to Iran" and Ayatollah Khomeini as its Supreme Leader. *Id.* "In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran 'bankroll[ed], arm[ed,] and train[ed] Hezbollah." *Lee*, 518 F. Supp. 3d at 482 (quoting McIntyre Report, PX-157, at 7).

In recognition of Iran's "support for acts of international terrorism" by using these forces, the United States designated Iran as a state sponsor of terrorism on January 23, 1984. Statement of Secretary of State George P. Schultz, 49 Fed. Reg. 2836 (Jan. 23, 1984). This designation arose "in partial response" to Hezbollah's 1984 bombing of a U.S. Marine barracks in Beirut, Lebanon that killed and injured hundreds of American troops. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 67 (D.D.C. 2010); *see also* McIntyre Report, PX-156, at 6 (ascribing responsibility for this designation to "actions of the IRGC and the Qods Force"). Similar terrorism-related

7

designations followed for the IRGC and Qods Force. *See Karcher*, 396 F. Supp. 3d at 22 (listing designations).

Operation Iraqi Freedom and the U.S. military's occupation of Iraq gave Iran an opportunity to exploit the power vacuum left open by the downfall of Saddam Hussein's regime. *See* Oates Report, PX-153, at 16. Iran quickly moved to develop Shi'a proxies in Iraq to promote its goals. *See id.* In 2003, Iran backed a "young and relatively low-ranking Shi'a cleric" named Muqtada al-Sadr and his Office of the Martyr Sadr ("OMS"), which purported to speak "for Iraq's disenfranchised Shi'a." *Id.* at 16–17. After a trip to Tehran, al-Sadr created an armed wing of the OMS called Jaysh al-Mahdi ("JAM"). 12/03/2018 (AM) Tr. 99:22–100:6; Oates Report, PX-153, at 17. With financial support from the Qods Force and training from Hezbollah, JAM "rapidly expanded their territorial control" to encompass much of Baghdad. Oates Report, PX-153, at 17; *see* 12/03/2018 (AM) Tr. 100:21–101:5.

From 2003 to 2006, the IRGC used JAM and smaller militias termed "Special Groups" as proxies to conduct terrorist operations against coalition forces in Iraq. McIntyre Report, PX-157, at 16, 37–38. The Special Groups originally remained loyal to al-Sadr but received "training, weapons[,] and operational direction" directly from Hezbollah and the Qods Force. Oates Report, PX-153, at 23. Iraqi recruits often "made multiple trips to Iran or to camps in Lebanon maintained by Hezbollah" to learn paramilitary and weapons skills. Pregent Report, PX-155, at 12. Soon, the Special Groups splintered from al-Sadr and JAM. In 2006, Iran invited Qais al-Khazali and Layth al-Khazali, two of al-Sadr's subordinates, to Tehran. McIntyre Report, PX-157, at 39. After Iran promised to aid their efforts, Qais al-Khazali formed a Special Group named Asayb Ahl al-Haq ("AAH"). *Id.* at 38–39. AAH received funding from the IRGC, training from Hezbollah, and weapons supplied by the Qods Force. 12/03/2018 (AM) Tr. 119:24–120:5. In this way, AAH was

not an "independent organization" but a "proxy of the Qods Force." *Id.* 120:19–22. Another Special Group was Kata'ib Hezbollah.[5] 12/03/2018 (AM) Tr. 123:22–25. Kata'ib Hezbollah was a "whole-cloth creation of the IRGC." *Id.* According to Oates, the Qods Force was "the exclusive director" of Kata'ib Hezbollah's operations and supplied the group with weapons. *Id.* 124:7–8, 19–21. These weapons included EFPs. *Id.* 124:5–8. By 2007, the Special Groups "accounted for almost half of the violence in Iraq" directed at coalition forces. Pregent Report, PX-155, at 12. And at that time, "Iran, through [the] IRGC and the Qods Force, was estimated to be 'providing between $750,000 and $3 million worth of equipment and funding to the Special Groups every month." *Lee*, 518 F. Supp. 3d at 483 (quoting Pregent Report, PX-155, at 12).

### iii.   Explosively Formed Penetrators ("EFPs") in Iraq

The attacks in this case involve a "uniquely lethal weapon" termed an "explosively formed penetrator." *Lee*, 518 F. Supp. 3d at 475. EFPs became insurgents' weapon of choice in Iraq to respond to the "up-armoring" of U.S. military vehicles. Barker Report, PX-158, at 12. At first, insurgents primarily attacked coalition forces with IEDs. *Id.* at 13. In response, the U.S. military developed "heavily-armored [Humvees]" that could withstand IED blasts. *Id.* But EFPs could still penetrate this armor, so EFP attacks soon became commonplace. *Id.* at 13–14; *see* 12/03/2018 (PM) Tr. 23:4–7 (explaining that insurgents used EFPs to respond to vehicles that "could survive large underbody IEDs"). EFP attacks first occurred in July 2005 and persisted through January 2011. Barker Report, PX-158, at 14.

EFPs' strength lies in their design. An EFP is built within a 3- to 12-inch diameter steel pipe. Barker Report, PX-156, at 6. One end is welded shut with a steel plate. *Id.* Inside this pipe,

---

[5] Kata'ib Hezbollah was an Iraq-based organization, unlike Lebanese Hezbollah. The Court's references to "Hezbollah" refer to Lebanese Hezbollah unless otherwise noted.

high-energy explosives are packed behind a "precision manufactured concave copper disk liner." *Id.* at 6. The resulting explosion generates enormous pressure, reshaping the copper liner into a metal slug traveling at "tremendous speed" with "significant[] . . . mechanical power." *Id.* at 6. Because copper has a high melting point, the copper liner is "just malleable enough that it will begin to shape" in midair, "but not so malleable that [it will] fly apart." 12/04/2018 (AM) Tr. 13:20–22, 17:6–8. A single copper slug can "pierce through several inches of military grade armor." Barker Report, PX-158, at 7. Worse still, a copper slug can "shatter [a] vehicle's armor and materials inward, sending hundreds or even thousands of razor-sharp shards of Teflon and steel ripping through the interior department." *Id.* The resulting heat can "ignite engine fuel and set vehicles ablaze." *Id.*

EFPs detonate only after being armed and triggered. *Id.* at 10. In Iraq, insurgents usually armed EFPs by remote frequency or command wire. *Id.* Once armed, an EFP would be triggered by a passive infrared device. *Id.* These devices could "detect the heat signature of," for example, "a passing vehicle," then "send an electrical current that set off the explosion within the EFP's casing." *Id.* Passive infrared sensors were used "almost exclusively . . . with EFPs." 12/03/2018 (PM) Tr. 26:13–15. The remote-triggering mechanisms allowed insurgents to "selectively target U.S. [m]ilitary vehicles and thus avoid civilian casualties." Barker Report, PX-158, at 12. And the infrared triggers enabled insurgents to camouflage EFPs within the environment—for example, in fake boulders or fake roadside curbs. *See id.* at 11.

