

**GATEHOUSE**
CHAMBERS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

**Case No. 1:20-cv-1227-RCL**

**B E T W E E N:**

**ALLAN ROBERTS *et al*.**

**Plaintiffs**

**v.**

**THE ISLAMIC REPUBLIC OF IRAN**

**Defendant**

> ## Expert report on English Law
>
> ## Charles Bagot QC
>
> ## 12 June 2022

Instructed by:

Singer Davis, LLC

1209A Laskin Road

Virginia Beach

VA 23451

U.S.A.

Attorneys for the Plaintiffs

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

## INTRODUCTION

A.   I provide this Opinion on the basis of my experience and expertise as a barrister specialising in personal injury and clinical negligence claims within the jurisdiction of England and Wales, where I have practised for approaching 25 years, having been called to the Bar in 1997. I was appointed one of Her Majesty's Counsel ("Queen's Counsel") in February 2018. I practise from Gatehouse Chambers in Gray's Inn, London (formerly known as "Hardwicke Chambers").

B.   I was recently elected the Chair of the Personal Injuries Bar Association, the specialist body which represents the interests of around 1,500 barrister members who specialise in Injury Law in England and Wales. I lead the Association alongside my full-time practice.

C.   I am instructed for both Claimants (Plaintiffs) and Defendants in high value and complex injury claims although my practice is predominantly (approximately 70%) for Defendants and their Insurers (both domestic claims and internationally for overseas insurers) and NHS Resolution (the body which represent the doctors and other healthcare professionals working for the National Health Service). The majority of my case load involves severe brain and psychiatric injuries. I am not qualified in US Law (or any jurisdiction other than England and Wales, save that I hold a diploma in French legal studies) but I am often involved in cases giving rise to a range of cross-border and international issues such as where the injured party resides abroad, including in the US.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



D.   I have a particular specialism in the sort of psychiatric injury "secondary victim" (as they would be called in my jurisdiction) claims which are the subject matter of the Plaintiffs' claims. I have appeared as Counsel in the majority of the leading cases which have shaped English Law in relation to liability for psychiatric injuries to secondary victims in the last dozen years. Most recently, I was Leading Counsel for all the Defendants in the three conjoined appeals which were decided by the Court of Appeal in January 2022, in *Paul v Royal Wolverhampton NHS Trust (and conjoined appeals)* [2022] EWCA Civ 12. My clients were successful in all the appeals in the Court of Appeal. A further appeal to the UK Supreme Court will take place in 2023 and I am again instructed to represent all the Defendants.

E.   In addition to my legal practice, I have been appointed as a part-time Judge, as follows:

   a.   A Deputy District Judge sitting in the London County Courts, from 2010 to 2018;

   b.   As a Deputy Master of the Queen's Bench Division of the High Court, London, from 2015 to date;

   c.   As a Recorder of the Crown Court (Criminal cases) and County Court (Civil Cases) from 2018 to date; and

   d.   As a Deputy High Court Judge in the Queen's Bench Division (i.e. the range of civil law work) from 2021 to date.

F.   My part-time judicial experience has predominantly involved the case management of and trials relating to civil litigation. This has provided me with additional experience and expertise in considering and determining matters of procedure, ruling on points of law and hearing trials in a wide range of fields of law, although a considerable amount

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



of that work is in complex and high value personal injury and clinical negligence claims. I am authorised to hear cases on the specialist Clinical Negligence and Asbestos lists, as well as general Queen's Bench Division work plus cases in the Administrative Court.

G.     My full profile as a practitioner is available on my chambers' website at:

      https://gatehouselaw.co.uk/barrister/charles-bagot-qc/

## BACKGROUND AND INSTRUCTIONS

1.     The Plaintiffs are US citizens and foreign nationals (including British citizens) who have been injured in terrorist attacks whilst working on contracts with the US government and their immediate family members. They have pursued claims in the US District Court for the District of Columbia ("the DC Court") against the Islamic Republic of Iran ("Iran") on the basis that the devices used in the attacks were made and/or distributed by Iran.

2.     It has been possible to recover for the victims under a federal statute providing a remedy for such terror attacks. However, claims for any family members, who are not US citizens, must be asserted as traditional common or state law claims. In these claims, the Court has decided not to apply DC Law, as it has previously done, but has applied a different choice of law analysis. The DC Court wishes to see evidence of the legal position in the jurisdictions where the non-US citizen family members are domiciled, including England.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



3.     As it is put in the introductory paragraphs of the DC Court's Memorandum Opinion of 24 January 2022:

"*During the United States military's occupation of Iraq, insurgents attacked American troops and their allies with explosively formed penetrators ("EFPs")-a type of improvised explosive device ("IED") capable of exceptional destruction and lethality. Plaintiffs here are thirteen contractors injured in EFP attacks (the "Contractor Plaintiffs") and their immediate family members (the "Family Member Plaintiffs" and the "Mughal Plaintiffs"). These individuals ask the Court to hold the Islamic Republic of Iran ("Iran") liable for materially supporting the EFP attacks that injured them. Iran has not responded to this lawsuit, so plaintiffs have moved for default judgment. See Entry of Default, ECF No. 15; Mot. for Default J., ECF No. 16.*

*[…] Plaintiffs raise claims against Iran under the Foreign Sovereign Immunities Act ("FSIA"), which guarantees a private cause of action for victims of state sponsored terrorism. See 28 U.S.C. § 1605A(c). Plaintiffs also allege claims for intentional infliction of emotional distress ("IIED") arising under District of Columbia ("D.C.") law. The Court possesses subject matter jurisdiction over plaintiffs' § 1605A(c) claims. But under D.C. choice-of-law principles, D.C. tort law cannot provide the substantive law governing plaintiffs' IIED claims. Without evidence of British, South African, and Iraqi law, the Court cannot grant default judgment on plaintiffs' IIED claims on this record.*"

4.     Under DC Law, the cause of action is effectively a unique type of Intentional Infliction of Emotional Distress ("IIED") claim. Family members are permitted to recover even if not present for the attack. The usual "presence requirement" is waived as a result of the understanding that the impacts of an act of terrorism are necessarily targeted at more than just the attack victim and it should be expected

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



that the families of those targeted would be emotionally damaged. It is necessary only to prove that the family members had a close emotional relationship prior to the attack and that they were somehow emotionally distressed as a result of the attack.

