UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALLAN ROBERTS, *et al.*,

    *Plaintiffs,*

v.

THE ISLAMIC REPUBLIC OF IRAN

    *Defendant.*

Case No. 20-cv-1227-RCL

## MEMORANDUM OPINION

Last year, this Court, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), granted plaintiffs' motion for default judgment against the Islamic Republic of Iran ("Iran") and in favor of U.S. contractors, and their U.S. citizen immediate family members, who were injured by explosively formed penetrator ("EFP") attacks carried out by Iran-supported insurgents during the United States' military occupation at Iraq. However, the Court denied plaintiffs' motion with respect to the remaining claim, intentional infliction of emotional distress ("IIED") arising under District of Columbia ("D.C.") law brought by the contractors' foreign citizen family members ("Family Member Plaintiffs"), because the Court determined that D.C. choice-of-law principles precluded D.C. tort law from governing their claim and because plaintiffs had not provided evidence of any other law that might apply to their claim.

Now, the Family Member Plaintiffs renew their motion for default judgment, insisting that D.C. law applies to their claim and, in the alternative, that they are entitled to relief under any formulation of the applicable law. For the reasons that follow, the Court concludes that under D.C. choice-of-law principles, Maryland, South African, and English law—the law of the Family Members Plaintiffs' domiciles—provide the substantive law governing their IIED claim. And

1

under that substantive law, plaintiffs may recover damages for their injuries under the law of Maryland and South Africa, but not the United Kingdom. Accordingly, the Court will **GRANT** in part and **DENY** in part plaintiffs' renewed motion for default judgment.

## I. BACKGROUND

The Court previously discussed the factual and procedural background of this case in detail in its prior opinion. *See Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. 2022). Consequently, the Court provides only the background necessary to decide the renewed motion.

Plaintiffs are U.S. contractors who were injured in EFP attacks carried out in Iraq by Iran-supported-proxy militias between 2004 and 2011 and their close family members. *Id.* at 163–66. One of those attacks, occurring on March 16, 2010, injured several British-citizen contractors. *Id.* at 166. Iran has long provided material support for proxy groups, and Iran's interest in targeting U.S. interests in Iraq is well documented. *Id.* at 158–62. Plaintiffs sued Iran under the FSIA, alleging that Iran materially supported the attacks causing them harm and intentionally inflicted emotional distress on their families. 28 U.S.C. § 1605A; Compl., ECF No. 1.

After Iran did not appear, plaintiffs filed an initial motion for default judgment. Mot. for Default J., ECF No. 16; Mem. in Supp. of Mot. for Default J., ECF No. 17 ("Original Mem."). This Court granted in part and denied in part that motion. *Roberts*, 581 F. Supp. 3d. at 176. Specifically, the Court found Iran liable to the U.S. contractor and U.S. citizen family member plaintiffs as to Counts I through XIII of the Complaint under § 1605A(c) of the FSIA. Finding of Liability, ECF No. 25. However, the Court denied without prejudice plaintiffs' motion as to Count XIV, D.C. IIED, because the Family Member Plaintiffs provided insufficient evidence to

determine which law applied to their separate claim.[1] *Id.*; *Roberts*, 581 F. Supp. 3d. at 176. Plaintiffs then filed a renewed motion for default judgment. Renewed Mot. for Default J., ECF No. 35; Mem. in Supp. of Renewed Mot. for Default J., ECF No. 35-1 ("Renewed Mem.").

Plaintiffs then moved to amend the Court's earlier liability finding after discovering that one foreign citizen family member plaintiff, Sitorai Khasanzod, was erroneously included in the U.S. citizen family member plaintiff group. *See* Mot. to Correct, ECF No. 39. Specifically, plaintiffs requested that the Court vacate its earlier liability determination with respect to Ms. Khasanzod's claim and evaluate her claim anew along with the rest of the Family Member Plaintiffs. *Id.* The Court subsequently ordered plaintiffs to provide information on Ms. Khasanzod's domicile. Order, ECF No. 45. Plaintiffs responded that Ms. Khasanzod is domiciled in Maryland and provided an explanation of Maryland IIED law. Pls.' Resp., ECF No. 46. The Court will acquiesce to plaintiffs' request. The liability finding in favor of Ms. Khasanzod will be vacated and her claim will be adjudicated with the other Family Member Plaintiffs.