The U.S. military responded to EFP attacks in several ways. First, the military added armor to the doors and windows of its armored vehicles and introduced "Mine-Resistant, Ambush Protected" ("MRAP") vehicles carrying more armor than a typical Humvee. *See id.* Second, the military created forensic units to analyze materials collected from EFP blasts and to develop

countermeasures against EFPs. *Id.* at 15–16. These countermeasures included (1) heated pieces of metal attached to poles held out in front of the vehicle, termed "Rhinos," and (2) radio jammers that prevented insurgents from arming the EFPs. *Id.* at 16.

None of these responses fully succeeded. "[N]o matter how much additional steel was welded onto U.S. [m]ilitary vehicles, EFPs could still penetrate them." *Id.* at 15. General David Petraeus even noted that MRAPs were susceptible to EFPs, explaining that a soldier died "in eastern Baghdad when an [EFP] pierced the passenger side door of the MRAP in which he was riding." *Id.* Insurgents also adapted to the U.S. military's countermeasures. After the military deployed Rhinos on the front of their vehicles, insurgents began "angling [EFPs] backward" to ensure their EFP charges still hit the targeted vehicles. *Id.* at 18. And soon after the military began using radio jammers, "local Shi'a terror cells deployed new technology . . . capable of defeating [the military's] most high-tech [radio-jamming] equipment." *Id.* at 16.

These sophisticated attacks and countermeasures were "beyond the capacity of individuals with basic training in IED construction." *Lee*, 518 F. Supp. 3d at 484 (citations omitted); *see* 12/03/2018 (PM) Tr. 26:19–27:21 (opining that the "level of engineering and trigonometry" required to conduct an EFP attack was not "within the abilities of an Iraqi insurgent without outside assistance"). Expert testimony connected these attacks to Iran. Barker opined that "the Special Groups and other Iranian-backed local Shi'a terror cells could not have deployed and implemented" EFP technology "without the active involvement, training, equipment[,] and support of the IRGC." Barker Report, PX-158, at 16; *cf.* 12/06/2018 (AM) Tr. 29:14–17 (stating that the Special Groups "could not make these modifications as rapidly as they were doing" without Iranian assistance). Barker further stated that Iranian agents "would build [EFPs] complete, [and] bring them [into Iraq] as a complete total system, ready to go." 12/04/2018 (AM)

Tr. 44:13–16.  Similarly, Oates believed that the Shi'a insurgents' "rapid capability development" in weapons training stemmed from "external assistance."  12/03/2018 (AM) Tr. 98:5–9.

The U.S. military's forensic analysis also pointed squarely at Iran.  The IRGC and Qods Force "used long-established smuggling routes and trusted Iraqi operatives" to smuggle EFPs into Iraq and supply them to Special Groups.  *Id.*  And "[t]he U.S. military traced much of the machinery used to manufacture the EFPs, high explosives[,] and [infrared] devices deployed in Iraq to Iran and its illicit supply chain."  Oates Report, PX-153, at 25 (footnote omitted); *see* 12/06/18 (AM) Tr. 48:11–49:8 (highlighting steel shipments and passive infrared devices that Iran imported into Iraq).  A task force investigating EFPs even traced the "principal source" of EFP materials, including precision-milled copper liners, to Iran.  *See* 12/03/2018 (AM) Tr. 95:11–96:16.

### D. The Attacks

Finally, the Court turns to the specific attacks in this case.  After considering plaintiffs' affidavits and expert reports, the Court finds Iran responsible for the EFP attacks in this case.

#### i. *November 20, 2004 Attack*

On November 20, 2004, a personal security detail was returning to the Baghdad Hotel after completing an escort mission.  Botha Aff. ¶ 4.  Plaintiff Leon Botha drove the second vehicle in the convoy.  *Id.*  As the convoy crossed the Olympic Bridge, an explosion detonated on the side of Botha's vehicle.  *Id.* ¶ 5.  The explosion cast shrapnel throughout the vehicle, hitting Botha in the face and neck and giving him a traumatic brain injury.  *Id.* ¶¶ 6–7.

Troops recovered copper slugs that had lodged in the driver's side of the vehicle and found copper shell fragments from the explosion site.  Barker Aff. ¶ 41.  Barker also attested that the penetrations through the vehicle's door and windshield were "consistent with the damage" that

would "result from an effectively fired EFP." *Id.* ¶ 39. This evidence led Barker to conclude "without any reasonable doubt" that "this attack involved an EFP . . . designed, manufactured, and distributed by Hezbollah [or] the IRGC." *Id.* ¶ 42. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the November 20, 2004 EFP attack by supporting proxy forces who conducted the attack.

### ii. *May 16, 2005 Attack*

On May 16, 2005, plaintiffs Jaco Botes and Johann Steenberg traveled in Iraq as part of a convoy with a personal security detail. Botes Aff. ¶ 4. Botes commanded the lead vehicle. *Id.* Steenberg commanded the third vehicle in the convoy. Steenberg Aff. ¶ 4. While the convoy was traveling, an explosive device detonated about four feet away from the driver's side of the lead vehicle. *Id.* ¶ 5. The blast instantly killed the driver and two passengers in Botes's vehicle and set the car ablaze. Botes Aff. ¶ 5. As Botes exited the car, he was hit in the back with three rounds from an AK-47. *Id.* ¶ 6. His bulletproof vest dulled the impact of these rounds and helped him survive. *Id.* Botes sustained shrapnel wounds to his left side, a large bruise on his face, and a burst eardrum. *Id.* ¶ 8.

Barker has attested that this explosive attack was from an EFP. Steenberg provided photos showing the vehicle damaged in the attack. Steenberg Aff., ECF No. 17-11 at 7–8. Because this photo shows "clean penetration[s] through steel armor" and "holes on both sides of the vehicle," Barker concluded that the projectiles from the explosion were "capable of traveling cleanly through the steel armor, the entire vehicle, and cleanly through steel armor again on the other side." Barker Aff. ¶ 46. These "telltale marks of EFP damage" led Barker to believe that the penetrations could only "have been made by an EFP device . . . designed, manufactured, and distributed by Hezbollah [or] the IRGC." *Id.* ¶ 47. Based on the evidence before the *Karcher* court and the

representations of plaintiffs' experts, the Court finds Iran responsible for the May 16, 2005 EFP attack by supporting proxy forces who conducted the attack.