5.    I am instructed on behalf of the Plaintiffs to provide an expert report for the Court, by Singer Davis, LLC, a Virginia law firm. I am asked to address whether the English Plaintiffs would have a similar or analogous cause of action to the DC claims, in the law of England and Wales ("English Law"[1]), enabling them to recover damages in such circumstances under their domestic law.

6.    I can confirm that there is no conflict of which I am aware in my acting as an expert witness in this matter. I do not know any of the parties and have not had any prior dealings with this claim. I have not met any of the Plaintiffs for the purposes of compiling this report and I do not consider that this is necessary. As noted, I have reviewed the DC Court's Memorandum Opinion in this matter, dated 24 January 2022, as well as the Complaint from 11 May 2020 and various emails from the Attorneys instructing me to provide this report.

7.    I understand that my duty is to the Court and not to any party instructing me. I can confirm that my fee for providing this report is not contingent on the outcome of the claims.

8.    I am not asked to address the question of damages, but rather the more fundamental question of whether there would be a cause of

---

[1] In this expert report, I will use "English Law" as an abbreviation for the Law of England and Wales. There is no such thing as "British Law" as such. The United Kingdom is governed by the Government in London and the Parliament in Westminster, subject to the more limited powers exercised by the devolved governments of the nations of Wales, Scotland and Northern Ireland. However, the UK has three separate legal and judicial systems, one in Scotland; one in Northern Ireland; and one in England and Wales. This expert report only addresses the position in England and Wales.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



action at all in English Law. I am told that if the elements of a claim for liability purposes are made out, the DC Court will apply the same principles of damages that are used for the US family member victims, as a means of ensuring consistency between comparable claims.

9.    In considering the question of whether there would be a cause of action for the Plaintiffs at all in English Law, I have considered a range of different possibilities, both in common law as a tort claim as secondary victims, under various statutory compensation schemes of last resort, as well as any other possible remedies such as under the *Human Rights Act* 1998 or for assault.

## SECONDARY VICTIM CLAIMS AT COMMON LAW

### Introduction

10.    In exploring whether the Plaintiffs would have a claim in English common law, it is necessary to first to distinguish their claims, as what would be known in England as "secondary victims", from those of "primary victims".

11.    The distinction, first made by Lord Oliver in the House of Lords[2] in *Alcock v Chief Constable of South Yorkshire* [1992] 1 AC 310, is

---

[2] Prior to the creation of the UK Supreme Court in 2009 as the final Appellate Court for the UK jurisdictions, including England and Wales, cases at that final appellate level were heard by the Appellate Committee of the House of Lords. On the commencement of the Supreme Court in October 2009, all current "Law Lords" (as they were known in the House of Lords) became its first Justices.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



critical because a primary victim does not have to satisfy the *Alcock* criteria or "control mechanisms" (particularly the policy-imposed test of 'proximity'), which effectively means establishing a duty of care as a secondary victim is much more difficult than for a primary victim.

12. The two seminal cases of *Alcock* in 1992 and *White/Frost* in 1999, both against the Chief Constable of South Yorkshire Police, defined and developed the law relating to secondary victim claims for psychiatric injury and distinguished them from primary victim claims. Both arose out of the Hillsborough Football (Soccer) Stadium disaster of 15 April 1989. Negligence by the police in managing crowds arriving late for the FA Cup semi-final match at the ground, as well as stadium design issues, contributed to a fatal crush in the Leppings Lane end of the stadium. This resulted in 97 deaths and hundreds of non-fatal injuries.  The *Alcock* cases were those by relatives of the deceased, who sustained psychiatric injuries from witnessing the unfolding disaster on television, or from different parts of the ground, knowing that they had relatives in the area of the crush; some subsequently identified their deceased relatives in mortuaries some hours later. The *White/Frost* claims were by police officers who also sustained psychiatric injuries from what they witnessed and dealt with that day. The claims failed in both *Alcock* and *White/Frost*, but the House of Lords set out for the first time the "control mechanisms", effectively policy boundaries limiting the scope of such claims beyond the constraints imposed by a simple test of foreseeability and the standard tortious requirements of duty, breach, causation and damage.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



# The distinction between Primary and Secondary Victims

13. The key authority on the ability of a primary victim to recover for psychiatric injury is the House of Lords case of *Page v Smith* [1996] 1 AC 155, in which the claimant was driving his car when suddenly and without warning, the defendant turned into his path. The impact caused some physical damage to the cars but none to the occupants. However, shortly after the accident the claimant was diagnosed with the recrudescence of myalgic encephalomyelitis ("ME" or "chronic fatigue syndrome") as a result of the accident. The claimant won at first instance and the defendant successfully appealed the decision on the basis that it had not been reasonably foreseeable that a person of normal fortitude would have suffered psychiatric injury. The Claimant appealed to the House of Lords.