The following Family Member Plaintiffs are domiciled in the following jurisdictions:

<u>Maryland:</u> Sitorai Khasanzod, Pls.' Resp. at 1;

<u>United Kingdom:</u> C.D.R., Roberts Aff., ECF No. 17-3, ¶ 3; Allan Roberts, in his capacity as guardian of C.D.R., *id.*; Bethan Johnson, *id.*; O.J.C, Crowley Aff., ECF No. 17-5, ¶ 3; L.A.C., *id.*; Stephen Crowley, in his capacity as guardian of O.J.C. and L.A.C., *id.*; Sarah Crowley, *id.*; Michael Crowley, *id.*; Patricia Crowley, *id.*; Kristin Jameson, Jameson Aff., ECF No. 17-6, ¶ 3; Edith Nichol, *id.*; and Thomas Jameson, *id.* (collectively "English Family Member Plaintiffs").

---

[1] Although the Family Member Plaintiffs, as foreign citizens, do not qualify for the private right of action in 28 U.S.C. § 1605A(c), a foreign state denied immunity under § 1605 is still "liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606. Plaintiffs may thus "bring state law claims [against a foreign state] that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). Plaintiffs here do just that.

3

<u>South Africa</u>: Natasha Grove, Botes Aff., ECF No. 17-4, ¶ 3; George Riekert, in his capacity as guardian of M.R., Riekert Aff., ECF No. 17-8, ¶ 3; M.R., *id.*; Simonè Riekert, *id.*; Simon Riekert, *id.*; Wilhelmina Oosthuizen, Oosthuizen Aff., ECF No. 17-9, ¶ 3; Chante Oosthuizen, *id.*; Shibone De Bruyn, *id.*; Shaun Oosthuizen, *id.*; Magdalena Oosthuizen, *id.*; Maggie Kieser, Kieser Aff., ECF No. 17-10, ¶ 3; Emogene Boje, *id.*; Sone Smith, *id.*; Gavin Smith, *id.*; Johannes Kieser, *id.*; Hester Hart, *id.*; Arnoldus Kieser, *id.*; Loraine Steenberg, Steenberg Aff., ECF No. 17-11, ¶ 3; René Botha, *id.*; Jené Steenberg Marais, *id.*; Deseré Steenberg, *id.*; Stephan Brink, in his capacity as executor of the Estate of Estelle Brink, *id.* & ECF No. 20; Brendon Botha, Botha Aff., ECF No. 17-12, ¶ 3; Leanelle Botha, *id.*; Janet Capazorio, Capazorio Aff., ECF No. 17-13, ¶ 3; Brandon Capazorio, *id.*; Shannon Figg, *id.*; George Capazorio, *id.*; Maud Capazorio, *id.*; Bettina Capazorio, *id.*; Carin Capazorio, *id.*; Sarel Du Plessis, Du Plessis Aff., ECF No. 17-14, ¶ 3; Susan De Clercq, *id.*; Rozelle Adams, Bruwer Aff., ECF No. 17-15, ¶ 3; Morne Bruwer, *id.* (collectively "South African Family Member Plaintiffs").

The Family Member Plaintiffs allege that Iran committed "intentional and reckless, extreme and outrageous" acts that caused them "severe emotional distress." Compl. ¶¶ 376–84. They seek relief under D.C. law for IIED. Iran has not responded to plaintiffs' renewed motion, and thus it is ripe for review. *See* Fed. R. Civ. P. 55(a).

## II.   LEGAL STANDARDS

### A. Motion for Default Judgment

When a defendant fails to appear, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The FSIA expressly provides that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). A district court retains discretion "to determine

4

precisely how much and what kinds of evidence the plaintiff must provide" to establish her claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). "[I]ndeed, 'the quantum and quality of evidence that might satisfy a court can be less than that normally required.'" *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Additionally, a plaintiff moving for default judgment "must persuade the trial court" that it may exercise subject matter jurisdiction and personal jurisdiction over the defendant. *Karcher v. Islamic Republic of Iran*, 496 F. Supp. 3d 12, 21 (D.D.C. 2019) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)). After all, a default judgment "rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422. And a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