### iii.   November 14, 2005 Attack

On November 14, 2005, plaintiff Pierre Du Plessis traveled in Iraq as part of a convoy with a personal security detail. Du Plessis Aff. ¶ 5.  When the convoy drove past the Iranian embassy, an explosive device detonated close to the vehicle behind Du Plessis.  *Id.* ¶ 6.  The damaged vehicle burst into flames.  *Id.*  A close friend of Du Plessis exited the vehicle "engulfed in flames," and Du Plessis tried to put out the fire but could not.  *Id.* ¶ 7.  Three other passengers in the damaged vehicle died because of the explosion—one from the blast itself, the others from their resulting injuries.  *Id.* ¶ 8.  Du Plessis suffers "ongoing flashbacks and nightmares" regarding the explosion and was subsequently diagnosed with post-traumatic stress disorder.  *Id.* ¶ 10.

Botha and Steenberg responded to the scene three minutes after the explosion.  Botha Aff. ¶ 10; Steenberg Aff. ¶ 10.  Both plaintiffs were responsible for securing the area and cleaning up the extensive casualties and deaths caused by the explosion.  Botha Aff. ¶ 10; Steenberg Aff. ¶ 10.

Barker attested that "signs of EFP damage" were "clearly visible" in photos submitted by Du Plessis showing the vehicle damage.  Barker Aff. ¶ 49.  A "clean circular penetration through the vehicle's transparent armor" led Barker to conclude that the explosion "was likely an EFP attack."  *Id.* ¶ 51.  Another "circular penetration that carried cleanly through the steel armor of the vehicle" reinforced Barker's conclusion.  *Id.* ¶ 52.  Because of this evidence and "the location of the attack," Barker posited that the explosion "was caused by an EFP device, designed, manufactured, and distributed by Hezbollah [or] the IRGC."  *Id.* ¶ 55.  Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran

responsible for the November 14, 2005 EFP attack by supporting proxy forces who conducted the attack.

### iv.  *January 4, 2006 Attack*

On January 4, 2006, plaintiff George Kieser traveled in a convoy returning to the Al Sadeer Hotel in Baghdad.  Kieser Aff. ¶ 4.  As the convoy approached the Olympic Bridge, an explosion detonated behind Kieser that disabled a vehicle in the convoy.  *Id.* ¶ 5.  While Kieser helped set up a perimeter around the vehicle, a second explosion detonated close to Kieser.  *Id.* ¶ 7.  This explosion knocked Kieser unconscious and he fell to the ground.  *Id.*  As a result, Kieser suffered an injured knee, damage to his hearing, and a traumatic brain injury.  *Id.*

In his affidavit, Barker attested that photos of the incident showed "classic evidence of an EFP attack."  Barker Aff. ¶ 60.  A photo of the vehicle's door armor showed "full penetration . . . , with little to no material deformation," which "perfectly matches" the damage that EFP slugs cause.  *Id.* ¶ 59.  Copper residue visible on the door armor and copper fragments visible in other photos, in Barker's view, also evince an EFP attack.  *Id.* ¶ 60.  Barker therefore had "a high degree of certainty" that the attack "was carried out using an EFP device designed, manufactured, and distributed by Hezbollah [or] the IRGC."  *Id.* ¶ 61.  Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the January 4, 2006 EFP attack by supporting proxy forces who conducted the attack.

### v.  *January 2006 Attack*

On or around January 2006, plaintiff Dean Capazorio traveled in a convoy from the Green Zone to the Baghdad Hotel.  Capazorio Aff. ¶ 5.  Capazorio was the rear gunner in the last vehicle of the convoy.  *Id.*  When the group turned onto Abu Nawas Street, a device exploded next to the third vehicle in the convoy.  *Id.* ¶ 6.  The explosion blew out the windows in Capazorio's vehicle.

*Id.* Capazorio exited his vehicle and returned small arms fire against the insurgents attacking the convoy. *Id.* The explosion caused permanent damage to Capazorio's hearing. *Id.* ¶ 8.

According to Capazorio, members of the U.S. military informed his commander that the explosion was an EFP attack. *Id.* ¶ 7. These troops stated that the EFP had been camouflaged in the curb of the road and directionally fired. *Id.* The troops also stated that they found copper residue inside and around the damaged vehicle. *Id.* Barker concluded, based on these statements and photos showing the damaged vehicle, that "it is far more likely than not" that this attack "involved an EFP device that was designed, manufactured, and distributed by Hezbollah [or] the IRGC." Barker Aff. ¶ 68. A photo of the confirmed blast site shows a curb that is "relatively undamaged" despite its proximity to the explosion, indicating "the use of a directional weapon" like an EFP. *Id.* ¶ 64. Photos show damage to the vehicle "consistent with an upward angled impact from an EFP device hidden in a roadside curb" and "what appears to be copper residue" on the steel frame of the vehicle. *Id.* ¶ 66. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the January 2006 EFP attack by supporting proxy forces who conducted the attack.

> ### vi. *March 29, 2006 Attack*

On March 29, 2006, plaintiff Schalk Bruwer traveled as part of a convoy escorting personnel to the Baghdad Police Academy. Bruwer Aff. ¶ 4. Bruwer drove the lead vehicle in the convoy. *Id.* Steenberg drove the vehicle behind Bruwer. Steenberg Aff. ¶ 11. The convoy had to travel through a tunnel to reach its destination. Bruwer Aff. ¶ 5. Roughly halfway through the tunnel, an explosion occurred near Bruwer's vehicle. *Id.* ¶ 6. The vehicle caught fire and became disabled soon after. *Id.* Steenberg used his vehicle to push the disabled lead vehicle out of the tunnel. Steenberg Aff. ¶ 11. Once out of the tunnel, Bruwer helped pull a passenger out of his

vehicle. Bruwer Aff. ¶¶ 6–7. Steenberg carried a passenger from the vehicle to a medic, injuring his knee in the process. Steenberg Aff. ¶ 11. As a result of the explosion, Bruwer suffered shrapnel wounds to his arms and body. Bruwer Aff. ¶¶ 6–8. Steenberg sustained an injured knee when carrying one of the victims to a medic. Steenberg Aff. ¶ 11.

Capazorio arrived soon after the explosion as part of a team securing the area. Capazorio Aff. ¶ 9. This incident caused extreme anxiety and stress for Capazorio and contributed to his ultimate diagnosis of post-traumatic stress disorder. *Id.* ¶¶ 10, 12.