14. Lord Lloyd gave helpful guidance on the distinction between a primary and secondary victim at page 184 of his speech in the House of Lords:

> "*In all these cases the plaintiff was the secondary victim of the defendant's negligence. He or she was in the position of a spectator or bystander. In the present case, by contrast, the plaintiff was a participant.* <u>*He was himself directly involved in the accident, and well within the range of foreseeable physical injury. He was the primary victim.*</u> *This is thus the first occasion on which your Lordships have had to decide whether, in such a case, the foreseeability of physical injury is enough to enable the plaintiff to recover damages for nervous shock….*

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



*In Alcock, Lord Oliver of Aylmerton said, at p. 407, of cases in which damages are claimed for nervous shock: 'Broadly they divide into two categories, that is to say, those cases <u>in which the injured plaintiff was involved, either mediately, or immediately, as a participant,</u> and those in which the plaintiff was no more than the passive and unwilling witness of injury caused to others.' Later in the same speech, at pp. 410-411, <u>he referred to those who are involved in an accident as the primary victims, and to those who are not directly involved, but who suffer from what they see or hear, as the secondary victims.</u> This is, in my opinion, the most convenient and appropriate terminology".* (underlined emphasis added).

15.   In *Hatton v Sutherland* [2002] ICR 613, Hale LJ[3] at p.623 described the distinction between a primary and secondary victim as follows:

*"Where psychiatric harm is suffered, the law distinguishes between 'primary' and 'secondary' victims. A primary victim is usually someone within the zone of foreseeable physical harm should the defendant fail to take reasonable care: see Page v Smith [1996] AC 155. A secondary victim is usually someone outside that zone: typically such a victim foreseeably suffers psychiatric harm through seeing, hearing or learning of physical harm tortiously inflicted upon others"*

---

[3] An abbreviation for (Lord or here) Lady Justice. Lady Hale was later President of the Supreme Court.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



## Establishing a Duty of Care as a Primary Victim

16.   In respect of a primary victim, it is much easier to establish that a duty of care was owed. This was discussed by Lord Lloyd in *Page v Smith* at p.187 and p.189 as follows:

"*187…Foreseeability of psychiatric injury remains a crucial ingredient when the plaintiff is the secondary victim, for the very reason that the secondary victim is almost always outside the area of physical impact, and therefore outside the range of foreseeable physical injury. But where the plaintiff is the primary victim of the defendant's negligence, the nervous shock cases, by which I mean the cases following on from Bourhill v Young are not in point. Since the defendant was admittedly under a duty of care not to cause the plaintiff foreseeable physical injury, it was unnecessary to ask whether he was under a separate duty of care not to cause foreseeable psychiatric injury….*

*189…Nor in the case of a primary victim is it appropriate to ask whether he is a person of 'ordinary phlegm.' In the case of physical injury there is no such requirement. The negligent defendant, or more usually his insurer, takes his victim as he finds him. The same should apply in the case of psychiatric injury. There is no difference in principle, as Geoffrey Lane J. pointed out in Malcolm v. Broadhurst* [1970] 3 All E.R. 508*, between an eggshell skull and an eggshell personality. Since the number of potential claimants is limited by the nature of the case, there is no need to impose any further limit by*

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



*reference to a person of ordinary phlegm. Nor can I see any justification for doing so…"*

17.   Lord Lloyd stated that the only limiting factor was that *"Before a defendant can be held liable for psychiatric injury suffered by a primary victim, he must at least have foreseen the risk of physical injury"* (p189).

18.   Therefore, in the case of a primary victim, the question will always turn on whether the foreseeable injury is physical, as Lord Lloyd stated:

> *"once it is established that the defendant is under a duty of care to avoid causing personal injury to the plaintiff, it matters not whether the injury in fact sustained is physical, psychiatric or both".*

19.   The Plaintiffs in the present matter were plainly, the words of Lord Lloyd, outside the area of physical impact, and therefore outside the range of foreseeable physical injury. They are not the primary victims. It is their loved ones, directly injured by the terrorist attacks who were the primary victims. The present Plaintiffs are only arguably secondary victims and, therefore it is necessary to explore whether they would have realistic prospects of satisfying the control mechanisms, the legal tests limiting the duty of care to such individuals.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

## Would the Plaintiffs qualify as Secondary Victims?

20.   For the reasons discussed above, the primary victims here are the relatives of the Plaintiffs directly killed and injured in the attacks. Can the Plaintiffs establish claims as secondary victims, therefore?

21.   The case of *Alcock* was the first to use the terminology and make the distinction between primary and secondary victims, building on the earlier and equally seminal House of Lords decision on the subject of what were then called "nervous shock" claims by relatives witnessing the distressing aftermath of a death or serious injury to a close relative caused by a tortfeasor's negligence, in *McLoughlin v O'Brian and Others* [1983] 1 AC 410.

22.   In *Alcock,* Lord Oliver set out the limits on secondary victim claims at p.410E:

   *"Although it is convenient to describe the plaintiff in such a case as a "secondary" victim, that description must not be permitted to obscure the <u>absolute essentiality of establishing a duty owed by the defendant directly to him — a duty which depends not only upon the reasonable foreseeability of damage of the type which has in fact occurred to the particular plaintiff but also upon the proximity or directness of the relationship between the plaintiff and the defendant…</u>In the end, it has to be accepted that the concept of "proximity" is an artificial one which depends more upon the court's perception of what is the reasonable area for the imposition of liability than upon any logical process of analogical deduction. The common features of all the reported cases of this type decided in this country prior to the decision of Hidden J. in the instant case and in which the*

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



*plaintiff succeeded in establishing liability are, first, that in each case there was a <u>marital or parental relationship</u> between the plaintiff and the primary victim; secondly, that the injury for which damages were claimed arose from the <u>sudden and unexpected shock</u> to the plaintiff's nervous system; thirdly, that the plaintiff in each case was <u>either personally present at the scene of the accident or was in the more or less immediate vicinity and witnessed the aftermath shortly afterwards;</u> and, fourthly, that the injury suffered arose from witnessing the death of, <u>extreme danger to, or injury and discomfort suffered by the primary victim</u>. Lastly, in each case there was not only an element of physical proximity to the event but a close <u>temporal connection</u> between the event and the plaintiff's perception of it combined with <u>a close relationship of affection</u> between the plaintiff and the primary victim. It must, I think, be from these elements that the essential requirement of proximity is to be deduced, to which has to be added the reasonable foreseeability on the part of the defendant that in that combination of circumstances there was a real risk of injury of the type sustained by the particular plaintiff as a result of his or her concern for the primary victim."* (Underlined emphasis added).