**B. Choice-of-Law**

A federal court assessing state-law claims under the FSIA must apply the choice-of-law rules of the forum. *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). D.C. employs a "constructive blending" of "governmental interest" analysis and the "most significant relationship" test of the Restatement (Second) of Conflict of Laws ("Second Restatement"). *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995). Governmental interest analysis requires a court to (1) "identify[] the policies underlying the laws" of each potential jurisdiction, *In re APA Assessment Fee Litigation*, 766 F.3d 39, 52 (D.C. Cir. 2014), then (2) determine whether a jurisdiction's policy would be advanced "by having its law applied to the facts of the case under review." *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989). As part of this analysis, a court should also consider the jurisdiction with the "most

significant relationship" to the dispute under the principles listed in the Second Restatement. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013); *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 180 (D.C. 2006). According to the Second Restatement, for personal-injury actions, the law of the "state where the injury occurred" should govern unless another state has a "more significant relationship" to the dispute. Restatement (Second) of Conflict of Laws § 146 (1971). Specific "[c]ontacts to be taken into account . . . include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* § 145.

### III. DISCUSSION

This Court previously determined the existence of subject-matter jurisdiction under the FSIA, personal jurisdiction over Iran, and the timeliness of plaintiffs' action. *Roberts*, 581 F. Supp. 3d at 167–72. And the Court previously held Iran liable under most of the counts in the Complaint. *Id.* at 176. The only remaining questions are: (1) which law to applies to the Family Member Plaintiffs' IIED claim and (2) whether that law affords plaintiffs relief.

Plaintiffs argue that D.C. law should apply. This Court previously held that D.C. law cannot apply based on this forum's choice-of-law analysis, because D.C. does not have a strong enough interest in applying its law or the most significant relationship to the dispute. *Id.* at 174–75. Now, this Court affirms its prior decision and holds that plaintiffs' domicile jurisdictions have the strongest interest in and most significant relationship to this case. Therefore, Maryland, South

6

African, and English law apply.[2] Additionally, after reviewing evidence of such laws submitted by plaintiffs, the Court concludes that plaintiffs have satisfactorily established that that Iran can be held liable under Maryland and South African law but not English law.

### A. The Family Member Plaintiffs' IIED Claim Is Governed by the Law of Their Domiciles

Several possible jurisdictions could provide the law governing the Family Member Plaintiffs' IIED claim: (1) D.C., as the forum; (2) Maryland, South Africa, and the United Kingdom, as plaintiffs' domiciles; or (3) Iraq, as the place of the wrong. D.C. choice-of-law analysis dictates that Maryland, South African, and English law apply here.

#### 1. *D.C. Law Does Not Apply*

##### i. *Governmental Interest Analysis*

This Court previously held that D.C. law does not apply because the policies underlying D.C.'s law permitting recovery for intentional infliction of emotional distress would not be promoted by applying D.C. law to this case. *Roberts*, 581 F. Supp. 3d at 174. The forum, therefore, lacks a legitimate interest in this dispute.

Plaintiffs in their renewed motion claim that D.C. law is appropriate because the United States has a unique interest in applying domestic law to cases of state-sponsored terrorism targeting U.S. interests abroad. Renewed Mem. at 5–7 (citing Original Mem.). It is not clear whether plaintiffs focus on D.C. law merely because it is the domestic law of the forum or because D.C. is the location of the federal government. *See* Original Mem. at 32 (citing *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 91 (D.D.C. 2018) for the proposition that the United States has a "unique interest" in applying domestic law and that the law of the "seat of the federal government"

---

[2] Consistent with plaintiffs' expert, Mr. Charles Bagot, the Court will use the term "'English Law' as an abbreviation for the Law of England and Wales" because "[t]here is no such thing as 'British Law' as such." Bagot Rep., Ex. 3 to Renewed Mot. for Default J., ECF No. 35-4, ¶ 5 n.1.

7

should apply). Either way, this interest, if such one exists, is insufficient to elevate D.C.'s interests above those of other jurisdictions.

Fundamentally, governmental interest analysis asks whether the policies underlying a *particular* law of a *particular* jurisdiction would be furthered by applying the law to the case at bar, not the interests of the nation as a whole. *See Hercules*, 566 A.2d at 41. The D.C. legislature, which passed the relevant law, has different aims and priorities than the federal government, despite being its formal seat. As this Court previously explained, D.C. does not have an independent interest in compensating foreign citizens residing abroad. *Roberts*, 581 F. Supp. 3d at 174. Rather, the "governmental interest test tends to point to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens." *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d. 101, 108 (D.D.C. 2007) (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d. 40, 54 (D.D.C. 2006)).