Bruwer and Steenberg attested that investigators told them that the explosion stemmed from an EFP camouflaged in polystyrene made to appear as part of the curb. Bruwer Aff. ¶ 10; Steenberg Aff. ¶ 11. This method of camouflage "was commonly used with EFP devices" and "unlikely to be used" with other forms explosive weapons used by Iraqi militias in 2006. Barker Aff. ¶ 74. Photos of the damaged vehicle showed "tightly distributed penetrations" indicating a directed blast. *Id.* ¶ 71. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the March 29, 2006 EFP attack by supporting proxy forces who conducted the attack.

### vii.   *June 15, 2006 Attack*

On June 15, 2006, plaintiff Christiaan Oosthuizen traveled in a convoy that was leaving the Baghdad Police Academy. Oosthuizen Aff. ¶ 4. When the convoy approached Olympic Bridge, Oosthuizen noticed that Iraqi police officers had stopped nearby traffic. *Id.* ¶ 5. An explosion then detonated near the right side of Oosthuizen's vehicle. *Id.* ¶ 6. Oosthuizen suffered shrapnel wounds to his face and neck, a traumatic loss of hearing, and a concussion as a result of the explosion. *Id.* ¶ 7.

Photos of the incident show "total penetration of the steel frame" of the damaged vehicle from the projectile in the explosion. Barker Aff. ¶ 79. The "clean exit hole" indicates that the projectile "was still traveling at a speed significant enough to cleanly penetrate the driver's side transparent armor." *Id.* ¶ 80. In Barker's opinion, no weapon available to Iraqi militias in 2006 could cause this penetration "[a]side from an expertly manufactured, assembled, and detonated EFP device." *Id.* Barker therefore attested that the penetrations in this attack "could only have been made by an EFP device designed, manufactured, and distributed by Hezbollah [or] the IRGC." *Id.* ¶ 81. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the June 15, 2006 EFP attack by supporting proxy forces who conducted the attack.

### viii.   March 16, 2010 Attack

On March 16, 2010, plaintiffs Allan Roberts, Steven Crowley, and John Jameson traveled in Iraq as part of a convoy escorting personnel. Roberts Aff. ¶ 5; Crowley Aff. ¶ 4; Jameson Aff. ¶ 4. While stopped at an Iraqi police checkpoint, an explosive device detonated near the left side of their vehicle. Roberts Aff. ¶ 6. The device had been placed inside of the bastion lining the side of the checkpoint. Crowley Aff. ¶ 5. The explosion scattered a large metal slug, shrapnel, and other debris inside the vehicle. *Id.* ¶ 6.

The explosion and shrapnel amputated Roberts's right leg and caused a severe wound to his left leg. Roberts Aff. ¶ 7. Surgeons eventually had to amputate Roberts's left leg. *Id.* The explosion partially amputated Crowley's left leg. Crowley Aff. ¶ 7. Jameson suffered injuries to his knees, hips, back, neck, and shoulder, as well as damage to his eardrums and a traumatic brain injury from shrapnel hitting his head. Jameson Aff. ¶ 6.

An explosive-ordnance-disposal team prepared a report stating that the March 16, 2010 explosion stemmed from an EFP. *See* ECF No. 17-3 at 5. Barker confirmed this assessment. Barker Aff. ¶ 85. Photos depict a "pinpointed" entry point "strongly indicative" of an EFP, as other IEDs would have "distributed far more widespread damage to the impact area." *Id.* ¶ 87. And the placement of the device—"two feet off the ground and directionally focused"—was "more consistent with an EFP device than any other plausible option." *Id.* ¶ 88. Barker therefore attested that the pinpoint entry hole "could only have been made by an EFP device designed and distributed by Hezbollah [or] the IRGC." *Id.* ¶ 89. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the March 16, 2010 EFP attack by supporting proxy forces who conducted the attack.

### ix. June 23, 2011 Attack

On June 23, 2011, a convoy left the university campus at Mustansiriya University in Baghdad. Mughal Aff. ¶ 5; Riekert Aff. ¶ 4. Plaintiff Abdul Ghaffar Mughal had been offering consulting and advising services at the university. Mughal Aff. ¶ 4. Plaintiffs Mughal and George Riekert traveled in the second vehicle in the convoy. *Id.* ¶ 5; Riekert Aff. ¶ 5. During the journey, an explosive device detonated on the left side of the vehicle. Riekert Aff. ¶ 7. The explosion killed one of the passengers instantly. *Id.* ¶ 8. Mughal suffered a broken hand, damaged hearing, and injuries from the shrapnel. Mughal Aff. ¶ 7. The explosion caused injuries to Riekert's head, neck, and back, and shrapnel from the blast gave Riekert multiple wounds. Riekert Aff. ¶ 7; *see id.*, ECF No. 17-8 at 9–11.

A photo of the damaged vehicle showing "clean penetration of a large slug through transparent armor." Barker Aff. ¶ 92. Barker also reviewed dash-cam footage of the attack showing that the blast detonated at least thirty feet away from the vehicle. *Id.* ¶ 93. The

combination of these factors—that a compact slug impacted the armor "at an extremely high rate of speed"—led Barker to conclude that the explosion stemmed from "an EFP device designed, manufactured, and distributed by Hezbollah [or] the IRGC." *Id.* ¶ 94. Based on the evidence before the *Karcher* court and the representations of plaintiffs' experts, the Court finds Iran responsible for the June 23, 2011 EFP attack by supporting proxy forces who conducted the attack.

### III.   CONCLUSIONS OF LAW

This Court's conclusions of law will proceed in several parts. First, the Court will address why it has subject matter jurisdiction under the FSIA's terrorism exception. Second, the Court will explain why it may validly exercise personal jurisdiction over Iran in this case. Third and fourth, the Court will discuss potential issues of timeliness and venue. Finally, the Court will assess whether plaintiffs have stated cognizable claims for relief under § 1605A(c) of the FSIA or under applicable tort law. As the Court will explain, the Contractor Plaintiffs and the Mughal Plaintiffs have validly stated claims for relief. But the Family Member Plaintiffs have alleged claims only under D.C. tort law. Applicable choice-of-law principles dictate that D.C. law should *not* apply to this dispute, meaning that the Court cannot grant default judgment on these claims.

#### A.   Subject Matter Jurisdiction

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, federal district courts have original subject matter jurisdiction over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity under the FSIA. *See* 28 U.S.C. § 1330(a). Plaintiffs meet the first three requirements here. They do not demand a jury trial, claim civil causes of action, and assert a right to *in personam* relief against a foreign state—the Islamic Republic of Iran.