23.    Those requirements have stood the test of time and, to date at least, define the limits of arguable secondary victim claims at common law. They have of course been examined and explained in a number of important cases since.

24.    The English common law has not made a distinction, in the requirements for secondary victim claims, between injuries which are recklessly or even deliberately caused, such as intentional torts (assault and battery) and those resulting from mere negligence. So,

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



the fact that the claims by the present Plaintiffs stem from deliberate assaults on their relatives, the primary victims, for which Iran has been held culpable in law, does not alleviate their legal difficulties in satisfying the strict control mechanisms.

Page | 15

25. So, in the case of secondary victims who sustain psychiatric injury as a result of witnessing death or injury to another, or perceive the risk of death or injury to another, the secondary victim establishes legal proximity and therefore the duty of care by satisfying the following control mechanisms:

  a. it must be reasonably foreseeable that a person of "*normal fortitude*" or "*ordinary phlegm*" might suffer psychiatric injury by shock (per Lord Lloyd in *Page v. Smith* at p.197F).

  b. There must be a close relationship of love and affection between the person killed or injured ("the primary victim") and the Claimant/ Plaintiff ("the secondary victim") (Lord Oliver in *Alcock* p.411F).

  c. The claimant must be in close proximity in space and time to the incident or its immediate aftermath (Lord Oliver in *Alcock* p.411G). There are two distinct meanings of proximity, legal proximity and physical proximity, as explained by Lord Dyson MR in *Taylor v. A.Novo UK Ltd*[4] [2014] QB 150, at p.164F-165C [paras. 26-27]. That case also decided that a secondary victim cannot recover where the shock is caused by witnessing a second event (such as a subsequent death, however shocking) separated in time from an initial negligent event causing some injury to the primary victim. In *Paul v Royal Wolverhampton*

---

[4] For completeness, I should mention that I appeared in that case as sole Counsel at trial and Junior Counsel in the Court of Appeal, acting for the successful Defendant.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



*NHS Trust (and conjoined appeals)*[5] [2022] EWCA Civ 12 the Court of Appeal clarified the effect of the *Taylor v Novo* decision, as being that no claim can be brought for psychiatric injury where there is an interval in time between the breach of duty/negligence and the shocking event relied upon. This is discussed further below.

d. There must be a recognised psychiatric injury and it must result from a "*sudden and unexpected shock*": Lord Oliver in *Alcock* at (411F). Lord Ackner in *Alcock* (at 401F) defined it as: "*(5) "Shock", in the context of this cause of action, involves the sudden appreciation by sight or sound of a horrifying event, which violently agitates the mind."*

e. per Lord Ackner in Alcock p.400F: "*Even though the risk of psychiatric illness is reasonably foreseeable, the law gives no damages if the psychiatric injury was not induced by shock. Psychiatric illness caused in other ways, such as by the experience of having to cope with the deprivation consequent upon the death of a loved one, attracts no damages.*" The same applies to situations where the family member becomes psychiatrically ill from the strain of caring for a gravely injured relative and the consequences of such injury. In *Liverpool Women's Hospital NHS Foundation Trust v Ronayne* [2015] PIQR P20 ("*Ronayne*"), the Court of Appeal reiterated that the shock must have been (a) horrifying; (b) sudden; and (c) exceptional.

---

[5] As noted in the Introduction to this expert report, I was Leading Counsel for the successful Defendants in all three appeals in the Court of Appeal.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523      E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law      W: www.gatehouselaw.co.uk



f.  The psychiatric injury must be caused by seeing or hearing the incident or its immediate aftermath, rather than being told about it: Lord Wilberforce in *McLoughlin v. O'Brian* at 422H-423A, as cited with approval, amongst others, by Lord Keith in *Alcock* at 398B.

26.  In *White/Frost* [op. cit.], Lord Hoffman held at [502D] that in *Alcock*, the House of Lords decided that liability for psychiatric injury should be restricted by "*control mechanisms*", which he said were "*more or less arbitrary conditions which a plaintiff had to satisfy and which were intended to keep liability within what was regarded as acceptable bounds*".

27.  Those control mechanisms have been reiterated in the Court of Appeal in *Taylor v Novo* and *Paul*, as has the importance of leaving any substantial departure from those principles to Parliament. In *Taylor v Novo* Lord Dyson MR held at 166E:

"*The courts have been astute for the policy reasons articulated by Lord Steyn [in Frost] to confine the right of action of secondary victims by means of strict control mechanisms. <u>In my view, these same policy reasons militate against any further substantial extension</u>. That should only be done by Parliament.*" (Underlined emphasis added).

28.  So, the Courts have been clear that any substantial extension to the present law would need statutory intervention by Parliament, rather than being an option open to the Courts. The present Plaintiffs claims would require exactly such a substantial extension to succeed. It

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



would be necessary for a Court to waive the physical proximity (presence) requirement in the way that is done for IIED claims arising from terrorist attacks under DC Law. A Court would also have to be prepared to relax the other control mechanisms, save for the close tie of love and affection test, most notably the requirement for the psychiatric injury sustained to result from witnessing a shocking event involving the death or serious injury to the primary victim or its immediate aftermath, rather than just the wider emotional impact of the attack on the relative.