Plaintiffs nevertheless insist that D.C. law is appropriate because the FSIA seeks to "promote uniformity and extend access to U.S. federal courts" and that D.C. law furthers this aim. Renewed Mem. at 6 (quoting *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 155 (D.D.C. 2011)). But as one of the other cases cited by plaintiffs acknowledges, "[the] concerns of uniformity and familiarity cannot prevail when another location otherwise has 'a significantly greater interest than does the District' in the cause of action." *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224 (JDB), 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005) (quoting *Mims v. Mims*, 635 A.2d 320, 325 (D.C. 1993)). Here, Maryland, South Africa, and the United Kingdom have a decidedly greater interest in providing relief to their injured domiciliaries.

*ii. Most Significant Relationship Analysis*

The most significant relationship analysis also points away from D.C. and most definitively towards the Family Member Plaintiffs' domicile jurisdictions. Almost none of the relevant contacts in § 145 of the Second Restatement relate to D.C. Neither the conduct causing the injuries nor the injuries themselves occurred in D.C. And none of the foreign citizen plaintiffs are domiciled here. Plaintiffs arguably have a common relationship in D.C. as the forum state. But D.C.'s relationship to the case, a product of plaintiffs' choice, is simply not as significant as the relationship of their domicile jurisdictions.

As the Court previously explained, "[p]ermitting foreign citizens to recover damages under D.C. law because of D.C.'s favorable substantive law" would be "the epitome of forum shopping," which the Second Restatement specifically seeks to prevent. *Roberts*, 581 F. Supp. 3d at 175 (internal quotation marks and citation omitted). Instead, applying the law of plaintiffs' domiciles, "where their injuries occurred and where they were domiciled at the time of their injuries," is more consistent with the Second Restatement's most significant relationship analysis as well as the law of this District. *See id.* at 175 & n.7 (citing Restatement (Second) of Conflict of Laws § 146; *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273, 2021 WL 2914036 (D.D.C. July 12, 2021); *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 196 (D.D.C. 2008); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 10 (D.D.C. 2008); *Blais*, 459 F. Supp. 2d at 54; *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 271–356 (D.D.C. 2006)).

As such, Maryland, South Africa, and the United Kingdom have a more significant relationship to this dispute than does D.C.

*2. Iraqi Law Does Not Apply*

Plaintiffs next argue that if D.C. law does not apply, Iraq is the most appropriate jurisdiction to supply the substantive law for their IIED claim. This Court disagrees. For personal injury actions, the law of the "state where the injury occurred" should govern unless another state has a "more significant relationship" to the dispute. Restatement (Second) of Conflict of Laws § 146; *Henkin*, 2021 WL 2914036, at *6. In cases brought under the terrorism exception to the FSIA, the plaintiffs' domicile often has a more significant relationship to the dispute than the law of the place of the conduct giving rise to the injury. *See Dammarell*, 2005 WL 756090 at *20 n.17 (citing Restatement (Third) of Foreign Relations Law § 402(3) cmt. g. (1987)). Accordingly, in actions seeking compensation for injuries caused by terrorist attacks abroad, "courts in this District frequently apply the law of the plaintiffs' domicile to non-U.S. national family members' claims." Order, *Farhat v. Islamic Republic of Iran*, No. 19-cv-3631 (RCL), ECF No. 25, at 2 (citing *Borochov v. Islamic Republic of Iran*, No. 19-cv-2855 (TNM), 2022 WL 656168, at *12–15 (D.D.C. Mar. 4, 2022); *Henkin*, 2021 WL 2914036, at *5–13; *Est. of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 684 F. Supp. 2d 34, 39–42 (D.D.C. 2010)). While Iraq has some relevant relationship to the case, as the location where the U.S. contractors were attacked, its relationship cannot be said to be *more* significant than that of the Family Member Plaintiffs' domicile countries, where they reside and where their injuries were felt. Consequently, Maryland, South Africa, and the United Kingdom supply the applicable law as plaintiffs' domicile countries.

Thus, under D.C. choice-of-law analysis, the Court concludes that the laws of Maryland, South Africa, and the United Kingdom apply to the Family Member Plaintiffs' IIED claim.

**B. Iran is Liable to the Family Member Plaintiffs Under Maryland and South African Law but Not Liable Under English Law**

Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source[.]" Fed. R. Civ. P. 44.1. In practice, "written or oral expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is proved." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984). "The court, however, need not uncritically accept such expert testimony and may 'engage in its own research . . . [or] reexamine and amplify material that has been presented by counsel in partisan fashion.'" *Est. of Botvin*, 772 F. Supp. 2d at 228 (quoting Fed. R. Civ. P. 44.1 advisory committee note).