That leaves the question of Iran's sovereign immunity. Foreign states are presumptively immune from jurisdiction subject to several enumerated exceptions. *See* 28 U.S.C. § 1604. A district court "has subject matter jurisdiction over a suit against a foreign state if—and only if— [a] plaintiff's claim falls within" one of these exceptions. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the district court has no jurisdiction." *Id.* Since federal courts must consider issues of subject matter jurisdiction *sua sponte*, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), a district court adjudicating FSIA claims must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983).

Plaintiffs argue that Iran's conduct falls within the FSIA's terrorism exception. The FSIA states that a foreign state has no immunity:

> in any case . . . in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting in the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). This exception applies only if plaintiffs meet three additional requirements. First, the foreign state must have been designated a state sponsor of terrorism when the underlying attack occurred or designated as a result of the attack. *Id.* § 1605A(a)(2)(A)(i)(I). Second, at the time of the underlying attack, the "claimant or victim" must have been a "national of the United States," a "member of the armed forces," or an employee or contractor of the United States Government acting within the scope of her employment. *Id.* § 1605A(a)(2)(A)(ii). Third, if "the act occurred in the foreign state against which the claim has been brought," the claimant

must have "afforded the foreign state a reasonable opportunity to arbitrate" the claim.   *Id.*
§ 1605A(a)(2)(A)(iii).

Plaintiffs undoubtedly meet several of these elements.  They seek money damages against
Iran, a foreign state.  *See* Compl. ¶¶ 220–384.  Plaintiffs allege personal injuries—both physical
and emotional—arising out of EFP attacks.[6]  *See id.*  Iran has been designated a state sponsor of
terrorism since 1984, including at the time of the EFP attacks.  *See* Determination Pursuant to
Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).
And the EFP attacks took place in Iraq—not Iran—meaning that plaintiffs need not afford Iran an
opportunity to arbitrate these claims.

Plaintiffs are also "claimant[s] or victim[s]" within the meaning of the FSIA.  *See* 28 U.S.C.
§ 1605A(a)(2).  The Contractor Plaintiffs were contractors of the United States government acting
within the scope of their employment.  *See supra* Section II.A (noting that plaintiffs were
employees of U.S. contractors); 28 U.S.C. § 1605A(a)(2)(A)(ii).  And § 1605A(a)(2) includes
"those whose claims arise out of those injuries" suffered as a result of a terrorist attack "but who
might not be victims themselves."  *Valore*, 700 F. Supp. 2d at 68; *accord Leibovitch v. Islamic
Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012).  The Family Member Plaintiffs' claims for
emotional distress originate from the EFP attacks on the Contractor Plaintiffs.  This causal link
brings them within the scope of "claimant[s]" contemplated by the FSIA.  *See* 28 U.S.C.
§ 1605A(a)(2).

---

[6] The FSIA does not restrict the "personal injury or death" requirement to injury or death suffered *directly* by a
claimant.  *Valore*, 700 F. Supp. 2d at 66.  Rather, the injury or death "must merely be the basis of a claim for which
money damages are sought."  *Id.* (citing 28 U.S.C. § 1605A(a)(1)).

Three elements remain.  The Court may properly exercise subject matter jurisdiction if Iran (1) provided "material support or resources" for (2) acts of extrajudicial killing that (3) caused plaintiffs' injuries.  *See* 28 U.S.C. § 1605A(a)(1).

### i.  Material Support or Resources

First, plaintiffs must show that Iran provided "material support or resources" for the EFP attacks that resulted in their injuries.  *See* 28 U.S.C. § 1605A(a)(1).  The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, *training, expert advice or assistance*, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, *explosives*, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1) (emphasis added); *see* 28 U.S.C. § 1605A(h)(3) (adopting definition of "material support or resources" found in 18 U.S.C. § 2339A).  The material support or resources must have been provided "by an official, employee, or agent of [the] foreign state" acting in the scope of her "office, employment, or agency."  28 U.S.C. § 1605A(a)(1).

Plaintiffs satisfy this element.  Multiple experts have testified that the Special Groups could not have conducted EFP attacks without the support of the IRGC and Qods Force.  *See supra* Section II.C.  This support included "millions of dollars of funding, training, and advanced weaponry."  *Lee*, 518 F. Supp. 3d at 493; *see, e.g.*, Pregent Report, PX-155, at 12 (detailing the training programs and funding Iran provided to Special Groups); Oates Report, PX-153, at 24–25 (explaining that coalition forces discovered caches of EFP materials traceable to Iranian manufacturers).  And, as other courts in this District have held, the Qods Force is "at least an agent of Iran," if not a governmental entity "such that individuals working for it would be officials or employees of Iran."  *Karcher*, 396 F. Supp. 3d at 55; *see Blais v. Islamic Republic of Iran*, 459 F.

Supp. 2d 40, 60–61 (D.D.C. 2006) (finding the IRGC to be a governmental entity). Plaintiffs have therefore proven that that Iran—acting through the IRGC and Qods Force—materially supported the EFP attacks that resulted in their injuries.

ii.    *Extrajudicial Killings*

Second, plaintiffs must demonstrate that the underlying terrorist attacks are "act[s] of . . . extrajudicial killing" under the FSIA. *See* 28 U.S.C. § 1605A(a)(1). The FSIA defines an "extrajudicial killing" by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). An "extrajudicial killing"—as defined by the TVPA—is "a deliberated killing not authorized by a previous judgment" of a "regularly constituted court" that "afford[s] all the judicial guarantees . . . recognized as indispensable by civilized peoples." Terrorist Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73, § 3(a) (1992). Thus, an "extrajudicial killing" contains three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. The EFP attacks meet all three requirements of an extrajudicial killing.

Though many of the EFP attacks in this case did not result in death, attempted extrajudicial killings may still constitute "act[s] of . . . extrajudicial killing" under § 1605A(a)(1). The text of § 1605A(a)(1) reads as follows:

> A foreign state shall not be immune . . . in any case . . . in which money damages are sought against a foreign state for personal injury *or* death that was caused by *an act of* . . . extrajudicial killing . . . or the provision of material support or resources *for such an act.*

28 U.S.C. § 1605A(a)(1) (emphasis added). The FSIA does not waive immunity when a foreign state supports an extrajudicial killing, but rather an "act of" extrajudicial killing. *Id.* And it is a "cardinal principle" of statutory interpretation that "courts 'must give effect, if possible, to every clause and word of a statute,'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting

24

*Williams v. Taylor*, 529 U.S. 362, 404 (2000)), suggesting that the "act of" language inserted in § 1605A(a)(1) is significant. The term "act of" could be read multiple ways. An "act" could refer to "a thing done" or a specific "deed." *Act, New Oxford English Dictionary* (2d ed. 2005). But an "act" might also refer to "[t]he process of doing" something. *Act, Oxford English Dictionary* (2d ed. 1989); *accord Act, Merriam-Webster's Collegiate Dictionary* (10th ed. 2005) (defining "act" as both "the doing of a thing" and "the process of doing"). Plausibly read, § 1605A(a)(1) could encompass (1) the specific deed of an extrajudicial killing or (2) the process of committing an extrajudicial killing. But the process of committing an extrajudicial killing does not imply that death results—meaning that an *attempted* extrajudicial killing could constitute an "act of extrajudicial killing."