29.   Whilst the latest *Paul v Royal Wolverhampton NHS Trust* decision is subject to a further appeal to the Supreme Court, likely to be heard in 2023, the present decision is a significant limitation on claims where the secondary victim is not present at the incident in which negligent harm is inflicted upon the primary victim or its immediate aftermath. I am advising on the present law, but obviously have an eye to any potential changes in the law. The Supreme Court's decision in the *Paul* case will be the first time in a generation that secondary victim law has been considered at the highest appellate level.

30.   It will be open to the Supreme Court to take secondary victim law in a different direction. In limited circumstances, the Supreme Court can depart from its own previous decisions or one of its pre-2009 equivalent, the Judicial Committee of the House of Lords. The House of Lords' Practice Statement of 26 July 1966 (Practice Statement (Judicial Precedent) [1966] 1 WLR 1234, stated that the House of Lords would treat former decisions of the House as normally binding but that it would depart from a previous decision when it appeared right to do so[6]. The Practice Statement is "*part of the established*

---

[6] See also UK Supreme Court Practice Direction 3 at paragraph 3.1.3.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



*jurisprudence relating to the conduct of appeals*" and "*has as much effect in [the Supreme] Court as it did before the Appellate Committee in the House of Lords*": Austin v Mayor and Burgesses of the London Borough of Southwark [2010] UKSC 28 at paragraphs 24, 25.

31.   But, for the Supreme Court to abandon the physical proximity requirement entirely, so that those not physically present at any stage to recover damage would be a complete sea change in the law of a type not sought by the Appellant Claimants (Plaintiffs) in the *Paul* appeal.

32.   For the Supreme Court to abandon the physical proximity test entirely and then to go further and abandon the control mechanisms in relation to the cause of the psychiatric injury and linking it to an event which is shocking as a matter of law, rather than the emotional impact of its consequences, if vanishingly unlikely in my view.

33.   So, in conclusion in relation to the common law, the Plaintiffs would be unable to satisfy the strict control mechanisms to establish secondary victim claims. There is no realistic prospect of the law changing as part of the present appeal to the Supreme Court in a way which would enable success, at common law.

34.   The next question is whether, notwithstanding the unavailability of a claim at common law, whether some other remedy would provide a viable cause of action in English Law.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



## The Victim of Overseas Terrorism Compensation Scheme

<u>Introduction</u>

35.     In my view, the *Victims of Overseas Terrorism Compensation Scheme* 2012[7] ("VOTCS") is the only realistic analogy to IIED claims in English Law which provides the potential for recovery. VOTCS is administered by the Criminal Injuries Compensation Authority ("CICA"), which is an executive agency sponsored by the UK Government Ministry of Justice.

36.     CICA itself handles compensation claims from people who have been physically or mentally injured because they were the victim of a violent crime in England, Scotland, or Wales. It is a publicly financed fund of last resort for those who cannot recover damages or compensation via any other route, such as a claim in the civil Courts against the perpetrator.

37.     VOTCS is a scheme which was laid before (approved by) Parliament under section 54(1) of the *Crime and Security Act* 2010. It replaced

---

[7]

https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/243508/9780108512124.pdf

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



an earlier *ex gratia* scheme for victims of overseas terrorism[8]. There is a paucity of information available on the interpretation and application of VOTCS, but as the scheme is similar (or the same in parts) to the Criminal Injuries Compensation Scheme 2012 ("CICS"), it is appropriate to draw upon some of the principles of CICS by way of analogy and to assist in interpreting VOTCS.

38.   For background, the CICS is the government-funded scheme which is designed to compensate victims of violent crime in the UK; it also provides compensation for bereaved families. The provisions pertaining to eligibility and the assessment of compensation are substantively the same as the provisions contained within VOTCS; both schemes adopt the same tariff of injuries.

Designated terrorist acts

39.   The VOTCS scheme sets out a list of designated terrorist acts for which claims can be made, including for example the attack at Port el Kantaoui, Tunisia (26 June 2015) and the attack at Kabul airport, Afghanistan (17 May 2015), although the specific government guidance states: *"you may be able to claim for other attacks"*. CICA is not responsible for deciding whether an act would be designated, as this decision falls to the Foreign and Development Secretary (a Government Minister, on advice from his or her Government Department) for an assessment of the facts and the circumstances of violent incidents.

---

[8] David Miers, "Compensating victims of domestic terrorism: reviewing the scope of the Criminal Injuries Compensation Scheme 2012" Crim L.R. 2021, 5, 338, 350.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8RB, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



40.    The eligibility criteria for the scheme state that:

*(4) A person may be eligible for an award under this Scheme if they sustain a relevant injury which is directly attributable to their being a direct victim of a designated act.*

*(5) A person may be eligible for an award if they sustain a relevant injury which is directly attributable to being present at or witnessing a designated act, or the immediate aftermath of a designated act, as a result of which a loved one sustained a relevant injury directly attributable to being a direct victim of a designated act. For these purposes, a "loved one" is a person with whom the applicant:*

*(a) at the time of the designated act had a close relationship of love and affection; and*

*(b) if the loved one is alive at the date of the application, continues to have such a relationship.*

41.    The requirement of being present at or witnessing a designated act or the immediate aftermath of a designated act is addressed extensively below.