After reviewing the supporting documentation plaintiffs provided, the Court concludes that plaintiffs have satisfactorily demonstrated that Iran may be held liable to plaintiffs for their injuries as alleged in Count XIV of the Complaint under Maryland and South African law but not under English law. The Court will discuss each of its conclusions in turn.

*1. Liability Under Maryland Law*

Maryland's IIED law mirrors the Restatement (Second) of Torts § 46 (1965). *See* Pls.' Resp. at 2–3. Accordingly, an IIED claim under Maryland law contains the following four elements: "[(1) the defendant's] conduct was intentional or reckless; [(2)] the conduct was extreme and outrageous; [(3)] a causal connection between the wrongful conduct and the emotional distress; and [(4)] the emotional distress was severe.'" *Burgess v. Goldstein*, 997 F.3d 541, 554 n.5 (4th Cir. 2021) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

"To state a claim, plaintiff must allege the defendant 'desire[d] to inflict severe emotional distress,' knew that 'such distress [was] certain, or substantially certain, to result from [its] conduct,' or 'act[ed] recklessly in deliberate disregard of a high degree of probability that the emotional distress [would] follow.'" *Morrison v. City of Cumberland*, No. 21-cv-1987 (DLB),

11

2022 WL 1663747, at *9 (D. Md. May 25, 2022) (quoting *Haines v. Vogel*, 249 A.3d 151, 163 (Md. Ct. Spec. App. 2021)). "For conduct to meet the test of 'outrageousness,' it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992) (quoting *Harris*, 380 A.2d at 614). "Severe emotional distress is defined as 'a severely disabling emotional response to the defendant's conduct.'" *See Gandy v. Howard Cnty. Bd. of Educ.*, No. 20-cv-3436 (GLR), 2021 WL 3911892, at *9 (D. Md. Sept. 1, 2021) (citing *Harris*, 380 A.2d at 616). Maryland's highest court has "cautioned that liability for the tort of IIED should be imposed sparingly and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" *Haines*, 249 A.3d at 163 (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1065 (Md. 1986)).

Ms. Khasanzod may recover damages under this standard. Iran's material support to proxies was a voluntary act as part of a deliberate strategy to cause harm. *See Roberts*, 581 F. Supp. 3d at 159–61. The conduct was extreme and outrageous because "[a]ll acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience[.]" *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). There is a causal connection between the material support—the EFP attacks that Iran facilitated—and the shock Ms. Khasanzod alleges she experienced due to the injuries her husband sustained. *Roberts*, 581 F. Supp. 3d at 166; Compl. ¶¶ 17, 278. Finally, Ms. Khasanzod alleges serious mental harm in the form of "severe mental anguish and harm." *See, e.g.*, Compl. at ¶¶ 216, 278. Thus, Ms. Khasanzod has sufficiently established that Iran may be held liable for her injuries under Maryland law for IIED.

*2. Liability Under South African Law*

To demonstrate their entitlement to recovery under South African law, plaintiffs submitted a memorandum from Tzvi Brivik, a personal injury attorney in South Africa with over twenty years of experience. *See* Brivik Mem., Ex. 2 to Renewed Mot. for Default J., ECF No. 35-3; Renewed Mem. at 8. According to Mr. Brivik, South African law recognizes "an action in delict for damages caused by intentional or negligent infliction of emotional shock[.]" Brivik Mem. ¶ 15. "Emotional shock" is defined as "shock suffered by a person without necessarily sustaining bodily injury, caused when a third party observes or is mortified by an unpleasant or disturbing event, e.g. the killing of a relative or a person with whom the third party had a close emotional relationship." *Id.* ¶ 4. The victim's "emotional shock" must generate a lasting "unpleasant mental condition such as fear, anxiety or grief[,]" not merely transient feelings of fright. *Id.* ¶ 5. It is "only in instances of more serious adverse physical or mental sequelae that a prejudiced person will be entitled to damages in respect of emotional shock[.]" *Id.* ¶ 7.

Mr. Brivik describes the elements of emotional shock under South African law as the following: (1) a voluntary act causing emotional shock; (2) factual and legal nexus between the voluntary act and the harm; (3) wrongfulness, that is, conduct causing "relatively ser[i]ous physical or mental harm"; (4) fault; and (5) damage, specifically "personality infringement, pain and suffering, [or] patrimonial loss," though there is no physical-injury requirement. *Id.* ¶ 11.