In light of this ambiguity, the Court will interpret § 1605A(a)(1) broadly. The D.C. Circuit has held that courts should "interpret [the FSIA's] ambiguities flexibly and capaciously" because of Congress's intent to "lighten the jurisdictional burdens borne by victims of terrorism seeking judicial redress" by passing § 1605A. *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013). And sister courts in this District have consistently held that attempted extrajudicial killings fall within the meaning of § 1605A(a)(1)'s text. *See, e.g., Lee*, 518 F. Supp. 3d at 491 (concluding that § 1605A(a)(1)'s text and "the court's mandate to construe ambiguities in the FSIA broadly" permitted jurisdiction for attempts to commit extrajudicial killings); *Karcher*, 396 F. Supp. 3d at 58 (interpreting § 1605A(a)(1) broadly since its text "does not expressly address attempts to commit acts"). The Court concludes likewise. Attempted extrajudicial killings are "acts of extrajudicial killing" within the meaning of § 1605A(a)(1). *See Lee*, 518 F. Supp. 3d at 491; *Karcher*, 396 F. Supp. 3d at 58. And attacks with EFPs—which wrought death upon many victims in Iraq—are attempted extrajudicial killings.

EFP attacks are also "deliberated." A deliberated killing is "one undertaken with careful consideration, not on a sudden impulse." *Lee*, 518 F. Supp. 3d at 491 (quoting *Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *13 (D.D.C. Sept. 25, 2019); *cf. Owens*, 864 F.3d at 770 (finding a killing "deliberated" when it involved "substantial preparation, meticulous timing, and coordination across multiple countries in the region"); *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (interpreting "deliberated" under the TVPA as "being undertaken with studied consideration and purpose"). Expert testimony demonstrates that an EFP attack requires significant planning, coordination, and timing. *See supra* Section II.C. A perpetrator must place the explosive device (often hiding it within boulders, debris, or roadside curbs), keep a sharp lookout for the target, and arm the device remotely as the target approaches. *See id.* The thought and consideration required to conduct an EFP attack are hallmarks of deliberation.

Additionally, no evidence on the record suggests that the EFP attacks in this case were authorized by a judgment pronounced by a court of law. The Court therefore concludes that Iran's material support for EFP attacks qualify as material support for acts of extrajudicial killing.

    *iii.* *Causation*

To prove causation under the FSIA's terrorism exception, a plaintiff must show that the foreign state's actions proximately caused the alleged injuries. *Owens*, 864 F.3d at 794. Proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). This inquiry contains two elements: (1) the defendant's actions "must be a 'substantial factor' in the sequence of events" leading to the injury; and (2) the injury must have been "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

Plaintiffs have shown that Iran proximately caused their injuries. First, Iran's material support for Iraqi insurgents was a substantial factor in the chain of events leading to plaintiffs' injuries. As Judge Mehta explained in *Lee*:

> Iran provided the funding, training, and weaponry that was used to injure [p]laintiffs. This support was particularly crucial: as the U.S. military developed countermeasures to make EFP attacks less lethal, Iran's training, technology, and provision of resources equipped insurgents with EFPs that could respond to U.S. countermeasures and inflict maximum damage.

*Lee*, 518 F. Supp. 3d at 493 (citations omitted); *see* Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24–25; 12/03/2018 (AM) Tr. 98:5–9. Second, plaintiffs' injuries were reasonably foreseeable consequences of Iran's proliferation of EFP materials in Iraq. Iran not only distributed the necessary materials to create EFPs to Iraqi insurgents, but also assisted those insurgents with circumventing the U.S. military's later-developed countermeasures. *See* 12/06/2018 (AM) Tr. 48:21–49:12 (explaining that the U.S. military traced devices that "wreaked havoc" on EFP countermeasures to Iran). By providing financial support, training, and weapons to Iraqi insurgents, Iran must have reasonably anticipated that its actions would lead to serious injuries or deaths among coalition forces. *See Lee*, 518 F. Supp. 3d at 494 (concluding that Iran "reasonably anticipated" serious injuries and deaths to U.S. troops based on its "financial support" and "provision of evolving and ever-more lethal weaponry" to Iraqi insurgents); *Karcher*, 396 F. Supp. 3d at 56–57 (holding that plaintiffs' harms were reasonably foreseeable when Iran intended "to kill people, not just disable vehicles"). In the same vein, the Family Member Plaintiffs' emotional harms were a reasonably foreseeable consequence of Iran's material support for potentially lethal EFP attacks in Iraq. *See Lee*, 518 F. Supp. 3d at 494 (citing *Salzman*, 2019 WL 4673761, at *14).

Accordingly, the Court concludes that Iran proximately caused plaintiffs' injuries through its material support for the attempted extrajudicial killings of the Contractor Plaintiffs. Since plaintiffs have proven each element of the FSIA's terrorism exception, the Court possesses subject matter jurisdiction over this dispute under 28 U.S.C. § 1330(a) and § 1605A(a)(1).

### B. Personal Jurisdiction

The Court now turns to its personal jurisdiction over Iran. A court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default [judgment] against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018). Federal courts have personal jurisdiction over a foreign state if (1) the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a), and (2) plaintiffs properly effectuate service under 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b). As explained above, the Court possesses subject matter jurisdiction over this dispute under § 1330(a). The remaining issue is whether plaintiffs followed the procedures required by § 1608(a).

The FSIA prescribes four valid methods of service. *See* 28 U.S.C. §. 1608(a). If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method listed. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014). First, a plaintiff should follow "any special arrangement[s]" for service—e.g., contractual provisions—between the plaintiff and the foreign state. 28 U.S.C. § 1608(a)(1). Second, a plaintiff may serve a defendant state "in accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). Neither option is available in this case. *See Lee*, 518 F. Supp. 3d at 495.