42.    There would also need to be evidence that the Plaintiffs have suffered from a recognised psychiatric injury, as mental anguish or distress would not be sufficient.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



The relevant date of the attacks

43.    The Scheme was made on 13 November 2012. In the guidance[9] it is stated that, *"This scheme comes into force on whichever is later of 30 September 2012 or the day after the end of the period of two weeks beginning with the day on which it is made"*.

44.    In various English Law firm blogs it is stated that the Scheme appears to apply to acts of terrorism which have occurred since 27 November 2012. However, this must be incorrect. Under *Annex A: Interpretation,* a *"designated act"* means *"an act designated under section 47 of the Crime and Security Act 2010 and a reference to the first date of the designated act means, where that act occurs over more than one day, the first day on which it occurs and a reference to the last date of the designated act means, where that act occurs over more than one day; the last day"*. The definition of designated act in section 47 of the *Crime and Security Act* 2010 (CSA 2010) is as follows:

(1)   *The Secretary of State may make arrangements for making payments to, or in respect of, persons who are injured as a result of an act designated under subsection (2).*

(2)   *The Secretary of State may designate an act under this subsection if—*

   (a)   *it took place outside the United Kingdom,*

   (b)   *it took place on or after 18 January 2010,*

---

[9] https://www.gov.uk/guidance/victims-of-overseas-terrorism-compensation-scheme-a-guide

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



(c)   in the view of the Secretary of State the act constitutes terrorism within the meaning of the Terrorism Act 2000 (see section 1 of that Act), and

(d)   having regard to all the circumstances, the Secretary of State considers that it would be appropriate to designate it.

(3)   Nothing in this section affects any power of the Secretary of State to make payments to, or in respect of, persons who are injured as a result of terrorism outside the United Kingdom.

(4)   In sections 47 to 54, "injury" includes fatal injury (and "injured" is to be construed accordingly).

45.   Moreover, section 13 of CSA 2010 clearly states that, "*the Act provides for a compensation scheme for persons injured (including those fatally injured) as the result of a designated terrorist act which took place outside the United Kingdom and occurred on or after 18 January 2010.*"

46.   The definition of terrorism under the 2000 Act is not repeated here, but the EFP attacks would safely satisfy the definition. Therefore, it is arguable, at least conceptually, that there is a remedy under English Law via the Scheme in respect of acts that took place on or after 18 January 2010, those acts being the 16 March 2010 EFP attack, and the 23 June 2011 EFP attack.

47.   For the earlier attacks, the Plaintiffs would have to have resort to the previous *ex gratia* scheme. There would be more uncertainty about any remedy under an entirely discretionary regime although, as set out below, it is to be hoped that it would be interpreted to permit the Plaintiffs to qualify, in accordance with the evolution of the more benevolent approach to VOTCS discussed below.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

Limitation

48.   VOTCS applications are to be made as soon as reasonably practicable and not later than two years after the date of the designated act (in the case of an adult). Claims made outside of the two-year time limit can be considered by the CICA in exceptional circumstances provided that the CICA will not have to make onerous further enquiries to resolve the claim. However, it is understood that that the relevant question for the DC Court is whether there would be a cause of action in English Law, not whether if brought now, a claim would necessarily succeed. That would be artificial, given the claims are being brought in DC, but that Court needs evidence of whether a claim could have been brought in England. It is therefore presumed that, aside from the qualifying event, procedural hurdles such as limitation are not relevant for the purposes of establishing an equivalent claim to an IIED claim.

Damages

49.   The Scheme provides a tariff of damages for the various injuries. It is however appreciated that damages need not be considered further in this report, in that the US Court will apply the same principles of damages used for the US family member victims, to achieve consistency.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523   E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law   W: www.gatehouselaw.co.uk



Proximity in Space and Time

50.     The biggest difficulty in establishing any entitlement to redress is the wording pertaining to the requirement for spatio-temporal (physical) proximity to the designated act. Similar problems would have arisen under any earlier *ex gratia* regime.

51.     The wording of VOTCS in relation to the requirement for presence at the immediate aftermath of an attack mirrors the provisions in the CICS 2012. There is limited information available on the interpretation of CICS, although Laura Begley's *Criminal Injuries Compensation Claims (2nd edn., 2016)* provides some insight. Begley considered that earlier versions of the CICS scheme (2001 and 2008) were more restrictive than the 2012 scheme as concerns the interpretation of *"immediate aftermath"*.

52.     In *AP v First Tier Tribunal and CICA* [2011] UKUT 368 (AAC) a claim was made under the 2008 scheme. The applicant's father was physically attacked in the early hours of the morning on 1 November 2001. He was taken to hospital and discharged at 10:30am the same day. The following day at around 3:00am his breathing was laboured; he was readmitted to hospital and passed away just before noon. The 12-year-old applicant had witnessed his father in hospital on 1 November 2001, 3-4 hours after treatment, but prior to discharge. The Upper Tribunal had to consider whether the applicant was entitled to recover under the CICS Scheme on the basis that he witnessed the subsequent consequences of his father's injury, including his lapse of consciousness. The Upper Tribunal held (upholding the first instance decision) that the applicant was not involved in the *"immediate aftermath"*. In considering the question

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



of whether the applicant was involved in the immediate aftermath, the Upper Tribunal stated that it was appropriate *"in answering that question, to regard the cases decided by the courts in relation to tortious liability as directly applicable"* (Begley 100).