The South African Family Member Plaintiffs may recover damages under this standard. Iran provided voluntary support to proxy militias that was intended to, and did, cause serious mental and physical harm. *See Roberts*, 581 F. Supp. 3d at 159–61. There is a causal link between the Iran-supported EFP attacks injuring their close family members and the "severe mental anguish and harm" the South African Family Member Plaintiffs allege they experienced as a result. *See id.*

13

at 163–67; Compl. ¶¶ 4–5, 23–63, 278. Additionally, the Court previously determined Iran to be at fault for the attacks. *See Roberts*, 581 F. Supp. 3d at 163–67. Thus, the South African Family Member Plaintiffs have sufficiently established that Iran may be held liable for their injuries under South Africa's law for the intentional infliction of emotion shock.

### 3. Liability Under English Law

Finally, to demonstrate their entitlement to recovery under English law, plaintiffs submitted an expert report from Mr. Charles Bagot, a member of the King's Counsel who has practiced as an English barrister for nearly twenty-five years. Bagot Rep., Ex. 3 to Renewed Mot. for Default J., ECF No. 35-4, ¶ A. While Mr. Bagot offered a potential avenue for plaintiffs to recover under English law, the Court concludes that the highly speculative nature of the remedy is insufficient to establish that the English Family Members Plaintiffs may hold Iran liable for their injuries under English law.

Mr. Bagot first determined that English common law does not provide a viable avenue for the English Family Members Plaintiffs' claim. Specifically, Mr. Bagot opined that, although English common law provides a cause of action for "secondary victims who sustain psychiatric injury as a result of witnessing death or injury to another, or perceive the risk of death or injury to another," "[t]he claimant must be in close proximity in space and time to the incident or its immediate aftermath." *Id.* ¶ 25. In his opinion, "[i]t would be necessary for a Court to waive the physical proximity (presence) requirement" in order for plaintiffs to recover under English common law. *Id.* ¶ 28. Because of this obstacle, and because "[t]here is no realistic prospect of the law changing," he concluded that "Plaintiffs would be unable to satisfy the strict control mechanisms to establish secondary victim claims." *Id.* ¶ 33. Mr. Bagot similarly concluded that

neither other areas of English common law nor the English Human Rights Act of 1988 would apply to the English Family Member Plaintiffs' claim. *Id.* ¶¶ 67–69.

Considering the foregoing, Mr. Bagot determined that, "[i]n [his] view, the Victims of Overseas Terrorism Compensation Scheme 2012 ("VOTCS") is the only realistic analogy to IIED claims in English Law which provides the *potential* for recovery." *Id.* ¶ 35 (emphasis added). As Mr. Bagot describes, the VOTCS is a statutory vehicle, approved by the legislature and administered by an executive agency, *id.* ¶¶ 35, 37, that is "a publicly financed fund of last resort for those who cannot recover damages or compensation via any other route, such as a claim in the civil Courts against the perpetrator."[3] *Id.* ¶ 36.

After review of Mr. Bagot's report, as well as the Court's own inquiry, the Court disagrees with Mr. Bagot and does not interpret the VOTCS as providing an avenue for the English Family Member Plaintiffs' recovery for a least four reasons.

First, it does not appear that the attack for which the English Family Member Plaintiffs claim damages, the March 16, 2010 EFP attack in Iraq, is eligible for compensation under the VOTCS. The VOTCS "sets out a list of designated terrorist acts for which claims can be made[.]" *Id.* ¶ 39. The current list of designated attacks occurred between January 2013 and April 2023. *Compensation for Victims of Terrorist Attacks Abroad*, Gov.Uk, https://www.gov.uk/compensation-victim-terrorist-attack [https://perma.cc/A52M-8ZBJ]. The

---

[3] The VOTCS resembles the United States Victims of State Sponsored Terrorism Fund ("USVSST Fund") with one important difference: the USVSST Fund requires that individuals claiming injuries from international terrorist attacks secure judgments against the foreign state sponsor prior to submitting their claim, while it does not appear that the VOTCS contains this requirement. *Compare United States Victims of State Sponsored Terrorism Fund*, U.S. Dep't of Just., https://www.justice.gov/criminal-mlars/usvsst [https://perma.cc/PB8L-NMV6] ("The USVSST Fund provides compensation to eligible claimants who hold judgments against state sponsors of terrorism") *with Victims of Overseas Terrorism Compensation Scheme: A Guide*, Gov.Uk, https://www.gov.uk/guidance/victims-of-overseas-terrorism-compensation-scheme-a-guide#eligibility [https://perma.cc/J56F-Q9GG] ("VOTCS Guidance") ("The [VOTCS] is intended to be one of last resort. Where the opportunity exists for you to pursue compensation in the United Kingdom or elsewhere you should do so.").