Plaintiffs thus attempted service under § 1608(a)(3), which permits service by mailing copies of the complaint, summons, and notice of suit on a defendant state's head of ministry of foreign affairs. *See* 28 U.S.C. § 1608(e)(3); Aff. Requesting Foreign Mailing, ECF No. 7. When

that attempt failed, plaintiffs tried to serve Iran via diplomatic channels. *See id.* § 1608(a)(4); Aff. Requesting Foreign Mailing, ECF No. 8. According to the Department of State, these documents were served on November 4, 2020, under cover of diplomatic note. Return of Service, ECF No. 13. The Court concludes that plaintiffs have complied with § 1608(a)(4) and properly served Iran in accordance with the FSIA. The Court may exercise personal jurisdiction over the parties.

### C. Timeliness

Actions under the FSIA's terrorism exception "may be brought or maintained" only if filed "not later than" the later of (1) "10 years after April 24, 1996" or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). But when a defendant state "fail[s] to enter an appearance or submit a filing at any stage of [a] case[]," it forfeits any potential statute-of-limitations defenses. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108 (D.C. Cir. 2019). A federal court has no authority to raise this statute of limitations defense "on behalf of an entirely absent defendant." *Id.* at 1112. Because Iran has not appeared in this case—and, therefore, has not raised a statute-of-limitations defense—the Court will not enforce the limitations period *sua sponte*.

### D. Venue

For civil actions "against a foreign state or political subdivision thereof," venue is proper "in the United States District Court for the District of Columbia." 28 U.S.C. § 1391(f)(4). Iran is a "foreign state" as defined by § 1603 of the FSIA. *See* 28 U.S.C. § 1603(a); *e.g.*, *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273, 2021 WL 2914036 (D.D.C. July 12, 2021). Since Iran is a foreign state, the Court concludes that venue is proper in this District.

### E. Liability and Choice-of-Law Issues

Finally, the Court will assess Iran's liability for plaintiffs' injuries. As explained above, plaintiffs pleaded two sets of claims: (1) claims arising under § 1605A(c)'s private cause of action and (2) claims that Iran committed IIED against the Family Member Plaintiffs. *See supra* Section I.A. The Contractor Plaintiffs and the Mughal Plaintiffs properly fall within the FSIA's private cause of action, and the Court will enter default judgment on their claims. But the Court cannot enter default judgment on the Family Member Plaintiffs' IIED claims. Plaintiffs argue that D.C. tort law should govern the IIED claims. The Court disagrees. Under D.C.'s choice-of-law principles, D.C. law must give way to the law of the Family Member Plaintiffs' domiciles or the law of Iraq.

### i. *Plaintiffs' § 1605A(c) Claims*

The FSIA provides a private cause of action for victims of state-sponsored terrorism in 28 U.S.C. § 1605A(c). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86–87 (D.D.C. 2018) (alterations in original) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017). But § 1605A(c)'s cause of action is limited to (1) U.S. nationals, (2) members of the U.S. armed forces, or (3) employees of the U.S. government or of a U.S. contractor acting within the scope of their employment. *See* 28 U.S.C. § 1605A(c).

As plaintiffs acknowledge, Mem. in Supp. 29, only the Contractor Plaintiffs and the Mughal Plaintiffs qualify for the private cause of action in § 1605A(c). The Contractor Plaintiffs were employees of U.S. contractors acting within the scope of their employment at the time of the attack. *See supra* Section II.A (citing plaintiffs' affidavits); 28 U.S.C. § 1605A(c)(3). And Abdul

Ghaffar Mughal and his family are all U.S. citizens. *See* 28 U.S.C. § 1605A(c)(1). The remaining plaintiffs—immediate family members of the Contractor Plaintiffs—are all foreign citizens. *See supra* Section II.A. Notwithstanding the Mughals, none of the Family Member Plaintiffs meet the statutory requirements of § 1605A(c). Since the Court has already established its subject matter jurisdiction over the qualifying plaintiffs' claims, *see supra* Section III.A, the Court concludes that Iran is liable to the Contractor Plaintiffs and the Mughal Plaintiffs under § 1605A(c) for their injuries suffered from EFP attacks in Iraq.

### ii.  The Family Member Plaintiffs' IIED Claims

The Family Member Plaintiffs alleged that Iran committed "intentional and reckless, extreme and outrageous" acts that caused them "severe emotional distress," but did not identify the substantive law governing their IIED claims. Compl. ¶¶ 376–84. These claims stand apart from plaintiffs' § 1605A(c) claims. *See id.* The Family Member Plaintiffs argue that D.C. tort law should apply to these IIED claims. Mem. in Supp. 30–34. The Court will reject this argument. Under D.C. choice-of-law principles, D.C. law should not provide the substantive law governing plaintiffs' IIED claims.

If a foreign state "is not entitled to immunity under [§] 1605 . . . the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Plaintiffs may thus "bring state law claims [against a foreign state] that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009); *see First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983). Put another way, "the FSIA . . . operates as a 'pass-through' to state law principles." *Oveissi*, 573 F.3d at 841 (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996)).

That begs the question of *which* state's laws apply. A federal court assessing state-law claims under the FSIA must apply the choice-of-law rules of the forum. *See Oveissi*, 573 F.3d at 841. Here, that forum is the District of Columbia. D.C. law employs a "constructive blending" of governmental interest analysis and the "most significant relationship" test of the Restatement (Second) of Conflict of Laws (the "Second Restatement"). *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

Governmental interest analysis requires a court to (1) "identify[] the policies underlying the laws" of each potential jurisdiction, *In re APA Assessment Fee Litigation*, 766 F.3d 39, 52 (D.C. Cir. 2014); then (2) determine whether a jurisdiction's policy would be advanced "by having its law applied to the *facts of the case* under review." *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (emphasis added). As part of this analysis, a court should also consider the jurisdiction with the "most significant relationship" to the dispute under the principles listed in the Second Restatement. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013); *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 180 (D.C. 2006).

Three jurisdictions could provide the law governing the Family Member Plaintiffs' IIED claims: (1) the District of Columbia, as the forum; (2) Great Britain and South Africa, as the plaintiffs' domiciles; or (3) Iraq, as the place of the wrong. Plaintiffs invoke only D.C. law in their motion for default judgment, *see* Mem. in Supp. 30–35, and therefore did not inform the Court whether British, South African, or Iraqi law permits recovery for IIED claims. The Court need not decide which jurisdiction's law governs plaintiffs' IIED claims by its approximation of foreign law. One conclusion is plain—under the norms of governmental interest analysis, D.C. law cannot apply to this dispute.