53.    The Court of Appeal cautioned against drawing on the common law when seeking to interpret such terms in the CICS scheme in *RS v CICA [2013]* EWCA Civ 1040, which concerned a claim under the 2001 scheme. The crux of that case concerned the timings of the end of a knife attack and the arrival of the appellant on the scene. The CICA appealed the Upper Tribunal's decision, which had given guidance as to the test to be applied in such cases, considering it to be too wide. The Court of Appeal confirmed that the Upper Tribunal had applied too wide a test and considered the meanings of both *"an occasion"* and *"immediate aftermath"*. Laws LJ gave the leading judgment and held:

*"I consider with respect that some caution needs to be exercised in drawing assistance from the common law cases in tort in relation to the immediate aftermath. It is important that the decision maker should not be distracted from applying the ordinary meaning of the scheme's words. Second, as to that, while I accept that immediate aftermath may allow a degree of temporal and spatial flexibility, the focus of the provision is upon the secondary victim's exposure to the overt consequences of the paragraph 8 event, and in the nature of things these are likely to follow the event more or less immediately"* [19].

54.    In the 2001 scheme, the paragraph 8 event simply refers to the event in which the criminal injury was sustained. As identified by Begley, the Court of Appeal rejected a nominal time period for the *"immediate*

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



*aftermath"*, and in the subsequent decision of *Davis v First-tier Tribunal (CIC) and another* (unreported, Court of Appeal, 24 June 2014), Briggs LJ (as he then was) held:

*"the Court of Appeal in RS by no means specified one hour as a rule, but only as helpful guidance from which there may in particular cases be exceptions"* (Begley 101)*.*

55.     The CICA's guide to the VOTCS scheme was last updated on 14 February 2022. The update provides a designated section on the meaning of *"witnessed or present at the immediate aftermath of a designated act".* It states, *"when we say 'immediate' we are normally referring to the period of time immediately following the designated act in which a loved one was injured and not where someone is later told about the act either by the victim or another person".*

56.     The wording of this provision strongly resonates with the secondary victim case law. At first blush, this would suggest that the Plaintiffs would struggle to prove the basic elements of the claim for liability purposes in this jurisdiction in the same way that they would struggle in a tortious secondary victim claim at common law. The reason being that it appears that the family members were not present at and did not witness the aftermath of the attacks.  Arguably therefore, this framework is not analogous to the IIED claims framework, which waives the usual requirement for spatio-temporal proximity (presence). However, the Court of Appeal in *RS* has cautioned against the tribunals drawing assistance from the common law when interpreting the schemes.

57.     Further, the use of the word *"normally"* in relation to the interpretation of the words *"immediate aftermath"* implies the

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



existence of a discretion. Moreover, in the guidance for the 2008 CICS scheme for example (prior to the inception of VOTCS), it is stated that: *"by 'aftermath' we mean events that happened straight after the incident. For the purpose of this Scheme it will be taken to mean arriving at the scene of the incident before the victim is moved to another location"* (Begley, 102). There is clearly a marked contrast here between the 2008 guidance, and the VOTCS guidance from 2022 which adopts the word *"normally".* Applying a purposive analysis, there is a potential mode of redress under VOTCS, as set out below.

A Purposive Analysis

58.   The Criminal Injuries Compensation Scheme Review 2020 ("the Review") states that one of the wider scheme's central principles is that it is a scheme of last resort and is intended for those who cannot obtain compensation through other means, for example through a civil personal injury claim. In the 2020 review, particular regard was had for the terrorism schemes, which as above, are distinct from the CICS but with parallel provisions. It was noted that a substantial portion of victims sought redress through the civil courts, and that any claims for compensation might be deferred by CICA pending the outcome of such civil proceedings.

59.   It can be assumed that this would apply equally to VOTCS as it does to CICS, as a scheme of last resort or safety net. Proposals were made to create a stand-alone compensation scheme for terrorism, effectively merging VOTCS and CICS to allow for targeted awareness raising and more rapid application processing, in view of the very low number of applications each year to the respective schemes. This

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



proposal would demand new primary legislation, but for the time being, individuals can apply for compensation either through VOTCS (for overseas attacks), or CICS for (domestic terrorism). The formulation of any overarching terrorism compensation scheme remains to be seen.

60.   The consultation for the Review ran from 16 July 2020 to 9 October 2020. In the consultation document, the Foreword from Alex Chalk MP (Parliamentary Under Secretary of State) describes the scheme as *"one of the most generous compensation schemes in the world"*, the aims of the review being to *"better serve some of the most vulnerable victims at the most difficult times of their lives"*. As part of a 2018 Victims Strategy, it was announced that the UK government would abolish the pre-1979 *"same roof rule"* which denied compensation for some victims who lived with their attacker prior to 1979. This change brought about a wave of new claimants, as provision was also made for victims whose applications had previously been refused under this rule. Crucially, Mr Chalk stated that *"the CICA has been improving its processes and <u>application of discretion</u>, where permitted, to ensure that it is treating such applicants sensitively, in a way that is attuned to their needs and nature of what they have experienced"* [emphasis added].

61.   The terms of reference for the 2020 review were published in December 2018[10] and include several issues for review, including an assessment of fitness for purpose and specifically, *"the impact of the scheme on particular groups, including victims of child sexual abuse*

---

[10] http://data.parliament.uk/DepositedPapers/Files/DEP2018-1283/terms_of_reference_CICS_Review.pdf

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk



*and victims of terrorism".* Mr Chalk's Foreword mentions that the UK has seen *"more incidents of terrorism at home and overseas".*

62.    In the review's section on terrorism, it is anticipated that there will be new legislation *"as soon as parliamentary time allows to provide for compensating victims of domestic and foreign terrorism".* In the short-term, victims of domestic terrorism would be kept within CICS and overseas terrorism would be covered through VOTCS. Nonetheless, it is clear from this section of the consultation that the anticipated legislative changes would be to broaden the scheme.