15

main page of the VOTCS website states: "You may be able to claim for other attacks." *Id.* However, the accompanying guidance explains that the VOTCS "is a government funded scheme designed to compensate victims who sustain a relevant injury which is directly attributable to their being a direct victim of a *designated act* of terrorism overseas." *Victims of Overseas Terrorism Compensation Scheme: A Guide*, Gov.Uk, https://www.gov.uk/guidance/victims-of-overseas-terrorism-compensation-scheme-a-guide#eligibility [https://perma.cc/J56F-Q9GG] ("VOTCS Guidance") (emphasis added). The guidance does not explain how to submit a claim for a non-designated attack.

The Court is not persuaded by Mr. Bagot's justification for how a victim of a non-designated attack may nevertheless recover under the VOTCS. Mr. Bagot infers that claims may arise under the VOTCS related to non-designated attacks occurring as early as January 18, 2010. Bagot Rep. ¶ 46. This date comes from a reading of the statutory process for designation of a terrorist attack covered under the VOTCS. Specifically, he notes that the Foreign and Development Secretary "may" determine whether a particular attack will be designated. *Id.* ¶ 39. Among the eligibility criteria for designated attacks are the requirements that the attack "took place outside the United Kingdom" "on or after 18 January 2010" and in the Secretary's view "the [attack] constitutes terrorism within the meaning of the Terrorism Act 2000[.]" *Id.* ¶ 44; Crime and Security Act 2010, c. 17, § 47(2)(a)–(c) (Eng.). However, it is not clear how the statutory criteria for *designated* attacks bears on victims' eligibility for compensation for *non-designated* attacks forming the basis of a claimant's application. Absent language explaining how claims for non-designated attacks are to be evaluated, the Court cannot infer that claimants of designated and non-designated attacks are equally eligible for compensation under the VOTCS.

More broadly, that the English legislature chose to provide compensation to certain victims of terrorist attacks—that is, those who were victims of designated attacks—but not others is an entirely appropriate, nonjusticiable policy exercise that unfortunately results in some victims going uncompensated. *See Steinberg v. Republic of Sudan*, Case No. 20-cv-2996 (RCL), 2023 WL 2682369, at *7 (D.D.C. Mar. 29, 2023) ("'Defining the class of persons' who may are eligible for compensation—'much like classifying [all] government beneficiaries—inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'") (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993) (internal citation and quotation marks omitted)).

Second, the VOTCS contains a space and time proximity requirement similar to the secondary victim requirements under English common law, indicating that the English Family Member Plaintiffs' claim under the VOTCS would fail for the same reason that Mr. Bagot concluded that the English common law was not a viable avenue for recovery. Even Mr. Bagot concedes that this requirement is the English Family Member Plaintiffs' "biggest difficulty in establishing any entitlement to redress[.]" Bagot Rep. ¶ 50.

The VOTCS provides that indirect victims may be eligible for compensation "if [they] were present at and witnessed the immediate aftermath of a designated act in which a loved one was injured." *See* VOTCS Guidance. The VOTCS further explains: "When we say 'immediate' we are normally referring to the period of time immediately following the designated act in which a loved one was injured and not where someone is later told about the act either by the victim or another person." *Id.*