32

Two policies underlie D.C.'s law permitting recovery for intentional infliction of emotional distress. To establish an IIED claim under D.C. law, a plaintiff must show: (1) that the defendant committed "extreme and outrageous conduct" (2) either intentionally or recklessly (3) causing the plaintiff severe emotional distress. *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (citing *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)). First, this cause of action aims to compensate D.C. residents for emotional harms suffered at the hands of a culpable defendant. Second, the law regulates conduct within the District by deterring individuals from committing extreme and outrageous acts leading to emotional distress.

Neither of these policies would be promoted by applying D.C. law to this case. The Family Member Plaintiffs have provided no evidence that they resided in D.C. at the time of their injuries. The District hardly has an interest in compensating foreign citizens residing abroad. The law's conduct-regulating policy is also inapposite. The EFP attacks instigating this case occurred entirely within Iraq. Applying D.C. law to this dispute would therefore deter conduct in *Iraq*, not the District itself. Since neither of the policies underlying D.C.'s IIED cause of action would be promoted by applying D.C. law to this case, D.C. lacks a legitimate interest in this dispute.

A court applying D.C. choice-of-law principles should also consider the state with the "most significant relationship" to the case in light of the Second Restatement's principles. Under § 145 of the Second Restatement:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which . . . has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 . . . include:
>
> > (a) the place where the injury occurred,
> >
> > (b) the place where the conduct causing the injury occurred,

33

(c) the domicil[e], residence, nationality, place of incorporation, and place of business of the parties , and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145. For actions for personal injury, the law of the "state where the injury occurred" should govern unless another state has a "more significant relationship" to the dispute under the principles in § 6. *Id.* § 146. Section 6, accordingly, lists principles that a court should consider in a choice-of-law analysis—the needs (1) to prevent forum shopping, (2) to recognize the policy interests of jurisdictions, and (3) to ensure predictability of results. *See id.* § 6; *Henkin*, 2021 WL 2914036, at *6.

The Second Restatement's provisions also point away from the District of Columbia. Plaintiffs' injuries occurred in Britain, South Africa, and Iraq. The conduct causing these injuries—the EFP attacks—occurred in Iraq. Permitting foreign citizens to recover damages under D.C. law because of D.C.'s favorable substantive law is "the epitome of forum shopping." *Henkin*, 2021 WL 2914036, at *6. And since plaintiffs provided no evidence that they resided in D.C. at the time of the attacks, D.C. has no interest in applying its law to this dispute. Finally, the § 145(2) contacts point to the law of the Family Member Plaintiffs' domiciles to ensure predictable results, as those jurisdictions are where their injuries occurred and where they were domiciled at the time of their injuries. *Accord id.*[7]

Plaintiffs' argument that D.C. law should apply because of the United States' "unique interest" in applying its domestic law to terrorism cases misses the mark. Mem. in Supp. 31–32.

---

[7] This reasoning reflects the Court's long history of applying the law of a plaintiff's domicile to FSIA disputes. *See, e.g., Henkin*, 2021 WL 2914036 (D.D.C. July 12, 2021); *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 196 (D.D.C. 2008); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 10 (D.D.C. 2008); *Blais*, 459 F. Supp. 2d at 54. In *Estate of Heiser v. Islamic Republic of Iran*, for example, the Court spent over eighty pages detailing conclusions of law for each of plaintiffs' domicile states. *See Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 271–356 (D.D.C. 2006).

The United States may well desire to apply its domestic laws to terrorist attacks on U.S. citizens abroad. *See Oveissi*, 573 F.3d at 843 (terming this desire a "strong interest"). But the remaining plaintiffs *are not citizens of the United States*.[8] Whether the United States, as a nation, wishes to apply its law (or the law of its concomitant states) in a dispute is inapposite. Governmental interest analysis instead asks whether the policies underlying a *particular* law of a *particular* jurisdiction would be furthered by applying the law to the case at bar. *See Hercules*, 566 A.2d at 41. Amorphous policy interests unconnected to specific laws do not follow this analysis.

The D.C. Circuit's decision in *Doe v. Exxon Mobil Corporation* supports this conclusion. 654 F.3d 11 (D.C. Cir. 2011), *affirmed in part on reh'g*, *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7 (D.C. Cir. 2013). In *Doe*, the court compared the laws of (1) three U.S. states, (2) the District of Columbia, and (3) Indonesia. *See Doe*, 654 F.3d at 70. The district court had held that D.C. law applied after comparing "the interest of the United States in applying [D.C.] law [with] the interest of Indonesia." *See id.* at 69. The D.C. Circuit reversed. *Id.* at 70. In the D.C. Circuit's view, the district court should have compared the interests of *individual jurisdictions*, not the interest of the United States as a whole. *See id.* at 69–70. For "the foreign affairs interest of the United States . . . does not necessarily reflect the interests of the several states." *Id.* After further analysis, the D.C. Circuit held that Indonesian law should govern the dispute. *Id.* at 70–71.

These analyses point to the same conclusion: D.C. law cannot apply to plaintiffs' IIED claims. None of the plaintiffs were D.C. domiciliaries at the time of the EFP attacks. Nor did the EFP attacks occur in the District. Applying D.C. law to this dispute would not further the

---

[8] Nor does the United States' "strong interest" amount to a "categorical rule that domestic law applies whenever a [United States] citizen is injured abroad." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 225, 225 n.5 (D.D.C. 2011). The court in *Botvin*, for example, applied Israeli law to a lawsuit by United States citizens domiciled in Israel because "the attack occurred in Israel," "the victim was domiciled in Israel," "the plaintiffs reside[d] in Israel," and no evidence showed that terrorists attacked the victim "merely because [she] was a U.S. citizen." *Id.* at 226–27.

compensatory or conduct-regulating policies underlying D.C.'s law permitting recovery for IIED. And doing so would cut against the Second Restatement's focus on preventing forum shopping, respecting interested states, and ensuring predictable results. The Court cannot conclude that Iran is liable for the Family Member Plaintiffs' IIED claims on this record.

### IV.    CONCLUSION

For the above-mentioned reasons, the Court will **GRANT IN PART** and **DENY IN PART** plaintiffs' motion for default judgment. The Court will **GRANT** plaintiffs' motion with respect to the § 1605A(c) claims of the Contractor Plaintiffs and the Mughal Plaintiffs. But the Court must **DENY** plaintiffs' motion as to the Family Member Plaintiffs' IIED claims. Without evidence of the British, South African, and Iraqi laws applicable to IIED claims, the Court cannot determine which jurisdiction's law should govern. A separate order consistent with this memorandum opinion shall issue this date.

SIGNED this 24th day of January, 2022.

Royce C. Lamberth
United States District Judge