63.    Limited secondary resources shed light on the proposed changes, although David Miers has remarked that *"the 2020 review adopts a less censorious tone about undeserving victims"* [11]. There are multiple examples throughout the Review of a shift towards discretion and accessibility. For example, paragraph 167 proposes the simplification of injury tariff descriptions, with a view to making the scheme more accessible; paragraph 190 proposes a less onerous claims process for funeral payments for bereaved families. The general tenor of the proposed changes appears to be one of flexibility; this is captured in *Section 5: Operational Improvements*, at paragraph 220 *"the experience and journey of every victim of violent crime is different. Taking this as a central operating principle for the Scheme means taking a much more victim-centred approach and ensuring all CICA's processes and interactions with applicants are sensitive to the difficult situations people find themselves in and are driven by an understanding of the trauma victims will have experienced".*

---

[11] David Miers "Compensating victims of domestic terrorism: reviewing the scope of the Criminal Injuries Compensation Scheme 2012" Crim L.R. 2021, 5, 338, 350

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



64.     The direction of travel is clearly towards a more victim orientated, flexible and generous approach. This would fit with using the discretion available in a way which operated to include, rather than exclude, Claimants seen as deserving, particularly those impacted by terrorist attacks.

65.     In my view, VOTCS would have provided a realistic avenue of recovery for the English Plaintiffs, on a properly purposive reading of the scheme and relevant guidance. This scheme provides an appropriate analogy to the US IIED claims, demonstrating that there is a viable cause of action in English Law. This is particularly the case for the Plaintiffs who rely upon acts that took place on or after 18 January 2010, those acts being the 16 March 2010 EFP attack, and the 23 June 2011 EFP attack.

66.     There would be more uncertainty about any remedy under an entirely discretionary *ex gratia* regime, which would be the only available route for those Plaintiffs relying upon acts prior to 18 January 2010. However, it is more than merely arguable that such an *ex-gratia* scheme would be interpreted to permit the Plaintiffs to qualify, in accordance with the evolution of the more benevolent approach to VOTCS discussed above. Given the focus in reviews upon the victims of terrorism, in particular, it is likely that those operating the scheme would view the family Plaintiffs as vulnerable and deserving of a remedy under such a scheme. If they did not, their interpretation could be challenged on appeal, relying upon that guidance and that, for consistency, it should be applied to the *ex-gratia* scheme.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523   E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law   W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

## Other remedies

67.    I have given thought to whether there are any other potential remedies in English Law, in addition to those already discussed in this expert report. None is viable, in my view.

68.    I have already discussed, as part of the consideration of secondary victim claims, why I do not consider that a claim for an intentional form of tort, rather than simple negligence, would alter the analysis at common law. Such a claim would still founder on the rock of the strict control mechanisms limiting such claims, if presented as a secondary victim claim. It would fail as a claim for the tort of assault, given that such a remedy would only be open to a primary victim of the attack, not a relative impacted in a way which is one step removed from involvement in the immediate physical impact of here, terrorist attacks.

69.    For similar reasons, I consider that no claim would arise under the *Human Rights Act* 1998 ("the HRA") for this secondary sort of claim, even if one ignored other problems with this cause of action. A claim under the HRA only arises against a public authority, for a breach of a convention right under the European Convention on Human Rights ("ECHR"). This gives rise to a discretion to award damages, especially where there would be no remedy save under the HRA. However, here, if I am right, there is an alternative remedy under VOTCS, as discussed in the preceding section of this report. Also here, Iran would not come within the definition of public authority subject to the HRA.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

## Conclusion

70. In this report, I have considered various possible avenues by which the Plaintiffs might establish an analogous cause of action in English Law to the IIED claims asserted in the DC claims.

71. I have considered the potential for claims as secondary victims at common law, having explained why the Plaintiffs are not primary victims. For the reasons discussed above, I do not consider that there would be realistic prospects of establishing claims as secondary victims given the strict control mechanisms (requirements) of physical proximity to (presence at) the relevant event or its immediate aftermath. There is no waiver of those requirements in claims arising out of particular types of attack, such as terrorism, or for intentional acts, as opposed to mere negligence.

72. I have discussed some other potential remedies and explained why they do not apply, such as under the *Human Rights Act* 1998.

73. In my view, the *Victims of Overseas Terrorism Compensation Scheme* 2012 ("VOTCS") is the only real analogy to IIED claims in English Law.

74. In my view, VOTCS would have provided a realistic avenue of recovery for the English Plaintiffs, on a properly purposive reading of the scheme and relevant guidance. This demonstrates that there is a viable cause of action in English Law. This is particularly the case for the Plaintiffs who rely upon acts that took place on or after 18 January 2010, coming within the scope of VOTCS, those acts being the 16 March 2010 EFP attack, and the 23 June 2011 EFP attack.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



GATEHOUSE
CHAMBERS

75.   There would be more uncertainty about any remedy under an entirely discretionary *ex gratia* regime, which would be the only available route for those Plaintiffs relying upon acts prior to 18 January 2010. However, it is more than merely arguable that such an *ex-gratia* scheme would be interpreted to permit those Plaintiffs to qualify, in accordance with the evolution of the more benevolent approach to VOTCS discussed above.

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523    E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law    W: www.gatehouselaw.co.uk



**GATEHOUSE**
CHAMBERS

## Expert's declaration

I confirm that insofar as the facts stated in my report are within my own knowledge, I have made clear which they are and believe them to be true and the opinions I have expressed represent my true and complete professional opinion.

*Charles Bagot*

**CHARLES BAGOT QC**

Gatehouse Chambers

12 June 2022

Charles Bagot QC, Gatehouse Chambers, 1 Lady Hale Gate, Gray's Inn, London WC1X 8BS, England
T: +44 (0)20 7242 2523     E: practicemanagementteam@gatehouselaw.co.uk
T: @gatehouse_law     W: www.gatehouselaw.co.uk