Despite the fact that this language "strongly resonates with the secondary victim case law" that would deny the English Family Member Plaintiffs an opportunity for recovery, Mr. Bagot suggests that the Court look beyond this language. *Id.* ¶ 56. He cites an English Court of Appeal case for the proposition that the VOTCS's time and space requirement is more flexible than the traditional secondary victim standard in English law. *See id.* ¶¶ 53, 56 (quoting RS v. Criminal Injuries Compensation Authority [2013] EWCA Civ 1040 [19], [2014] 1 WLR 1313 (Eng.), stating that "some caution needs to be exercised in drawing assistance from the common law cases in tort in relation to the immediate aftermath. It is important that the decision maker should not be distracted from applying the ordinary meaning of the scheme's words."). However, that case concerned an earlier version of the VOTCS, so it is unclear what relevance it has to the current scheme. *Id.* ¶ 53. But more importantly, the next sentence in that opinion cuts squarely against an expansive reading of the time and space requirement: "[W]hile I accept that immediate aftermath *may* allow a degree of temporal and spatial flexibility, the focus of the provision is upon the secondary victim's exposure to the overt consequences of the [ ] event, and in the nature of things these *are likely to follow the event more or less immediately*." *Id.* (emphases added). Mr. Bagot claims that another scholar considered that earlier versions of the VOTCS "were more restrictive than the 2012 scheme as concerns the interpretation of 'immediate aftermath.'" *Id.* ¶ 51 (internal citation omitted). But this unsubstantiated opinion of another scholar, viewed in conjunction with the text of the *RS* case as well as the body of English common law, is insufficient to support Mr. Bagot's assertion that English courts view the secondary victim time and space requirement differently under the VOTCS than they do under the common law.

Mr. Bagot's alternative argument is that the VOTCS's "use of the word 'normally' in relation to the interpretation of the words 'immediate aftermath' implies the existence of a

18

discretion" within the VOTCS to consider claims for injuries to secondary victims occurring outside of a strict temporal and special relationship to the attack. *Id.* ¶ 57. The Court is skeptical of reading so much into a single word of the VOTCS's detailed guidance. But even assuming Mr. Bagot's implication is true, just because the VOTCS hypothetically *could* consider the claim does not inform this Court whether the VOTCS *would* consider the claim. And Mr. Bagot does not provide any evidence or examples that the implementing agency has, in fact, exercised its discretion to award damages for injuries occurring outside of a narrow space and time window.

Third, Mr. Bagot examined several legislative proposals for changes to the VOTCS—not yet enacted—and observed that "[t]he direction of travel is clearly towards a more victim orientated, flexible and generous approach. This would fit with using the discretion available in a way which operated to include, rather than exclude, Claimants seen as deserving, particularly those impacted by terrorist attacks." *Id.* ¶¶ 64; 58–63. Thus, he concluded that "a properly purposive reading of the scheme and relevant guidance" would provide "a realistic avenue of recovery for the English Plaintiffs[.]" *Id.* ¶ 65. However, these assertions, like Mr. Bagot's previous attempts, do not explain how the agency administering the VOTCS would actually consider the English Family Member Plaintiffs' claim. If anything, the fact that the proposals he cites have not yet been enacted strengthens the conclusion that relief is unavailable under *current* English law.

Fourth and finally, the VOTCS contains a critical requirement overlooked by Mr. Bagot: "evidence that the Plaintiffs have suffered from a recognised psychiatric injury, as mental anguish or distress would not be sufficient." *Id.* ¶ 42. The VOTCS guidance states that a claimant must "present medical evidence from a psychiatrist or a clinical psychologist confirming that this is the case." *See* VOTCS Guidance. This suggests that the VOTCS follows a stricter interpretation of

19

injury than the traditional IIED framework, again cutting against the notion that the VOTCS provides a realistic avenue of recovery for the English Family Member Plaintiffs.[4]

* * *

Plaintiffs bear the burden of "establish[ing] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Jerez*, 775 F.3d at 423. Here, the Family Member Plaintiffs established that Iran can be held liable both for IIED under Maryland law and for intentional infliction of emotional shock under South African law. *See* Part III.B.1–2. However, the English Family Member Plaintiffs have not satisfactorily established that Iran can be held liable under the English VOTCS or secondary victim law. *See* Part III.B.3. In the absence of evidence sufficiently demonstrating Iran's liability under English law for the March 16, 2010 EFP attack perpetrated by proxy militias, the Court declines to hold Iran liable for the emotional injuries of the English Family Member Plaintiffs alleged in connection with that attack.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** plaintiffs' Motion to Amend/Correct and **GRANT** in part and **DENY** in part plaintiffs' Renewed Motion for Default Judgment. A separate order shall issue.

Date: July 5, 2023

Royce C. Lamberth
United States District Judge

---

[4] What is more, it is not clear that the English Family Member Plaintiffs would meet this requirement. In the Complaint, plaintiffs alleged "severe emotional distress," Compl. ¶ 378, not any recognized or diagnosed psychiatric injuries.